1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Poder in Action, et al.,                     No. CV-20-01429-PHX-DWL

10             Plaintiffs,                      **ORDER**

11  v.

12  City of Phoenix, et al.,

13             Defendant.

14

15                          **INTRODUCTION**

16      In March 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES

17  Act") came into effect.  Among other things, it allocated $150 billion to state, local, and

18  tribal governments to assist those entities in covering "necessary expenditures incurred due

19  to the public health emergency" arising from the COVID-19 pandemic.  *See* 42 U.S.C.

20  § 801(d).  This $150 billion allocation is known as the Coronavirus Relief Fund ("CRF").

21      The City of Phoenix received $293 million of CRF funds and chose to use about

22  10% of that money, $25.7 million, to create the COVID-19 Emergency Utility Rent and

23  Mortgage Assistance Program ("the Program").  The purpose of the Program is "to assist

24  Phoenix residents affected by the COVID-19 emergency . . . by providing aid to eligible

25  Phoenix residents for utility bills (water, electric and/or gas), mortgage and rental

26  obligations."  (Doc. 24-1 at 2.)

27      When formulating the Program's eligibility criteria, the City consulted the Personal

28  Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), a federal statute

enacted in 1996.  Under PRWORA, "an alien who is not a qualified alien" is ineligible to receive any "federal public benefit" unless certain exceptions apply.  *See* 8 U.S.C. § 1611(a).  The City concluded that the distribution of CRF funds via the Program constitutes a "federal public benefit" and further concluded that none of PRWORA's exceptions were applicable.  Thus, the City concluded that it was required, as a matter of federal law, to require applicants to the Program to "provide proof of qualified legal status in the U.S." (Doc. 24-1 at 19.)  As a practical matter, this excluded many Phoenix residents.

Now pending before the Court is a motion for a preliminary injunction by Plaintiffs Poder In Action ("Poder"), the Arizona Dream Act Coalition ("ADAC"), and Aurora Galan Mejia (collectively, "Plaintiffs").  In a nutshell, Plaintiffs argue that the City isn't required by federal law to impose any immigration-related eligibility restrictions under the Program and that the City is affirmatively violating federal law by doing so.  (Doc. 14.)

For the following reasons, the motion will be denied.  First, Plaintiffs have not established a likelihood of success on the merits of their challenge to the Program.  Instead, Plaintiffs have made a lesser showing—that there are "serious questions going to the merits" of their challenge.  This is because the parties' competing interpretations of PRWORA are both plausible.  Although Plaintiffs raise a serious argument that the Program falls within PRWORA's exception authorizing the allocation of "[s]hort-term, non-cash, in-kind emergency disaster relief" without regard to the recipient's immigration status, the City's counter-arguments concerning the inapplicability of this exception have some force.  This is a close question not directly addressed by any existing precedent.

Second, Plaintiffs have not established a likelihood (as opposed to a possibility) of irreparable harm in the absence of a preliminary injunction.  Although there is intuitive appeal to the notion that withholding emergency housing assistance during a crisis will result in irreparable harm to those being deprived of the assistance, the sole individual plaintiff in this case has not demonstrated that she faces an imminent risk of eviction.  In fact, her declaration suggests she has not missed any mortgage payments and simply wishes to avoid falling behind in the future.  Ninth Circuit law suggests that, in the housing context,

a more acute risk of eviction is necessary to warrant preliminary injunctive relief.  Such a showing is particularly necessary here because the City has agreed to accelerate the ultimate resolution of Plaintiffs' constitutional challenge to the Program, which the Court plans to do in the coming weeks.  As for the entity plaintiffs' assertion that some of their members and constituents face eviction in the absence of a preliminary injunction, those assertions lack foundation and are undermined, at least in part, by the fact that Arizona's Governor has issued a pair of executive orders delaying evictions during the pandemic. Although Plaintiffs dispute the extent to which those executive orders truly protect them, the orders still undercut the strength of Plaintiffs' showing as to irreparable harm.

Third, Ninth Circuit law provides that when (as here) a plaintiff has failed to demonstrate a likelihood of success on the merits, preliminary injunctive relief is available only if the plaintiff makes a particularly strong showing as to the balance-of-hardships factor.  Plaintiffs have failed to do so here.  This case, somewhat uniquely, involves a finite pool of resources that the City is seeking to distribute to Phoenix residents suffering from financial dislocation during the pandemic.  If Plaintiffs were awarded benefits via a preliminary injunction, only for the City to ultimately prevail on the merits, this would diminish the funds available to others.  In any event, Plaintiffs have not established any risk that the available funds will be depleted before an accelerated merits hearing.

For these reasons, Plaintiffs' motion will be denied.  This outcome should not, to be clear, be interpreted as a sign that Plaintiffs' challenge to the Program will ultimately fail. Instead, it is compelled by the exacting standards applicable when assessing a request for a preliminary injunction, which "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted).

…

…

…

…

# BACKGROUND

## I.   Factual Background

Poder and ADAC are nonprofit organizations that advocate on behalf of, and whose members include, immigrants and their families in Phoenix.  (Doc. 24 ¶¶ 12-13.)  Ms. Galan Mejia is a Phoenix resident and a Deferred Action for Childhood Arrivals ("DACA") recipient.  (*Id*. ¶ 14.)

On March 11, 2020, Arizona Governor Douglas A. Ducey declared a public health emergency in response to the COVID-19 pandemic.  (Doc. 36-1 at 2.)

On March 24, 2020, Governor Ducey issued an executive order entitled "Postponement of Eviction Actions."  (Doc. 36-2.)  Subject to certain exceptions, it ordered law enforcement officers to "temporarily delay enforcement of eviction action orders for residential premises" when various "circumstances exist and are documented to the landlord or property owner."  (*Id.* at 3.)  One such circumstance was that "[t]he individual suffered a substantial loss of income resulting from COVID-19."  (*Id.*)  The order clarified, however, that "[n]o provision of this Executive Order shall be construed as relieving any individual of the obligation to pay rent."  (*Id.* at 4.)  Finally, the order specified that it would "remain in effect for 120 days"—that is, until July 22, 2020.  (*Id.*)

On March 27, 2020, President Trump signed the CARES Act into law.  Pursuant to a population-based formula, the CARES Act allocated $293 million to the City to help cover expenses related to the pandemic.  (Doc. 24 ¶ 3.)

On May 20, 2020, the City passed an ordinance setting aside $25.7 million of the CRF funds to create the Program.  (*Id*. ¶ 19.)  The City thereafter signed a contract with a nonprofit organization, the Arizona Community Action Association (known as "Wildfire"), to administer the Program.  (*Id*. ¶¶ 19-20.)  The contract provides that the "purpose" of the Program is to "creat[e] a temporary program to assist Phoenix residents affected by the COVID-19 emergency . . . by providing aid to eligible Phoenix residents for utility bills (water, electric and/or gas), mortgage and rental obligations."  (Doc. 24-1 at 2.)  The contract further provides that the Program "will remain in effect until December

30, 2020 or the funds are depleted." (*Id.*)  The contract explains that "[f]unding will consist of one-time Coronavirus Relief Fund monies" (*id.* at 13) and specifies that, because "federal CRF grant funds" are at issue, "Wildfire agrees to comply with guidelines for applicable federal funding sources as identified herein . . . ." (*Id.* at 6.)  Finally, as for the payment mechanism, the contract explains that participating agencies will "issue payment to local utility service providers and/or landlords or mortgage companies on behalf of the eligible client." (*Id.* at 15 [section 6.1.19].)

The contract identifies four eligibility requirements that applicants to the Program must establish (and Wildfire must verify): (1) "COVID-19 Job/Wage Instability," which can be demonstrated through proof of unemployment/termination, reduced hours or wages, increased day care costs, or other "reduction in income . . . not tied to a formal employment structure" (*id.* at 20); (2) residency within the City, which can be demonstrated through identification documents, utility bills, and other sources (*id.* at 21); (3) identity verification, which can be established through similar documents (*id.* at 22); and (4) "verification of lawful presence in the United States" (*id.* at 23, capitalization omitted).  During oral argument, the City explained that the final requirement was included solely due to the City's determination that it was required by PRWORA.

On July 16, 2020, Governor Ducey signed an executive order entitled "Continued Postponement of Eviction Enforcement Actions."  (Doc. 36-1.)  It largely mirrored the earlier order but added a new requirement—"After August 21, 2020, a tenant, lessee or resident is entitled to the delay in the enforcement of a writ of restitution for residential premises . . . provided they demonstrate . . . [t]hey have provided the landlord or property owner a copy . . . of proof of submission of their completed pending application for rental assistance through a state, city, county or nonprofit program."  (*Id.* at 4.)  This order specified that it would "take effect on July 23, 2020"—that is, the day after the previous order expired—"and shall expire on October 31, 2020."  (*Id.* at 5.)

Finally, utility companies in the Phoenix area have "halted disconnections and late payments because of the pandemic."  (Doc. 27 at 14 & n.5.)

- 5 -

II.   Procedural History

On July 20, 2020, Plaintiffs initiated this action by filing a complaint.  (Doc. 1.)  The complaint alleges that the Program's eligibility restrictions violate (1) the Supremacy Clause of the U.S. Constitution and (2) the Fair Housing Act ("FHA").  (Doc. 1 ¶¶ 48-69.)

On July 24, 2020, Plaintiffs filed a motion for class certification.  (Doc. 7.)  That same day, Plaintiffs filed a motion for a preliminary injunction and an accompanying memorandum.   (Docs. 14, 15.)   Those materials clarify that Plaintiffs are seeking preliminary injunctive relief based solely on their Supremacy Clause claim.  (*Id.*)

On July 27, 2020, Plaintiffs filed a motion for expedited consideration.  (Doc. 19.)

On July 28, 2020, the Court granted the motion to expedite in part.  (Doc. 21.)  The Court stayed all briefing as to class certification and set an expedited briefing and hearing schedule concerning the preliminary injunction request.  (*Id.*)

On August 5, 2020, Plaintiffs filed a first amended complaint ("FAC").  (Doc. 24.)  It asserts the same two claims as the original complaint.  (*Id.*)

On August 7, 2020, the City filed an opposition to the preliminary injunction request.  (Doc. 27.)

On August 12, 2020, Plaintiffs filed a reply.  (Doc. 32.)

On August 14, 2020, the Court held oral argument.  (Doc. 35.)  At the conclusion of the hearing, the Court ordered the parties to file supplemental briefing concerning Governor Ducey's executive orders.  (*Id.*)

On August 18, 2020, the parties filed their supplemental briefing.  (Docs. 36, 37.)

**DISCUSSION**

I.   Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez,* 680 F.3d at 1072 (quotation omitted).  *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  A plaintiff seeking a preliminary injunction must show that (1) it

is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

However, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quotation and emphasis omitted).  Under this serious-questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.  Regardless of which standard applies, the movant "carries the burden of proof on each element of the test."  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Finally, "[w]hen the government is a party, the[] last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The parties dispute whether the injunction sought by Plaintiffs is mandatory or prohibitory.  "A mandatory injunction orders a responsible party to take action," while "[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (internal quotations and alteration omitted).  "[M]andatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."  *Id*. at 879 (quotation omitted).

The Ninth Circuit has held that an injunction that "prevents future constitutional violations . . . [is] a classic form of prohibitory injunction."  *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).  Here, Plaintiffs argue that the City's actions violate the Supremacy Clause and that a preliminary injunction would merely prevent future constitutional violations.  Moreover, the relief sought by Plaintiffs is not that the City be affirmatively ordered to provide CRF funds to individuals who, but for their immigration

1   status, would be eligible to participate in the Program.  Instead, it is that the City be

2   enjoined from denying funds based on immigration status.  Although this is a fine (and

3   possibly illusory) distinction, the Ninth Circuit has seemed to accept it in other cases.  *Ariz.*

4   *Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (concluding an

5   injunction was prohibitory where plaintiffs sought to enjoin a state policy denying driver's

6   licenses to DACA recipients but did not "order" defendants to provide driver's licenses).

7   Thus, the Court concludes the injunction sought in this case is prohibitory.[1]

8   II.    Likelihood Of Success On The Merits

9          Plaintiffs challenge the City's decision to include immigration-based eligibility

10  restrictions in the Program.  (Doc. 15 at 4-9, 12-13.)  First, Plaintiffs argue that the CARES

11  Act should be interpreted as expressing Congress's intention not to place any immigration-

12  related restrictions on who may receive CRF funds.  (*Id.* at 4-5.)  Second, Plaintiffs argue

13  that CRF funds are not a "federal public benefit" within the meaning of PRWORA or, at a

14  minimum, fall within one of PRWORA's exceptions.  (*Id.* at 5-9.)  Thus, Plaintiffs argue

15  that the City's decision to restrict certain aliens from participating in the Program runs

16  counter to the intent of Congress, is preempted by federal law, and violates the Supremacy

17  Clause.  (*Id.* at 12-13.)

18         The City responds that the text and structure of the CARES Act do not suggest that

19  Congress intended for unqualified aliens to receive CRF funds.  (Doc. 27 at 6-8.)  To the

20  contrary, the City argues that it was unnecessary for Congress to say anything on this topic

21  because it was legislating against the backdrop of PRWORA, which has long precluded

22  unqualified aliens from receiving any "federal public benefit."  (*Id.* at 7.)  The City further

23  argues that the Program qualifies as a "federal public benefit," that none of PRWORA's

24  exceptions are applicable, and that it was therefore compelled by federal law to include

25  _____

26  [1]    The Ninth Circuit has questioned the utility of the mandatory/prohibitory
    distinction.  *Hernandez*, 872 F.3d at 997-98.  Other circuits have rejected it.  *See, e.g.,*
27  *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006)
    ("Preliminary relief is properly sought only to avert irreparable harm to the moving party.
28  Whether and in what sense the grant of relief would change or preserve some previous state
    of affairs is neither here nor there.  To worry these questions is merely to fuzz up the legal
    standard.") (citations omitted).

immigration status in the Program's eligibility criteria.  (*Id.* at 8-11.)

### A.    **CARES Act**

Section 5001 of the CARES Act "appropriated for making payments to States, Tribal governments, and units of local government under this section, $150,000,000,000 for fiscal year 2020."  *See* 42 U.S.C. § 801(a)(1).  The purpose of this allocation, dubbed the CRF, was to assist those entities in accounting for "necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) . . . [that] were not accounted for in the budget most recently approved as of the date of enactment of this section for the State or government."  *Id.* § 801(d).

Plaintiffs argue that, because Congress included an immigration-related eligibility restriction in a different part of the CARES Act,[2] its failure to do so in Section 5001 is evidence that it did not wish to place any limits on who may receive CRF funds.  (Doc. 15 at 4-5; Doc. 32 at 3.)  Although this argument has surface appeal—a venerable rule of statutory construction is that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted)—it overlooks that the CARES Act was enacted against the backdrop of PRWORA, a statute that has, for nearly a quarter-century, placed an immigration-related limitation on who may receive any "federal public benefit."  *See* 8 U.S.C. § 1611(a).  Notably, PRWORA also provides that this limitation applies "[n]otwithstanding any other provision of law," *id.*, which is a term of art that "broadly sweep[s] aside potentially conflicting laws," *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).  Thus, if CRF funds constitute a "federal public benefit," it would have been unnecessary for Congress to specify in Section 5001 that only qualified aliens may receive CRF funds—such a specification would have been superfluous.[3]

---

[2]    Specifically, Section 2201 of the CARES Act excluded "nonresident alien individuals" from receiving a $1,200 tax credit provided to other eligible taxpayers.  *See* Pub. L. No. 116-36, 134 Stat. 281, 335.

[3]    In contrast, because the tax credit created in Section 2201 doesn't appear to qualify as a "federal public benefit" under PRWORA, it follows that Congress needed to specify,

At bottom, then, Plaintiffs' argument is that the CARES Act should be construed as implicitly overruling whatever restrictions on the receipt of CRF funds might otherwise arise from PRWORA.  The difficulty with this argument is that the Ninth Circuit applies "extremely strict standards for finding an implied repeal," because "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest."  *Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1069 (9th Cir. 2010) (citation and internal quotation marks omitted).  Section 5001 cannot be said to evince a "clear and manifest" intention to override PRWORA.  Its silence as to who may receive CRF funds, although perhaps creating some ambiguity, can easily be viewed as acquiescence to PRWORA's longstanding limitations.  A finding of implicit repeal would be inappropriate in these circumstances.  *Cf. Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication . . . depends on context.  We have long held that the *expressio unius* canon does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it, and that the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion. . . .  [T]he background presumptions governing [the subject at issue] are a highly relevant contextual feature.").

Plaintiffs also point to a pair of recent decisions in which district courts enjoined the Department of Education from applying an immigration-related eligibility restriction when disbursing yet another type of benefit created by the CARES Act—higher education emergency relief funds ("HEERF").  *Oakley v. Devos*, 2020 WL 3268661 (N.D. Cal. 2020); *Noerand v. DeVos*, 2020 WL 4274559 (D. Mass. 2020).  Those cases are distinguishable, however, because the portion of the CARES Act establishing the HEERF program, Section 18004, requires schools to "use no less than 50 percent of such funds to provide emergency financial aid grants *to students* for expenses related to the disruption of campus operations due to coronavirus."  *See* Pub. L. No. 116-36, 134 Stat. 281, 568 (emphasis added).  The

---

in the text of the CARES Act, whether any immigration-related eligibility restrictions should apply to it.

relevant statutory text, in other words, specifically identifies the universe of eligible recipients ("students") and does not suggest that any students should be excluded based on their immigration status.  Section 5001 of the CARES Act does not contain this sort of textual clue—it is utterly silent as to who should receive CRF funds.[4]

The CARES Act, in sum, doesn't provide a clear expression of congressional intent concerning whether certain aliens should be excluded from receiving CRF funds.  The Court must therefore turn to PRWORA.

### B.    **PRWORA**

#### 1.    "Federal Public Benefit"

PRWORA provides that, with certain enumerated exceptions, "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit."  8 U.S.C. § 1611(a).  PRWORA defines "Federal public benefit" as:

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and
>
> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c)(1).  "[A] federally funded benefit is still considered a 'federal public benefit' even if administered by a state or local agency."  *Pimental v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012).

Plaintiffs argue that, "under longstanding federal agency interpretation," CRF funds "are not a federal public benefit under PRWORA."  (Doc. 15 at 6.)  In support of this claim, Plaintiffs rely on a 1998 interpretation of PRWORA by the Department of Health and Human Services ("HHS"), which they argue is entitled to deference under *Chevron, U.S.A.,*

---

[4]    Additionally, it is not certain that *Oakley* and *Noerand* were correctly decided.  *See Washington v. DeVos*, 2020 WL 4275041, *6 (E.D. Wash. 2020) (concluding that Section 18004 did not implicitly overrule PRWORA because the "statutory language discrepancies" in various sections of the CARES Act concerning recipient eligibility "are more likely attributable to inartful drafting under the constraints of a global pandemic rather than any clearly expressed intent to override a longstanding provision of federal law with an overarching 'notwithstanding' clause").

*Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  (Doc. 32 at 5).  Among other things, the HHS interpretation provides that "in order for a program to be determined to provide benefits to 'eligibility units' *the authorizing statute* must be interpreted to mandate ineligibility for individuals, households, or families that do not meet certain criteria, such as a specified income level or a specified age."  *Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"*, 63 Fed. Reg. 41658-01, 41659 (Aug. 4, 1998) (emphasis added).  Plaintiffs' argument is that because Section 5001 of the CARES Act—the authorizing statute—does not mandate ineligibility based on specified criteria, it cannot be said to provide a federal public benefit.  (Doc. 15 at 7.)

This argument is unavailing.  Although Plaintiffs assert in conclusory fashion that HHS's interpretation of PRWORA is entitled to *Chevron* deference, they fail to develop this argument in any depth.  Plaintiffs do not, for example, present any argument concerning the "threshold 'step zero' inquiry" of "whether the *Chevron* framework governs at all," which requires the Court to "ask whether it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and whether the agency interpretation claiming deference was promulgated in the exercise of that authority."  *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) (internal quotations and brackets omitted).

Nor does it appear that Plaintiffs could make such a showing.  Although PRWORA authorized a variety of different agencies to promulgate regulations concerning discrete parts of the statute,[5] Plaintiffs have not identified—and the Court is not aware of—any

---

[5]    *See, e.g.,* Pub. L. No. 104-193, 110 Stat. 2105, 2196 ("Within 3 months after the date of the enactment of this Act, the Commissioner of Social Security shall prescribe such regulations as may be necessary to implement the amendments made by this subtitle."); *id.* at 2236 ("The Secretary of Health and Human Services shall prescribe final regulations for implementation of section 454A of the Social Security Act not later than 2 years after the date of the enactment of this Act."); *id.* at 2248 ("The Secretary of each military department, and the Secretary of Transportation with respect to the Coast Guard when it is not operating as a service in the Navy, shall prescribe regulations to facilitate the granting of leave . . . ."); *id.* at 2272 ("The Attorney General, in consultation with the Secretary of Health and Human Services, shall prescribe such regulations as may be necessary to carry out subparagraph (A).").

provision specifically authorizing HHS to promulgate regulations concerning how to define the term "federal public benefit."  Indeed, HHS itself explained that it issued its 1998 interpretation in response to a request by the Department of Justice ("DOJ").  63 Fed. Reg. at 41659 (noting that, in 1997, DOJ encouraged "the Department and other Federal agencies" to "interpret the term [federal public benefit]" because those interpretations would "facilitate compliance with the verification requirement[s]").  If HHS issued the 1998 guidance document at the request of a different executive branch agency, instead of at the behest of Congress, it is difficult to see how *Chevron* could apply.  *Cf. Gonzalez v. Oregon*, 546 U.S. 243, 258 (2006) ("*Chevron* deference . . . is not accorded merely because the statute is ambiguous and an administrative official is involved.  To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official.").

Given this backdrop, the deference owed to HHS's interpretation (if any) would reach "only to the extent that the agency's reasoning is persuasive." *Sierra Club*, 929 F.3d at 692.  Here, HHS's reasoning is not persuasive.  In 1997, DOJ issued its own notice of interim guidance concerning PRWORA.  *See Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 62 Fed. Reg. 61344-02 (Nov. 17, 1997).  In 1998, DOJ followed up by issuing a proposed rule.  *See Verification for Eligibility for Public Benefits*, 63 Fed. Reg. 41662-01 (Aug. 4, 1998).  These documents, unlike the 1998 HHS document, seem to have been issued pursuant to an express delegation by Congress.  *See* 8 U.S.C. § 1642(a)(1) ("Not later than 18 months after August 22, 1996, the Attorney General of the United States, after consultation with the Secretary of Health and Human Services, shall promulgate regulations requiring verification that a person applying for a Federal public benefit (as defined in section 1611(c) of this title), to which the limitation under section 1611 of this title applies, is a qualified alien and is eligible to receive such benefit.").

In both documents, DOJ provided essentially the same three-part definition of the term "federal public benefit" under Section 1611(c)(1)(B): "[T]he benefit [1] must be one

- 13 -

of the types of benefits described [in Section 1611(c)(1)(B)], [2] it must be provided by a Federal agency or by federally appropriated funds, and [3] it must be provided to one of the enumerated categories of recipients (an individual household, or family eligibility unit)."  63 Fed. Reg. at 41664; *see also* 62 Fed. Reg. at 61361.  In the Court's view, this interpretation is more persuasive than HHS's interpretation.  Not only did HHS fail to explain why a benefit program's status should turn on whether Congress explicitly laid out the eligibility criteria in the statutory text, but HHS's approach would result in a large number of benefit programs falling outside PRWORA's reach, which would run counter to Congress's intent in enacting PRWORA.  *Cf. Pimentel*, 670 F.3d at 1099 (noting that a stated purpose of PRWORA was "to further the national immigration policy that aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and . . . [that] the availability of public benefits not constitute an incentive for immigration to the United States") (internal quotation omitted).

Under DOJ's interpretation, there is a strong argument that the Program qualifies as a "federal public benefit."  First, the type of benefit provided under the Program (emergency rent, mortgage, and utility assistance) is, at a minimum, "similar" to the housing, health, and welfare benefits that are identified in Section 1611(c)(1)(B) as illustrative examples of federal public benefits.  *Cf. Uriostegui v. Alabama Crime Victims Compensation Comm'n*, 2010 WL 11613802, *15 (N.D. Ala. 2010) ("The categories of benefits listed in § 1611(c)(1)(B) are quite broad in their variety, going well beyond basic means-tested social programs such as include welfare, food assistance, healthcare, and public housing.").  Second, it is undisputed that CRF funds disbursed via the Program constitute "appropriated funds of the United States."  Third, the Program provides benefits on a household basis and thus meets the "enumerated categories" requirement.

For these reasons, Plaintiffs have not established a likelihood of success concerning—or even serious questions going to the merits of—their argument that PRWORA is categorically inapplicable to the Program.

2.      "Short-Term, Non-Cash, In-Kind Emergency Disaster Relief"

Although PRWORA creates a general prohibition against the distribution of federal public benefits to unqualified aliens, it also creates several exceptions to this prohibition. Among other things, this prohibition "shall not apply with respect to the following Federal public benefits":

(A)   Medical assistance under title XIX of the Social Security Act (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title (other than the requirement of the receipt of aid or assistance under title IV of such Act, supplemental security income benefits under title XVI of such Act, or a State supplementary payment).

(B)   Short-term, non-cash, in-kind emergency disaster relief.

(C)   Public health assistance (not including any assistance under title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

(D)   Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

(E)   Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under title V of the Housing Act of 1949, or any assistance under section 1926c of Title 7, to the extent that the alien is receiving such a benefit on August 22, 1996.

8 U.S.C. § 1611(b)(1).

Plaintiffs argue that the exception set forth at 8 U.S.C. § 1611(b)(1)(B), for "[s]hort-term, non-cash, in-kind emergency disaster relief," is applicable here. (Doc. 15 at 8-9.) In response, the City doesn't dispute that the Program involves "short-term" "emergency

disaster relief" but argues that "[p]aying a bill on a household's behalf cannot reasonably be construed as a 'non-cash, in-kind' relief.  Rather, 'non-cash, in-kind' reliefs must be understood as providing goods and services, *e.g.,* temporary housing, emergency medical treatment, or the like, not paying people's bills."  (Doc. 27 at 8-9.)

This issue presents a close call.  As an initial matter, it seems clear that the benefits provided under the Program are "non-cash" benefits.  Money isn't disbursed directly to applicants but instead is sent to landlords, mortgage companies, and utility companies.

The more difficult question is whether this type of benefit qualifies as an "in-kind" benefit.  Black's Law Dictionary defines "in kind" as "[i]n goods or services rather than money."  Black's Law Dictionary (11th ed. 2019).  This dichotomy, unfortunately, isn't very helpful here.  It doesn't seem correct to characterize the payment of a third party's outstanding bills as a payment of "money" to the third party, because the third party isn't directly receiving anything.  That is why the "non-cash" part of Section 1611(b)(1)(B) is likely satisfied here.  But it also seems odd to characterize such a benefit as "goods or services."

The City argues that Plaintiffs' approach is flawed because it treats the "non-cash" and "in-kind" requirements of Section 1611(b)(1)(B) as fungible, which would violate the presumption against surplusage,[6] and that adopting Plaintiffs' interpretation "would create a massive expansion of PRWORA's limited exception."  (Doc. 27 at 10.)  These arguments have undeniable force.  Nevertheless, "[t]he canon against surplusage is not an absolute rule," *Marx,* 568 U.S. at 385, and there are several reasons why it may not be controlling here.

First, Section 1611(b)(1)(D) already contains an exception for "[p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) . . . which . . . deliver in-kind services at the community level, including through public or private nonprofit agencies."  Because Congress has already created, via

---

[6]    *See, e.g., Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are . . . reluctant to treat statutory terms as surplusage in any setting.") (internal brackets and quotations omitted).

Section 1611(b)(1)(D), one exception that encompasses traditional forms of emergency relief, it is logical to infer that Congress intended Section 1611(b)(1)(B) to encompass something different. The City's argument that Section 1611(b)(1)(B) must be limited to "temporary housing, emergency medical treatment, or the like" (Doc. 27 at 8-9) ignores this aspect of the statute and would arguably result in a different form of surplusage.

Second, it would arguably lead to absurd results to accept the City's position. Under the City's interpretation of Section 1611(b)(1)(B), it would be permissible for the City to wait until Phoenix residents were evicted from a building, then use CRF funds to purchase that building, and then use that building as an emergency shelter for the now-homeless residents, but it would be impermissible to use the same CRF funds to prevent the evictions from occurring in the first place. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Third, in other contexts, the receipt of housing assistance and housing subsidies is considered an "in-kind" benefit. *See*, *e.g.*, 20 C.F.R. § 416.1102 ("In-kind income is not cash, but is actually food or shelter, or something you can use to get one of these."); *Young v. Schweiker*, 680 F.2d 680, 682 (9th Cir. 1982) ("The Ninth Circuit has already approved the [HHS] Secretary's practice of attributing in-kind income to persons paying reduced rent.").

On this point, the Ninth Circuit recent decision in *City & County of San Francisco v. U.S. Citizenship & Immigration Services*, 944 F.3d 773 (9th Cir. 2019), is particularly instructive. As background, since the 1880s, "U.S. law has prohibited the admission to the United States of 'any person unable to take care of himself or herself without becoming a public charge.'" *Id.* at 779 (citation omitted). In 1999, the INS issued a guidance document explaining that although "the receipt of *cash* benefits received under a public program would be considered a factor in determining whether an alien was likely to become a public charge, . . . *non-cash* benefits would not be taken into account for public-charge purposes." *Id.* at 780. However, in 2019, the Department of Homeland Security ("DHS") issued a

new rule that "redefin[ed] the term 'public charge' to require a consideration of not only cash benefits, but also certain non-cash benefits," including "Section 8 project-based rental assistance." *Id.* (emphasis omitted).

In *City & County of San Francisco*, the Ninth Circuit addressed whether DHS's promulgation of this new rule was valid. In the course of that analysis, the court repeatedly characterized the Section 8 rental-assistance program as an "in-kind" benefit program. *See, e.g., id.* at 783, 799, 800. This nomenclature is notable because the Section 8 rental-assistance program is very similar to the Program. "Through the Section 8 program, . . . tenants make rental payments based on their income and ability to pay; the Department of Housing and Urban Development (HUD) then makes 'assistance payments' to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a 'contract rent.'" *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993). Similarly, under the Program, participating agencies "issue payment to local utility service providers and/or landlords or mortgage companies on behalf of the eligible client." (Doc. 24-1 at 15.) All of this suggests that Plaintiffs' attempt to characterize the Program as providing a "non-cash, in-kind" benefit is not beyond the pale—similar programs have been viewed by the Ninth Circuit, at least colloquially, as "in-kind" benefits.

For these reasons, the Court concludes that Plaintiffs have established serious questions as to whether the Program constitutes "[s]hort-term, non-cash, in-kind emergency disaster relief"—a characterization that would, in turn, make it permissible for the City to administer the Program without regard to the immigration status of recipients.

### 3.   Non-Profit Verification

Alternatively, Plaintiffs argue that because Wildfire, a nonprofit charitable organization, is tasked with administering the Program, another PRWORA exception applies—specifically, 8 U.S.C. § 1642(d), which provides that, "[s]ubject to subsection (a), a nonprofit charitable organization, in providing any Federal public benefit . . . is not required under this chapter to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits." (Doc. 15 at 9.) The City responds that Section 1642(d)

1    is irrelevant because although "federal law does not *require* non-profits to verify eligibility,

2    it does not *prohibit* non-profits from verifying eligibility." (Doc. 27 at 10-11.)  Plaintiffs

3    do not address this argument in their reply.

4         The City has the better side of this argument.  Had Congress allocated CRF funds

5    directly to Wildfire so Wildfire could distribute those funds as part of a federal public

6    benefit program, there might be an argument that Wildfire could, under Section 1642(d),

7    administer the program without verifying whether the recipients were unqualified aliens.

8    But here, the City itself received the allocation.  Plaintiffs do not dispute that, had the City

9    chosen to administer the Program without any outside help (and if the Program were

10   considered a "federal public benefit" not subject to any PRWORA exceptions), the City

11   would have been required to verify the immigration status of applicants.  It seems

12   anomalous that a city or state government in this situation could bypass PRWORA simply

13   by choosing to subcontract with a non-profit organization for assistance with program

14   administration.  Plaintiffs have not identified any case, regulation, or other authority

15   supporting this outcome and the Court has, through its own research, identified at least one

16   agency document that seems to contradict it.  *See* HHS-Office of Child Care, Program

17   Instruction CCDF-ACF-PI-2008-01, *Verification of Citizenship & Immigration Status by*

18   *Non-Profit Organizations & Head Start Grantees* (May 2, 2008) ("[W]hile non-profit

19   organizations are exempt from verification requirements mandated by title IV of

20   PRWORA, this exemption does not release the Lead Agency from its responsibilities to

21   assure that only individuals 'eligible' for services receive them.  If a non-profit

22   organization contracted by the Lead Agency elects not to verify the citizenship and

23   immigration status of applicants for CCDF benefits, the Lead Agency retains this

24   responsibility and therefore must establish procedures for verification.").  Thus, Plaintiffs

25   have not established a likelihood of success on, or even serious questions going to the

26   merits of, their argument concerning Section 1642(d).[7]

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [7]    The Court, to be clear, does not proffer the HHS program instruction as definitive
28   proof of how to interpret Section 1642(d).  As discussed elsewhere in this order, *Chevron*-
     style arguments require more than simply rummaging up a document issued by an
     administrative agency.  Additionally, "interpretations contained in policy statements,

1

2

### C.   **Supremacy Clause**

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  It follows that "Congress has the power to preempt state law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013).

The City clarified during oral argument that it chose to exclude unqualified aliens from the Program solely due to its interpretation of PRWORA and that it was not exercising an independent policy judgment.  The City also conceded that if the Program were deemed to fall within Section 1611(b)(1)(B)'s exception for "short-term, non-cash, in-kind, emergency disaster relief," then the Program's immigration-based eligibility restriction would be void as a matter of conflict preemption because it would contravene Congress's intent to allow unqualified aliens to receive this particular form of federal public benefit.

Thus, based on the discussion in section II.B.2 above, it follows that Plaintiffs have established serious questions going to the merits of their Supremacy Clause challenge.

### III.   <u>Irreparable Harm</u>

"A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief.  Mere possibility of harm is not enough." *Enyart v. Nat. Conference of Bar Exam'rs*, 630 F.3d 1153, 1165 (9th Cir. 2011) (citation omitted).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition*, 757 F.3d at 1068.

Plaintiffs argue they have shown a likelihood of irreparable harm because (1) "the Ninth Circuit has consistently found likely irreparable harm where a local law, policy, or

agency manuals, and enforcement guidelines . . . lack the force of law [and] do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).  The narrow point is that, because Plaintiffs did not develop this argument in depth in their motion and then ignored it in their reply, and because there are authorities that seem to contradict their position, Plaintiffs have not met their preliminary-injunction burden of demonstrating a likelihood of success or serious questions.

practice was preempted by federal law" and (2) "the denial of access to housing assistance may constitute irreparable harm." (Doc. 15 at 11.) The City responds that (1) the alleged harm is economic in nature, (2) there is no evidence that Plaintiffs will suffer irreparable harm in the form of lost housing if they are ineligible for CRF funds, particularly in light of the fact that "the Governor has delayed evictions through October 2020," and (3) other programs exist to assist unqualified aliens during the pandemic. (Doc. 27 at 13-14.)

The Court concludes that, although Plaintiffs have shown a possibility of irreparable harm in the absence of preliminary injunctive relief, they have not established a likelihood of such harm. As for Plaintiffs' first argument—that a likelihood of irreparable harm automatically arises in cases involving preemption challenges—the cases cited in Plaintiffs' motion do not support that proposition. In *Arizona Dream Act Coalition*, which involved a preemption challenge to an Arizona law barring DACA recipients from obtaining state driver's licenses, the court did not hold that a likelihood of irreparable harm arose due to the nature of the plaintiffs' challenge. 757 F.3d at 1068. Instead, the court carefully examined the practical effect the challenged policy would have on the plaintiffs ("limiting their professional opportunities . . . [by] prevent[ing] them from applying for desirable entry-level jobs, and from remaining in good jobs where they faced possible promotion"), assessed whether that injury could be remedied retroactively by an award of damages, concluded it could not, and only then found that a likelihood of irreparable harm existed. *Id.* Similarly, in *Valle del Sol,* which involved a preemption challenge to an Arizona law that criminalized the harboring and transportation of unauthorized aliens, the court did not rely on the nature of the challenge when assessing irreparable harm—instead, it found that the required showing had been made because the lead plaintiff had "demonstrated a credible threat of prosecution under the statute and the organizational plaintiffs ha[d] shown ongoing harms to their organizational missions as a result of the statute." 732 F.3d at 1029. These authorities suggest that Plaintiffs cannot meet their burden of establishing a likelihood of irreparable harm simply by noting that they are

raising a preemption challenge.  More is required.[8]

As for Plaintiffs' second argument—that "the denial of housing assistance may constitute irreparable harm"—this statement is correct but incomplete.  The Ninth Circuit has recognized that the denial of housing assistance may result in irreparable harm if it creates an imminent risk of (or, at least, a likelihood of) eviction.  *See, e.g., Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("The district court . . . correctly determined that the individual Plaintiffs were likely to suffer irreparable harm absent preliminary relief *because they faced eviction from their rental units*.  Defendants communicated an intention to charge market rates for the individual Plaintiffs' apartments, and Plaintiffs demonstrated an inability to pay those market rates. . . .  *Given the district court's factual findings regarding the likelihood of eviction*, it reasonably concluded that Defendants' threat to evict Plaintiffs created a likelihood of irreparable harm in the absence of an injunction barring future evictions.") (emphasis added).  In contrast, when the denial of housing assistance does not result in a likelihood of eviction, courts are much less likely to find irreparable harm.  *See, e.g., Volis v. City of Los Angeles Housing Auth.*, 2014 WL 12704885, *3-4 (C.D. Cal. 2014) (acknowledging that "eviction can constitute irreparable harm" but denying preliminary injunction because the plaintiff "proffered no evidence . . . that he is threatened with imminent eviction"); *Stean v. Wells Fargo Co.*, 2009 WL 1405912, *3 (N.D. Cal. 2009) (denying motion for TRO because "Plaintiffs have not demonstrated that any particular defendant has taken steps to evict any particular plaintiff" and thus "have not demonstrated by 'probative evidence' that they . . . are likely to suffer imminent harm").  Thus, it is not

---

[8]     In their reply, Plaintiffs cite *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009), as a case that further supports their claim that irreparable harm always exists in cases involving constitutional challenges.  Although the *American Trucking* court did observe that "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm," the court also provided a detailed description of how the challenged policy was harming the plaintiffs and described why that harm would "disrupt and change the whole nature of [their] business in ways that most likely cannot be compensated with damages alone." *Id.* at 1058.  It is difficult to interpret this passage as proof that a plaintiff in a preemption case doesn't need to submit any evidence concerning irreparable harm and can rest solely on the nature of the challenge.

1    enough for Plaintiffs to show that their challenge concerns a housing assistance program.

2    They must go further and address whether being excluded from the Program during the

3    relevant timeframe—*i.e.,* between now and the merits hearing on their Supremacy Clause

4    claim, which the City has agreed to accelerate[9]—will expose them to a risk of eviction.

5        On this issue, the evidence submitted by the sole individual plaintiff, Ms. Galan

6    Mejia, is vague and undeveloped.  Ms. Galan Mejia states in her declaration that she is a

7    DACA recipient (Doc. 12 ¶ 2); that she has owned a home in Phoenix for 11 years (*id.* ¶¶

8    1-2); that she lost her job as a result of the COVID-19 pandemic (*id.* ¶ 3); that her spouse

9    also experienced a reduction in income due to the pandemic (*id.* ¶ 4); and that she did not

10   apply to the Program due to her immigration status (*id.* ¶ 6).  As for the key question of

11   how she has been injured by her exclusion from the Program, Ms. Galan Mejia's

12   declaration provides: "I am worried that the longer the pandemic goes on, I will not be able

13   to keep up with my mortgage and utility payments.  I do not want to lose my home or have

14   my utilities shut off.  The longer the pandemic goes on, the more I stress about the future."

15   (*Id.* ¶ 8.)  This paragraph suggests that Ms. Galan Mejia is still current on her mortgage

16   payments and simply wishes to avoid falling behind in the future.  Thus, Ms. Galan Mejia

17   is months away from any conceivable risk of eviction.  Although her desire not to miss a

18

19   _____

     [9]      To be precise, the City stated that "[b]ecause Plaintiffs' Supremacy Clause claim
20   raises a pure issue of law, the City would support consolidating the preliminary injunction
     with a trial on the merits under Rule 65(a)(2) to resolve that claim.  The merits could be
21   resolved based on the briefing and oral argument.  Even if this Court agrees with Plaintiffs[]
     on the merits on Count 1 . . . Plaintiffs should not receive a permanent injunction."  (Doc.
22   27 at 14 n.6.)  Here, the Court is not formally ordering consolidation under Rule 65(a)(2),
     as it is ruling on the preliminary injunction request before reaching the merits of Count
23   One, but the Court interprets the City's statement as an assent to an accelerated trial on the
     merits and possesses discretion to order acceleration *sua sponte* in any event.  *See, e.g.,*
24   *Puna Speaks v. Edwards*, 554 F. Supp. 117, 120 (D. Haw. 1982) ("[T]he Court concludes
     that the public interest is more appropriately served by expediting a hearing on the merits
25   and denying the requested interim relief.");  Wright & Miller, Relationship of the
     Preliminary Injunction Hearing to the Trial on the Merits § 2950, 11A Fed. Prac. & Proc.
26   Civ. (3d ed. April 2020) ("It long has been recognized that an accelerated trial on the merits
     often is appropriate when a preliminary injunction has been requested. . . .  [I]f relief under
27   Rule 65(a) is denied, a quick disposition of the merits shortens the period in which plaintiff
     may be threatened by irreparable harm.").  *Cf. Warm Springs Dam Task Force v. Gribble*,
28   565 F.2d 549, 551 (9th Cir. 1977) ("We conclude that the public interest can best be served
     by expediting an appeal of the hearing on the merits and denying the requested interim
     injunctive relief.  We do not believe that appellants have shown that they will suffer
     significant harm during the pendency of such an expedited hearing on the merits.").

future mortgage payment is understandable, this is a far cry from the type of evidence that has justified the issuance of preliminary injunctive relief in other housing cases.

The organizational plaintiffs have also submitted declarations. Karina Ruiz de Diaz, the executive director of ADAC, avers in her declaration that ADAC has about 1,000 members (Doc. 11 ¶ 2); that 50-80% of ADAC's members have been "impacted" by the COVID-19 pandemic in the form of lost jobs and reduced wages (*id.* ¶ 3); that "ADAC and its members were very disappointed that the City refused to allow DACA recipients and other immigrants to participate in the emergency housing assistance program" (*id.* ¶ 4); that "we know the need for assistance is there" (*id.*); and that the City's decision to exclude unqualified immigrants from the Program forced ADAC to divert its funds, which it had hoped to use to pay for youth scholarship programs and "know your rights" sessions, to provide rent assistance to members (*id.* ¶ 5). These statements are, again, too vague to establish that any ADAC members will be exposed to a risk of eviction unless the Court grants a preliminary injunction before an accelerated merits hearing. There is no information at all about threatened or actual evictions.

Finally, Viridiana Hernandez, the executive director of Poder, avers in her declaration that Poder has about 300-400 members (Doc. 10 ¶ 5); that the COVID-19 pandemic "has hit the immigrant community in Phoenix very hard" and has also "financially impacted" Poder's members (*id.* ¶¶ 7, 9); that the City's decision to exclude unqualified immigrants from the Program forced Poder to divert its funds, which it had hoped to use to "assist[] families to get technology into their homes," to provide rent assistance to members (*id.* ¶¶ 11-12); that, in response to a survey conducted at the outset of the pandemic, Poder's members stated that "the number one bill [they] were worried about paying was their rent or mortgage" (*id.* ¶ 13); and that, in response to a different survey conducted during the pandemic, "[a]t least half of those interviewed told our staff that they are behind on their bills because of the pandemic and did not know what to do," "[s]everal persons staff interviewed had been evicted from their rentals," and "[m]any other immigrants have been threatened with evictions" (*id.* ¶ 14).

Although paragraph 14 of Ms. Hernandez's declaration seems, at first blush, to supply the eviction-related information that was missing from the Galan Mejia and Ruiz de Diaz declarations, there are two related problems with this paragraph. First, it lacks foundation. Paragraph 14 constitutes Ms. Hernandez's summary of undated conversations between unspecified other Poder representatives and unspecified Poder members. Although this doesn't mean that paragraph 14 must be disregarded for preliminary-injunction purposes,[10] it makes it appropriate to scrutinize the assertions in paragraph 14 with particular care. This, in turn, implicates the second problem—paragraph 14 doesn't explain how "several" evictions could have occurred, or how "many" other evictions could have been threatened, in light of Governor Ducey's efforts to delay all Arizona evictions through October 2020.

For this and other reasons, the Court ordered the parties to provide supplemental briefing concerning Governor Ducey's executive orders ("EOs") and the effect of those EOs on the issue of irreparable harm. In its supplemental brief, the City argues that Plaintiffs have not presented evidence that Ms. Galan Mejia or the organizational plaintiffs' members are at any risk of eviction or that anyone who has complied with the EOs and sought postponement of eviction has lost their housing. (Doc. 36 at 3-4.) In their supplemental brief, Plaintiffs argue that (1) the EOs only cover renters and provide no relief to homeowners, who would otherwise be able to participate in the Program to obtain assistance with mortgage payments, (2) the EOs don't prevent a judgment of eviction, which itself can have "potentially devastating effects," (3) the most recent EO doesn't provide any protection to unqualified aliens because it requires proof that the applicant sought benefits from another source (and unqualified aliens are excluded from applying to

---

[10]    *See, e.g., Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction."); *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (noting that "[t]he urgency of obtaining a preliminary injunction," which "makes it difficult to obtain affidavits from persons who would be competent to testify at trial," means that "[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial").

1   the Program), and (4) the unlawful denial of public benefits is itself irreparable harm.  (Doc.

2   37 at 2.)

3        Plaintiffs' first supplemental argument is unavailing.  Although it's true that the EOs

4   only cover renters and exclude homeowners, Plaintiffs have not identified any homeowners

5   who are have been evicted or are facing imminent eviction—Ms. Galan Mejia (the one

6   identified homeowner) has failed to demonstrate that she is facing eviction, the Ruiz de

7   Diaz declaration focuses on the "rent assistance" being provided to ADAC's members

8   (Doc. 11 ¶ 5), and the Hernandez declaration similarly focuses on Poder's efforts to provide

9   "rent for families" and states that some Poder members were "evicted from their rentals"

10  (Doc. 10 ¶¶ 11, 14).  The best reading of the latter two declarations is as an attempt to

11  demonstrate that the organizations' members are renters who are falling behind on their

12  rent payments.  Thus, Plaintiffs' emphasis on the fact that the EOs don't cover homeowners

13  is something of a red herring and sheds little light on whether Plaintiffs have established

14  *they* are facing irreparable harm.

15       Plaintiffs' second supplemental argument presents a closer call.  Under Arizona law,

16  if a tenant fails to pay rent, the landlord can terminate the rental agreement by filing a

17  special detainer action.  If the landlord prevails, the court grants judgment to the landlord

18  "for restitution of the premises, for late charges stated in the rental agreement, for costs

19  and, at the plaintiff's option, for all rent found to be due and unpaid . . . and shall grant a

20  writ of restitution."  A.R.S. § 33-1377(F).  The EOs don't prevent landlords from *obtaining*

21  such relief—they simply prevent landlords from *enforcing* a writ of restitution until the end

22  of October 2020.  Plaintiffs thus argue that "[i]mmigrants wrongfully excluded from the

23  City's program will suffer irreparable harm even if they qualify for a delay in enforcement

24  of a writ of restitution under the EO.  They will incur penalties, fees, and costs.  They will

25  have a judgment of eviction that remains on their records permanently.  And—come

26  November 1st—even those who qualified under the EO will be subject to being thrown out

27  on the street in the midst of a pandemic."  (Doc. 37 at 6.)

28       Although this argument has some force, it also has two shortcomings.  First, this

theory of harm is different from the theory presented in Plaintiffs' motion, which is that Plaintiffs are being deprived of funds needed "to stay in their homes during this pandemic." (Doc. 15 at 11.)  A litigant seeking the extraordinary remedy of a preliminary injunction should not be able to advance a new theory of irreparable harm for the first time in a supplemental brief filed after oral argument.  Second, putting aside the issue of preservation, Plaintiffs have presented no evidence that any of their members are subject to unexecuted writs of restitution or, more important, that any of their members face an imminent risk of such a writ being issued in the coming weeks.  Instead, Plaintiffs have simply theorized about how such harm might arise.  This, again, is generally insufficient in the preliminary-injunction context.  *See, e.g., Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm. Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (citations omitted); *Enyart*, 630 F.3d at 1165 ("Mere possibility of harm is not enough.").

Plaintiffs' third supplemental argument is that "[t]he City's exclusion actually prevents many tenants from qualifying under the [July 2020] EO because, in order to qualify, a tenant must show proof that they completed an application for housing assistance."  (Doc. 37 at 2.)  This argument lacks merit.  To qualify for eviction-postponement under most recent EO, an applicant must "demonstrate . . . [t]hey have provided the landlord or property owner a copy . . . of proof of submission of their completed pending application for rental assistance *through a state, city, county or nonprofit program*."  (Doc. 36-1 at 4, emphasis added.)  As the italicized language makes clear, the most recent EO does not require proof that the applicant applied to *the City* for housing assistance—it may be satisfied by proof that the applicant sought assistance from any number of sources, including a "nonprofit program."  Here, Poder and ADAC both

acknowledge that they are nonprofit entities that have created rent-assistance programs for their members in light of the COVID-19 pandemic.  The plain language of the most recent EO suggests that proof of an application to one of those programs (rather than to the City's Program) would be sufficient to trigger eviction protection.

Plaintiffs' final supplemental argument is that "the unlawful denial of public benefits is itself irreparable harm."  (Doc. 37 at 2, 7.)  But here, Plaintiffs simply cross-reference the argument set forth in their initial motion (and already addressed above), which is that irreparable harm automatically exists in a case involving a preemption challenge.

For these reasons, the Court concludes that Plaintiffs have shown a possibility of, but not a likelihood of, irreparable harm in the absence of preliminary injunctive relief.

IV.     Public Interest And Balance Of Harms

"[D]istrict courts must give serious consideration to the balance of equities."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted).  In doing so, courts must consider "all of the competing interests at stake."  *Id.*

Plaintiffs argue that the "likely injury to Plaintiffs outweighs any potential injury to" the City and "[i]t is . . . in the public's interest to grant a preliminary injunction that prevents the [City] from imposing unlawful immigration requirements in its program." (Doc. 15 at 14.)  The City responds that allocating funds to Plaintiffs may deprive other households of funds.  (Doc. 27 at 15.)

When balancing the equities, the Court must consider the impact the requested injunction could have on the availability of funds for other eligible families in Phoenix. *Cf. League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("The public interest inquiry primarily addresses impact on non-parties rather than parties.") (quotation omitted).  Here, the funds are limited, making the disbursement of funds a zero-sum game.  If Plaintiffs were awarded benefits via a preliminary injunction, only for the City to ultimately prevail on the merits, this would diminish the funds available to others.  Additionally, although Plaintiffs' declarations

suggest that ADAC's and Poder's members represent a vulnerable subset of the population, it's not clear they are more vulnerable than other groups affected by the pandemic.  In any event, Plaintiffs have not introduced any evidence concerning what percentage of the $25.7 million in Program funds have been disbursed to date—and, thus, have not established any risk that the available funds will be depleted before an accelerated merits hearing.

For these reasons, the Court cannot conclude that the balance of equities favors Plaintiffs.  At a minimum, the balance of equities does not tip so sharply in Plaintiffs' favor as to make up for their failure to establish a likelihood of success on the merits.  *Shell Offshore*, 709 F.3d at 1291.

Accordingly, **IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction (Doc. 14) is **denied**.

**IT IS FURTHER ORDERED** that the parties, after meeting and conferring, must file a joint statement that (1) proposes an accelerated schedule for reaching a merits resolution of Count One of the amended complaint (the parties may provide separate proposals if they cannot reach agreement), (2) sets forth the parties' views concerning how to address the issue of class certification in light of the acceleration, and (3) addresses any other matters the parties deem relevant.

**IT IS FURTHER ORDERED** that the joint statement must be filed by **September 2, 2020**.  The Court's desire is to resolve the merits of Count One before the end of September 2020.

Dated this 26th day of August, 2020.

Dominic W. Lanza
United States District Judge