ELLEN SUE KATZ, AZ Bar. No. 012214
BRENDA MUÑOZ FURNISH, AZ Bar No. 027280
WILLIAM E. MORRIS INSTITUTE FOR JUSTICE
3707 North Seventh Street, Suite 300
Phoenix, Arizona 85014
(602) 252-3432
eskatz@qwestoffice.net
bmfurnish@qwestoffice.net

DANIEL J. ADELMAN AZ Bar No. 011368
ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
514 West Roosevelt Street
Phoenix, Arizona 85003
(602) 258-8850
danny@aclpi.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>The City of Phoenix, a municipal corporation,<br><br>        Defendant. | No.  CV 20-01429-DWL<br><br><br>**PLAINTIFFS' OPENING BRIEF FOR A FINAL DECISION IN THEIR FAVOR ON COUNT I** |

Plaintiffs' Count I claim under the Supremacy Clause of the U. S. Constitution satisfies the criteria for a final merits decision in their favor.  Plaintiffs seek a permanent injunction and a declaratory judgment.  Defendant's counsel  at the oral argument on August 14, 2020, stated that the City's decision to impose the challenged immigrant restriction on eligibility for the emergency housing funds was solely because of the City's interpretation of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") and was not a policy decision.  As discussed below, neither Congress nor the relevant federal agency has imposed or instructed states and localities to

1   impose immigration restrictions in addressing the emergency housing and utility needs of
2   their residents when using monies distributed from the Coronavirus Relief Fund ("CRF").
3   The PRWORA immigrant restrictions do not apply because the Coronavirus Aid, Relief,
4   and Economic Security Act ("CARES" Act) is a later passed law specifically intended to
5   address the COVID-19 pandemic. Even if PRWORA could apply, the CRF emergency
6   housing funds pursuant to long-standing federal guidance do not meet the definition of
7   federal public benefit and even if they did, the emergency housing funds at issue fall
8   squarely within two PRWORA exceptions.

9       In support of this request for final relief, Plaintiffs submit the following documents
10  with their opening brief:  First and Second Supplemental Declarations of Karina Ruiz De
11  Diaz with Exhibit; First and Second Supplemental Declarations of Viridiana Hernandez
12  with Exhibit; Declaration of Jay Young; Declaration of Professor David Super with
13  Exhibits; Declaration and Supplemental Declaration of LV; and Declaration of Ellen
14  Katz with deposition transcripts as exhibits.  In support of this opening brief Plaintiffs
15  also incorporate by reference evidence submitted previously in the court record in this
16  case, including the Declarations of Karina Ruiz De Diaz (Doc. 11), Viridiana Hernandez
17  (Doc. 10) and Aurora Galan Mejia (Doc. 12).

18      The material facts in this case are set out in Plaintiff's First Amended Complaint,
19  Doc. 24 ¶¶ 1-4; 12-15; 9-28; 59, and the Court's Order dated August 26, 2020, Doc. 40 at
20  4-6.  As explained below, the Court should find that the City's actions violate federal law
21  and grant injunctive and declaratory relief to Plaintiffs.

22  **I.    Defendant's Imposition of Immigration Requirements for Eligibility for the**
23  **Emergency Housing Funds Violates Federal Law**

24      **A.    The City's Emergency Housing Assistance Program Using**
25  **Coronavirus Relief Funds Does Not Meet the Definition of Federal**
    **Public Benefit in PRWORA**

26      To come within the restrictions of PRWORA, the City's emergency housing
27  assistance must meet the statute's definition of "federal public benefit," 8 U.S.C. §
28  1611(c), and not fall within one of the mandatory exceptions in subsection (b). Only one

federal agency has issued interpretive guidance on the definition.  On August 4, 1998, the United States Department of Health and Human Services issued a public notice with a comment period on the agency's interpretation of the term "federal public benefit." Office of the Secretary, Health and Human Services ("HHS"), *Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"* ("HHS Interpretation of Federal Public Benefit") 63 Fed. Reg. 41658-01. HHS noted the difference in the definition of "federal public benefit" in PRWORA and the definition of "federal benefit" in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").   Specifically, IIRIRA's definition does not include the phrase "individual, household or family eligibility unit."   *Id.* at 41659.  HHS concluded that Congress' inclusion of the phrase "individual, household or family eligibility unit" in the definition of federal public benefit intended to "limit those benefits that would not be available to non-qualified aliens."   *Id.*   HHS interpreted the phrase "individual, household or family eligibility unit" to refer to benefits that are:

> (1) provided to an individual, household, or family, and (2) the individual, household, or family must, as a condition of receipt, meet specified criteria (*e.g.*, a specified income level or residency) in order to be conferred the benefit, that is, they must be an "eligibility unit."

*Id*. HHS explained that the term "federal public benefits" does not include benefits generally targeted to certain communities or sectors of the population, such as "people with particular physical conditions such as a disability or disease; gender; [or] general age groups such as youth or elderly." *Id*. This is because "in order for a program to be determined to provide benefits to 'eligibility units' the authorizing statute must be interpreted to **mandate ineligibility** for individuals, households, or families that do not meet certain criteria, such as a specified income level or a specified age." (emphasis added).

HHS also explained that while HHS programs may target the needs of specific populations such as children or pregnant women, "unless the authorizing statutes **require**

**that the characteristics of these groups form the basis for denial of services or benefits**, these are not benefits that go to 'eligibility units.'" *Id.* (emphasis added). That was because the authorizing statutes "identify populations with specific characteristics to clarify the types of services that should be provided; they do not contemplate that providers use variations in individual characteristics as a basis for determining eligibility, on a case by case basis." *Id.* Thus, a benefit targeted to certain populations based on their characteristics, such as a benefit provided under the Maternal and Child Health program, which provides health services to women and children, is an example of a benefit that is not a "Federal public benefit." *Id.* at 41659-60. The CRF funds are similar to "block grants" that HHS concluded are not federal public benefits, such as community services block grants because they are intended to serve a  community, even if some funds go to individuals. *Id.* at 41659.

The HHS interpretation issued contemporaneously to facilitate compliance with 8 U.S.C. §1642 is entitled to deference. The question is what deference the HHS interpretation is entitled to receive. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) generally requires a court to defer to an agency's reasonable interpretation of an ambiguous statute. *Chevron* deference requires delegated authority by Congress and agency interpretation pursuant to that authority. *U.S. v Mead*, 533 U.S. 218, 226-27 (2001).

Regardless of whether an agency has "express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices" and even if the choices do not bind judges, they certainly may influence courts facing the same questions the agency already answered. *Id. at* 227. Sometimes the delegation of interpretive authority is implicit and it is apparent that Congress would expect the agency to address the ambiguity and fill in the gaps and speak with the force of law. *Id.* at 229. As long as the agency's interpretation is reasonable, a reviewing court is obliged to accept the agency's position. *Id.* The Court has long recognized that there is a range of statutory variations that lead to more than one variety

1    of judicial deference.  *Id.* at 237.

2        In PRWORA, Congress directed the Attorney General to consult with HHS in

3    promulgating regulations.  8 U.S.C. § 1642 (a)(1) and (2).  Professor David Super is an

4    expert in public benefits law and immigration law and his qualifications are described in

5    David Super Declaration ("Super Decl.") ¶¶ 1-5 and in his deposition, Exhibit 1 to Katz

6    Declaration, ("Exh. 1") David Super Deposition ("Super Dep.") 8:12-28:6.[1]  He followed

7    closely the Congressional negotiations over PRWORA.  He submitted a detailed

8    declaration with his expert opinions on the Health and Human Services interpretation of

9    the term federal public benefit in PRWORA.  Professor Super has direct knowledge of

10   the roles the various federal agencies played in the enactment of PRWORA and the

11   subsequent agency interpretations.   Super Decl. ¶¶ 6-15. He provided significant

12   information about this legislative process.  After PRWORA was enacted, Professor Super

13   described the federal agency coordination between DOJ and HHS in publishing their

14   guidance on the same day. *Id.* ¶¶ 23-26.   HHS took the lead on interpreting the term

15   "federal public benefit" and is the only federal agency to articulate principles for defining

16   it and for addressing the meaning of the term "eligibility units."  Exh. 1 to Katz Decl.,

17   Super Dep. 123: 20-25- 124: 1-5.  HHS published its definition through a public notice

18   with a comment period that was immediately "effective unless and until they put out

19   something subsequent." *Id.* 110: 8-21-111: 8-10.   The notice was never changed and

20   remains in effect. *Id.* 135: 19-25.

21       On August 4, 1998, the Department of Justice ("DOJ") issued proposed rules on

22   the "Verification of Eligibility for Public Benefits." 63 Fed. Reg. 41662-01.   These

23   proposed rules appeared in the Federal Register immediately after the HHS notice

24   discussed above. DOJ never finalized the proposed rules. Exh. 1 to Katz Decl., Super

25   Dep. 114: 3-11. This coordination made sense because DOJ had expertise in document

26   verification requirements and HHS in public benefits. *Id.* 132:14-25–133:1-5. HHS was

---

[1]    All deposition transcripts are attached as exhibits to the Declaration of Ellen Katz submitted with the opening brief.

the lead benefit-granting agency.  *Id.* 120: 9-20.  HHS consequently identified over 20 HHS programs that provide federal public benefits that do not fall within one of the exceptions in PRWORA. HHS Interpretation of Federal Public Benefit, 63 Fed. Reg. at 41658.

Although DOJ included a definition of federal public benefits in its proposed rules, the definition essentially mirrors the wording of PRWORA. DOJ largely copied the statutory language, Exh. 1 to Katz Decl., Super Dep. 120:3-8, and reprinted the statutory language.  *Id*. 124: 6-12. In that situation, the definition is not entitled to deference, because it does little more than restate the terms of PRWORA.  *Gonzales v. Oregon,* 546 U.S. 243, 257, (2006) (a parroting regulation does not change the fact that the question is not the meaning of the regulation but the meaning of the statute and an agency does not acquire special authority to interpret its own words when instead of using its expertise and experience to formulate a regulation it merely paraphrases the statutory language).[2] Professor Super explained that the DOJ proposed rulemaking and the HHS notice issued *on the same day and appearing sequentially in the Federal Register* demonstrate coordination between the two agencies. Exh. 1 to Katz Decl., Super Dep. 116: 2-16. He explained that DOJ described the extensive interagency consultation that DOJ did not want to take discretion from the benefit-granting agencies and, by repeating the statutory language, DOJ was leaving the interpretation to HHS. *Id*. 119: 11-25–22:1-8. This coordination demonstrates that HHS' contemporaneous interpretation was compatible with PRWORA and the DOJ proposed rules. *Id*. 121:3-19. It was Office of Management and Budget's ("OMB") job to be sure that the agencies were speaking consistently. *Id*. 121: 12-19.  Such coordination meant that DOJ would have seen the

---

[2]      Previously, DOJ issued *Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, Nov. 17, 1997, 62 Fed. Reg. 613344-02 ("*Interim Guidance on Verification*").  Here, as well, DOJ's definition of federal public benefit generally recites the wording of PRWORA.  *Id.* at 61361.

1    HHS notice prior to its publication and would have objected to it if it disagreed, which

2    did not happen.  *Id*. 116: 2-16.[3]

3         The fact that an agency reached its interpretation through less formal means than

4    "notice and comment" rulemaking does not automatically deprive the interpretation of

5    *Chevron* deference. *Barnhart v Walton,* 535 U.S. 212, 221-22 (2002).  *See Young v.*

6    *Community Nutrition Institute, et al.,* 476 U.S. 974, 981 (1986) (agency notice published

7    in Federal Register entitled to *Chevron* deference). Congress gave HHS "consultative

8    authority," Exh. 1 to Katz Decl., Super Dep. 66: 8-13, the authority to offer guidance in

9    DOJ's rulemaking.  *Id*. 76: 13-19. By requiring DOJ to consult with HHS Congress

10   showed it placed a special trust in HHS.  *Id*. 67: 16-19. Moreover, OMB would not have

11   allowed DOJ to issue guidance without consulting with HHS.  *Id*. 68: 18-25 – 69:2.  HHS

12   took the lead on the interpretation of the term "federal public benefit" in PRWORA and

13   its definition is "authoritative."   No other agency published guidance after August 4,

14   1998, although some listed the programs under their jurisdiction that were restricted by

15   PRWORA.  *Id*. 127:3 – 129: 1. Twenty-two years later, HHS' guidance continues to be

16   the only detailed agency interpretation. This demonstrates that HHS was speaking for the

17   federal government.  Such a long-standing interpretation is entitled to *Chevron* deference.

---

18   [3]    Plaintiffs claim that the CARES Act can be construed consistently with PRWORA

19   is supported by the DOJ guidance. The Attorney General issued a final specification
     regarding programs exempt under section (b)(1)(D).  *Final Specification of Community*

20   *Programs Necessary for the Protection of Life or Safety Under Welfare Reform*
     *Legislation,* 66 Fed. Reg. 3613-02, (Jan. 16, 2001) ("*Final Specification of Community*

21   *Programs*").  DOJ confirmed that the "Department will grant all appropriate deference to

22   the determination, if one has been made, by  the benefit granting  agency as to whether
     the program is a federal public benefit."  *Id*. at 3614. In DOJ's *Interim Guidance on*

23   *Verification* DOJ stated that "If you have any questions as to whether a particular

24   program provides a federal public benefit covered by the Act or a benefit that is
     exempted from the Act's requirements, you should consult with the federal agency or

25   department that oversees the program." 62 Fed. Reg. 61344, 61361.  Indeed, 8 U.S.C. §

26   1614 requires federal agencies that administer programs covered by PRWORA to publish
     notification to the public of program eligibility. The Treasury Department has not filed

27   such a notice.  Thus, the two statutes can be read consistently. For all the reasons stated in
     Plaintiffs' briefing on the Motion for a Preliminary Injunction, Docs. 13 and 32, and in

28   this Opening Brief, the CRF funding stream is not a federal public benefit.

*See e.g.*, *Barnhart,* 535 U.S. at 219-220 (according *Chevron* deference to "long-standing" interpretation applied for twenty years by the Social Security Administration); *Arizona Health Care Cost Containment System v. McClellan*, 508 F.3d 1243, 1253-54 (9th Cir. 2007) (according *Chevron* deference to an interpretation used by the Health Care Financing Administration for more than twenty years).

If the Court were to find that Congress did not intend to delegate authority, even implicitly, or the agency did not act pursuant to that authority, judicial deference is merited only to the extent that the agency reasoning is persuasive. *Mead,* 533 U.S. at 234. For all the reasons cited above, the HHS reasoning is persuasive. Certainly, it should not be discounted or ignored.  Finally, although HHS' interpretation has been in effect for over 22 years, no one has challenged it in court.

Applying the HHS definition, the inquiry is whether the "authorizing statute," in this case the CARES Act, "must be interpreted to **mandate ineligibility** for individuals, households, or families who do not meet certain criteria, such as **specific income level** or **specified age**." (emphasis added). HHS Interpretation of Federal Public Benefit, 63 Fed. Reg. at 41659.   The CARES Act has no such mandate on ineligibility for emergency housing funds.

Similarly, the City's emergency housing program requirement that persons suffer some financial impact, such as *some* reduction in income or *some* increase in expenses due to the pandemic, does not constitute eligibility criteria such as a specific income level.  This is the classic situation where the program is open to a broad group of persons and does not fall within the definition of a federal public benefit. Nor does HHS' interpretation expand the restrictions beyond the stated policy of the PRWORA that immigrants be self-reliant. 8 U.S.C. § 1601(5).  Immigrants who may find themselves in need of emergency housing or utility assistance because of the unprecedented COVID-19 pandemic are not dependent and only find themselves in dire circumstances because of this unprecedented pandemic. *See* evidence discussed in Section III below.   A statutory term is ambiguous if it is capable of a range of meanings.  "So long as the agency has

defined the term within the range of meanings, [the court] has no grounds for second-guessing the agency, 'even if the agency's reading differs from what [we] believe is the best statutory interpretation.'" *City and County of San Francisco v. U.S. Citizenship and Immigration Services,* 944 F.3d 773, 792 (9th Cir. 2019) (citations omitted). That is what HHS has done.

In contrast to the City's program, HHS identified the Low-Income Energy Assistance Program ("LIHEAP") as a federal public benefit. HHS Interpretation of Federal Public Benefit, 63 Fed. Reg. 41658. A review of the LIHEAP statute shows how the eligibility unit definition is used.  LIHEAP has specific income eligibility limits. 42 U.S.C. § 8624 (b)(2)(B)(i) and (ii) (household income cannot exceed 150% of the poverty level for the state or 60% of the state medium income, respectively) and  certain persons are categorically eligible for the assistance, such as persons who receive Supplemental Security Income benefits or food stamps. Only one such person must be in the household. 42 U.S.C. § 8624 (b)(2)(A) (ii) and (iii), respectively. Thus, the LIHEAP program is consistent with HHS guidance for the definition of federal public benefit because LIHEAP mandates *ineligibility* for those who do not meet the specified criteria in the statute.

For all these reasons, HHS' interpretation is entitled to deference or at least persuasive effect and the City's emergency housing assistance vendor payments are not a federal public benefit.

**B.     Even if PRWORA Applies, the Emergency Housing Funds Are a Mandatory Exception as Short-Term, Non-Cash, In-Kind Emergency Disaster Relief**

Even if PRWORA's restrictions applied to the Coronavirus Relief Fund ("CRF"), funding stream, emergency housing assistance would fall within the mandatory exception for "short-term, non-cash, in-kind emergency disaster relief."  8 U.S.C. § 1611(b)(1)(B). "Subsection (a) **shall not apply** with respect to the following Federal public benefits."  8 U.S.C. § 1611(b)(1) (emphasis added).  The funds at issue fall squarely within this exception.

1   There is no dispute that the City's emergency housing funds are "short-term" and
2   "disaster relief" in response to the COVID-19 pandemic. Here, the City's emergency
3   housing assistance program is funded by the CRF, which was created to help states and
4   localities respond to an emergency disaster. The City's program is a short-term assistance
5   program which is intended to provide eligible applicants with one-time assistance for
6   vendor payments for rent, mortgage or a utility bill accrued from March through
7   December 2020.

8   The emergency housing assistance is dispersed through vendor payments from the
9   entities administering the program to a landlord for rent, a mortgage company for
10  mortgage payments or a utility company for utilities. No money is paid to the applicant.
11  Unlike cash, the assistance is not fungible, but goes directly to the housing or utility
12  provider for in-kind support.

13  The parties dispute the meaning of the terms "non-cash and "in-kind."  The
14  interplay of these terms is demonstrated by DOJ's interpretation of another PRWORA
15  exception for "programs services or assistance" under 8 U.S.C. § 1611(b)(1)(D). *Final*
16  *Specification of Community Programs,* 66 Fed. Reg. 3613-02 (Jan. 16, 2001).   In the
17  specification section of this guidance, DOJ inserts "(non-cash)" immediately after the
18  term "in-kind" each time it appears.  66 Fed. Reg. at 3616.   Thus, it appears that DOJ
19  interprets the terms as interchangeable.[4]

20  Housing assistance, including housing subsidies, is considered an "in-kind"
21  benefit in many other contexts.  For example, the Social Security Administration for
22  receipt of Social Security benefits in 20 C.F.R. § 416.1102 addresses what constitutes
23  "income:"

24  > Income is anything you receive **in cash or in kind** that you
25  > use to meet your needs for food and shelter. . . **In-kind**
     > **income is not cash** but is actually food or shelter, **or**
26  > **something you can use to get them**.  (emphasis added).

27  ---
    [4]   In an earlier Notice on the same subject, DOJ also inserted the term "(non-cash)"
28  after the term "in-kind" in its specification section. *Specifications of Community
    Programs*, 61 Fed. Reg, 45985-10, Aug. 30, 1996.

1    This interpretation, like DOJ's, confirms that "in-kind" is "non-cash."  Nor is it limited as

2    the City suggests to goods and services.

3        Similarly, the Ninth Circuit has upheld HHS's policy that the difference between

4    the rent paid and the fair market value of the rental constituted "in-kind" income and

5    would reduce the renter's Supplemental Security Income benefits.  *Young v. Schweiker*,

6    680 F.2d 680, 682 (9th Cir.1982).  The same analysis applies to situations where the

7    person lives rent-free, *Antoniloi v. Harris*, 624 F.2d 78, 80-81 (9th Cir. 1980), or where

8    someone else pays the person's rent.  *Hoff v Colvin*, No. 13-cv-0558-MFJ, 2014 WL

9    2880427 (D. Ariz. Sept. 24, 2014).  The vendor payments are similar to these situations

10   where rental assistance paid on behalf of someone, no matter the form, are treated as

11   "non-cash" and "in-kind."[5]  Certainly, the applicant does not get any cash in hand to use

12   for anything they want.  Nor can the vendor payments be used for anything but rent,

13   mortgage and utilities.  The funds cannot be used to buy food, make a car payment or

14   anything else.

15        The question is why the City has been so strident in its refusal to consider the

16   vendor housing and utility payments as "non-cash" and "in-kind."  Recall, the City's

17   claim is that its interpretation of PRWORA prohibits the City from considering the

18   vendor payments as coming within this the exception.  The City points to no authority for

19   its position.

20        As explained above, the City's housing assistance program is exempt from

21   PRWORA's restrictions pursuant to 8 U.S.C. § 1611(b)(1)(B) and the City has no basis

22   for imposing eligibility restrictions based on immigration status. Under the plain wording

23   of 8 U.S.C. § 1611(b)(1)(B), short-term, non-cash, in-kind emergency disaster relief such

24   as the City's CRF for emergency housing assistance fits squarely within PRWORA's

25   exception and, therefore, is not restricted based on immigration status.

26

27   [5]    The Court also noted that in *City and County of San Francisco*, 944 F.3d at 783,

28   799, 800, the court refers to Section 8 rental assistance as "in-kind" payments. Doc. 40 at
     17-18.   This is another example of housing assistance considered as "in-kind."

1
2

### C.    Even if PRWORA Applies, the Exception that Non-Profits Are not Required to Verify Immigrant Eligibility Applies

3       Even if the Court determines that these funds are federal public benefits subject to

4   PRWORA, an exception to the immigration eligibility verification requirements applies

5   when the funds are distributed by non-profit charitable organizations.  8 U.S.C. § 1642(d)

6   ("a nonprofit charitable organization, in providing Federal public benefits . . . is not

7   required under this chapter to determine, verify, or otherwise require proof of eligibility

8   for any applicant for such benefits.").   The community entities that take applications,

9   determine eligibility and deliver the emergency housing funds to the vendors are

10  nonprofits.  The federal law does not require (or expect) these groups to make eligibility

11  decisions based on immigration status.

12      Professor Super also submitted his expert opinion regarding the history and

13  development of the non-profit exception.  As he explains, the legislative history confirms

14  this analysis.  Super Decl. ¶¶ 16-22.  He describes Congress' decision to include this

15  provision in PRWORA.  He explains that many in Congress had a strong preference for

16  private non-profits, including faith-based organizations, over governmental bureaucracies

17  as means to disburse aid. *Id.* ¶ 16. During the negotiations over PRWORA, members of

18  Congress argued that non-profits who rely heavily on a volunteer staff could not feasibly

19  train their volunteers to verify immigration status properly.  *Id*. ¶ 17.   They also were

20  concerned that "requiring non-profits to determine persons' immigration status before

21  providing assistance would disadvantage U.S. citizens as well as non-citizens because it

22  would cause potentially beneficial non-profits to drop out of program administration and

23  because the more complex and burdensome eligibility determination process would slow

24  the provision of aid in times of need." *Id*. ¶ 18.  This was a bipartisan concern.  Exh. 1 to

25  Katz Decl., Super Dep. 93:7-17.  Thus, "[a]s one of the conditions the President set on his

26  willingness to sign the legislation, the [Clinton] Administration demanded that no

27  immigration check be required for benefits provided by non-profit organizations."  Super

28  Decl. ¶ 21. This was a change from the earlier conference agreement.  *Id.* ¶ 20. Senator

Ted Kennedy confirmed this change and discussed the importance of the exception, emphasizing that the change:

> allows nonprofit organizations, such as Catholic Charities, church social service programs, or community-based organizations to continue to assist communities with Government funds, without having to check the citizenship and green cards of everyone who walks into their doors. Rather than making harsh welfare reforms even harsher for legal immigrants, this bipartisan agreement provides modest but needed improvements over those reforms for battered immigrants for charities and other nonprofit organizations that are a lifeline to immigrant communities.

*Id* at ¶ 21; 142 Cong. Rec. S11863, S11864 (daily ed. Sept. 30, 1996).

At his deposition, Professor Super explained that Senator Kennedy was contrasting the final bipartisan bill to an earlier partisan version of the bill that did not have the same provision for non-profits.  Exh. 1 to Katz Decl., Super Dep. 98:20-99:5; 99:13-101:18. Senator Grassley acknowledged that the Clinton administration demanded inclusion of the non-profit provision in the bill.  *Id*. 103:20-103:23.

Further, the Department of Justice's Interim Guidance on PRWORA explains that:

> A non-profit charitable organization that chooses not to verify cannot be penalized (e.g., through cancellation of its grant or denial or reimbursement for benefit expenditures) for providing federal public benefits to an individual who is not a U.S. citizen, U.S. noncitizen national or qualified alien.

62 Fed. Reg. 61344, 61345.  The Interim Guidance contemplates situations where the exception would not apply – if a law other than PRWORA *independently* restricts a program based on immigration status.  Because the CARES Act's Coronavirus Relief Fund does not have specific immigration status verification requirements, the exemption applies, and nonprofits are not expected to make these determinations.  Congress intended that if the entity making eligibility decisions was a non-profit, the very groups Congress wanted to play a larger role in making benefit decisions, then the exception applied.  This was the trade-off for the non-profits to participate in the programs.

1    The legislative history of the exception for programs administered by non-profits

2    clarifies the exception's clear language that the federal law does not require or expect

3    these organizations to verify immigration status.  The City's program is administered by

4    Wildfire, a non-profit organization.  Because of this, the City's program fits within this

5    exception and, thus, the required immigration eligibility requirements meet the exception

6    in the statute.

7    **II.    The City's Immigrant Restriction Is Preempted by Federal Law**

8    The City's immigrant restrictions are invalid under both field and conflict

9    preemption principles.  The Supreme Court has recognized that the federal law governing

10   immigrants preempts state law when it encroaches on the federal law or is in conflict with

11   it.  *Arizona, et al., v. U. S.*, 567 U.S. 387, 399 (2012).  A local provision is in conflict

12   with the federal law when it "stands as an obstacle to the accomplishment and execution

13   of the full purposes and objectives of Congress."  *Id*. at 406 (quoting *Hines v.*

14   *Dadidowitz*, 312 U.S. 52, 67 (1941).  In this situation, compliance with both local and

15   federal requirements is not possible.  *Id.*  As discussed in Section I above, the City's

16   decision to impose immigration restrictions in the CRF program is in conflict with federal

17   law in at least three ways.  *See Valle del Sol, Inc., v. Whiting,* 732 F.3d 1006, 1026-27

18   (9th Cir. 2013) (the additional and distinct state penalties disrupt the federal plan even

19   when the state shares similar goals to the federal government).

20   The City's restrictions also fall under the field preemption principles. The CARES

21   Act and PRWORA provide a "pervasive" regulatory framework concerning when

22   immigrants are eligible for federally funded assistance.  The intent to displace state law

23   can be inferred from a framework of regulation "so pervasive  . . . that Congress left no

24   room for States to supplement it" or "where there is a federal interest  . . . so dominant

25   that the federal system will be assumed to preclude enforcement of state law on the same

26   subject."  *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S.

27   218, 230 (1947).  In this situation, Congress left no room for states to make their own

28   decisions on immigrant eligibility or to set different eligibility requirements when they

are using federal funds.   *See Arizona Dream Act Coalition v. Brewer,* 855 F.3d, 967, 974-75 (9th Cir. 2017) (state law regarding drivers' license is preempted by the exclusive federal authority to classify noncitizens).

The City relies on PRWORA when the funds at issue do not meet the definition of federal public benefit and if they do, the law specifically exempts short-term, non-cash, in-kind emergency disaster relief and non-profits from the immigration verification requirements. As explained in footnote 3, the CARES Act and PRWORA can be construed consistently. The City's policy does not in any way "mirror" federal objectives. Rather, the City has undercut the federal objective to ensure that emergency housing disaster relief is available without regard to immigration status.  The City's policy does not in any way closely track a federal law or comport with federal goals. Instead, it directly conflicts with federal law and is preempted.

**III.   Plaintiffs Satisfy the Requirements for a Permanent Injunction**

To obtain a permanent injunction**,** Plaintiffs must show in addition to actual success on the merits that (1) they have suffered irreparable injury/harm; (2) remedies available at law are not adequate; (3) in considering the balance of hardships between the plaintiffs and defendant an injunction is warranted; and (4) the public interest  would not be disserved by a permanent injunction. *eBay, Inc. v MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).    Plaintiffs satisfy these requirements.

**A.   Plaintiffs Have Suffered, Are Suffering, and Will Continue to Suffer Irreparable Harm**

Defendant's improper immigration eligibility restrictions are causing irreparable harm by unlawfully precluding the individual Plaintiff, and the communities served by the organizational Plaintiffs, access to the City's Program during this pandemic.  At the outset, it is important to point out the different procedural context of the present pleading compared to the previous motion for preliminary injunction.  As the Court stated, the key consideration before the Court was the likelihood of harm in the brief period between the Court's ruling and a decision on the merits.   The evidence has been developed

significantly since the preliminary injunction briefing and establishes irreparable harm

**The organizational Plaintiffs.** The declarations and testimony of the Directors of Poder in Action and the Arizona Dream Act Coalition explain that they are intimately and directly involved in the immigrant communities in Phoenix, which have been hit very hard by the COVID-19 pandemic. Doc. 10, Viridiana Hernandez Declaration ("Hernandez Decl.") ¶¶ 7-9; Doc. 11, Karina Ruiz De Diaz Declaration ("Ruiz De Diaz Decl.") ¶¶ 2-3. Poder members would have applied for the City's housing funds if they were eligible. Doc. 10, Hernandez Decl. ¶¶ 13, 15. ADAC members also would have applied if they were eligible. Doc. 11, Ruiz De Diaz Decl. ¶ 6; Doc. 12; Aurora Galan Mejia Declaration ("Galan Mejia Decl.") ¶6. As a result of the terrible hardships their communities were experiencing, and because of their exclusion from the City's Program, both organizations worked outside their core missions and diverted significant resources to fundraise and administer a fund known as the Arizona Undocumented Workers Relief Fund ("Relief Fund"). ADAC helped raise money for the fund and contributed some of its own money to the fund. Doc. 11, Ruiz De Diaz Decl. ¶ 5; Karina Ruiz De Diaz First Supplemental Declaration ("Ruiz De Diaz First Supp. Decl.") ¶¶ 3-4; Karina Ruiz De Diaz Second Supplemental Declaration ("Ruiz De Diaz Sec. Supp. Decl.") ¶ 4.[6]

The executive director of ADAC, Ms. Karina Ruiz De Diaz, personally interviewed at least 100 individuals who came to ADAC for help from the Relief Fund. Ruiz De Diaz First Supp. Decl. ¶ 5. The vast majority of people who requested help had lost their jobs or had their hours cut due to COVID-19. Exh. 2 to Katz Decl., Karina Ruiz De Diaz Deposition ("Ruiz De Diaz Dep.") 32:20-33:3; DX03; *see also* Doc. 11, Ruiz De Diaz Decl. ¶ 3. Of the persons that she interviewed, most needed help with their rent or mortgage and many were one to three months behind ,but ADAC could only give

---

[6]     Administering this fund was done on a purely volunteer basis because 100% of the money raised went to families in need. All the time spent was in addition to, and diverted resources from, ADAC's other responsibilities, which include census and voter registration responsibilities. Doc. 11, Ruiz De Diaz Decl. ¶ 5; Exhibit 2 to Katz Declaration, Ruiz De Diaz Dep. 26:7-27:15

each household $500.  Exh. 2 to Katz Decl., Ruiz De Diaz Dep. 23:8-16; Ruiz De Diaz First Supp. Decl. ¶¶ 3, 5.  ADAC knew that people needed far more than this, but they did not have sufficient funds. *Id*. ¶ 3.  Tenants were being threatened with eviction.  Exh. 2 to Katz Decl., Ruiz De Diaz Dep. 23:8-16.  ADAC hoped that by giving people $500, they could at least make a partial rent payment, which they hoped would delay or prevent eviction for as long as possible.  *Id.*

Ms. Viridiana Hernandez is the executive director of Plaintiff Poder in Action. Doc. 10, Hernandez Decl. ¶ 1.  Most Poder members live in the City of Phoenix.  *Id.* ¶ 5; Exh. 3 to Katz Decl., Viridiana Hernandez Deposition ("Hernandez Dep.") 8:1-9. Ms. Hernandez and Poder also worked to raise money for the Relief Fund.  Doc. 10, Hernandez Decl. ¶ 11.  Poder distributed Relief Funds of up to $600 to over 330 needy immigrant applicants.  Viridiana Hernandez First Supplemental Declaration ("Hernandez First Supp. Decl.")  ¶¶ 3- 4.  When they set the amount of money that could be provided to each person, they knew it would not fulfill their needs, but the Relief Fund wanted to provide whatever help they could.  *Id.* ¶ 3; Exh. 3 to Katz Decl., Hernandez Dep. 64:7-17. Ms. Hernandez personally spoke with Poder members who are not qualified immigrants who wanted to apply for the City's Program but could not because of their immigration status.  *Id.* 59:16-61:10. Some Poder members were evicted; others were threatened with eviction.  Doc. 10, Hernandez Decl. ¶¶ 13- 14; Hernandez First Supp. Decl. ¶¶ 9-10.

Ms. Ruiz De Diaz and Ms. Hernandez testified that their respective organizations maintained a spreadsheet pursuant to the requirements of the Relief Fund, which was administered by the Arizona Community Foundation.  The spreadsheets documented the nature of each request, the city where the applicant lived, why the person lost income due to COVID-19 (e.g., laid off, lost hours, etc.), what their biggest need was for the money (e.g., rent/mortgage, utilities, etc.), and various other fields.  Ruiz De Diaz Sec. Supp. Decl.; Exh. 1 to Decl. ("ADAC Spreadsheet"); Viridiana Hernandez Second Supplemental Declaration ("Hernandez Sec. Supp. Decl."), Exh. 1 to Decl. ("Poder

Spreadsheet"). *See also Id.* ¶ 5 (providing additional foundation for these documents).[7]
The vast majority of ADAC applicants had been laid off or had their hours reduced,
ADAC Spreadsheet, column N.  ADAC helped 491 persons and approximately 447 listed
their rent or mortgage as the main need for the funds, with 17 more persons listing rent or
mortgage and another need such as utilities.  ADAC spreadsheet, column O.  Similarly,
Poder's spreadsheet documented the circumstances of the individuals who were seeking
help.  Hernandez Sec. Supp. Decl. ¶¶ 5-7.  Most applicants had been laid off or had their
hours reduced.  Others had COVID-19 and could not work.  *See* Poder Spreadsheet,
column N.  Most listed rent/mortgage as their biggest need, either alone (115 applicants)
or in addition to utilities or another item (90) applicants.  *Id.*, column O.  Many others
listed utilities as their number one need, either alone, or in combination with other needs.
*Id.*

Most of the applicants for the funds lived in the City of Phoenix, *Id.* column AC,
and ADAC and Poder members were among the applicants.  Ruiz De Diaz Sec. Supp.
Decl. ¶ 8, Hernandez Sec. Supp. Decl. ¶ 8.

The Relief Fund has essentially run out of money, and both organizations had to
turn many people away.  Exh. 2 to Katz Decl., Ruiz De Diaz Dep. 41:7-24; Exh. 3 to
Katz Decl., Hernandez Dep. 25:13-25.  They continue to have people calling for help, but
they have no ability to help them.  Exh. 2 to Katz Decl., Ruiz De Diaz Dep. 17:5-8; Exh.
3 to Katz Decl., Hernandez Dep. 25:13-25.  The immigrants received from the Relief
Fund only a small fraction of the benefit that would have been provided had they been
able to participate in the City's program.  They have suffered and continue to suffer
irreparable harm.

**Individuals.**   The individual Plaintiff, Ms. Galan Mejia, is a homeowner, a
Deferred Action for Childhood Arrivals ("DACA") recipient and a member of ADAC
who lives in the City of Phoenix.  She was laid off, has lost income due to COVID-19

---

[7]      In paragraphs 7 and 8 of the Katz Declaration, Attorney Katz explains how these
documents were produced as exhibits and how to read them.

and is struggling to pay her mortgage.  Doc. 12, Galan Mejia Decl. ¶¶ 7, 8.  She would like to apply for the City's Program but is being wrongfully denied the opportunity – and therefore is being harmed – by the City's wrongful immigration requirements.

An additional declarant known in this case by her initials, LV, has also provided evidence of harm.  LV is an undocumented immigrant who lives in a trailer park in the City of Phoenix.[8]  LV Declaration ("LV Decl.") ¶¶ 1-2.  She became ill with COVID-19 and lost her job and income as a result of the pandemic.  *Id.* ¶¶ 3-4.  She got behind on her rent and utilities as a result.  *Id.* ¶ 5.  She tried to apply to the City Program but was told she could not because of her status.  *Id.* at ¶ 6; LV Supplemental Declaration ("LV Supp. Decl.") ¶ 4.   She received help from Poder and from her church, but it is not enough.  LV Decl. ¶ 6; LV Supp. Decl. ¶ 5.  She was threatened with eviction if she falls farther behind, was told she will be taken to court.  LV Decl. ¶ 7.  She was charged late fees.  *Id.* ¶ 8.  The letter she received from her mobile home park explains the consequences she faced:

- Being taken to Eviction Court, which can be "a humiliating experience and also a matter of permanent public record;"

- "Dispossession.  You will be forcibly removed from the premises.;"

- "Judgment(s).  Your credit rating will be severely damaged" and you may be subject to a collection process until your debt is paid in full; possible seizure of assets; garnishment of wages; notification of credit bureaus causing inability to qualify for lines of credit including credit cards, car loans, and mortgages; and notification of National Tenant Reporting Services causing inability to qualify for rental housing.

*See* Exh. 3 to Katz Decl., Hernandez Dep., Exh. DX13; LV Decl. ¶¶ 7-9; LV Supp. Decl. ¶ 2.[9]

---

[8]     LV's identity is being shielded pursuant to an agreement of the parties.

[9]     LV provided the letters to Attorney Adelman and also texted the letter and invoice to Ms. Hernandez. *See* LV Supp. Decl. ¶ 2. These letters were also produced by Ms. Hernandez pursuant to subpoena. Those documents were marked as Exhibits DX12 and DX13 to Ms. Hernandez's deposition. Hernandez Sec. Supp. Decl. ¶ 9. At the time of her

**Community Housing Group Director:** LV's harms are not unique. John ("Jay") Young is the executive director of the Southwest Fair Housing Council, Jay Young Declaration ("Young Decl.") ¶ 1. Mr. Young has extensive experience in the fields of eviction and eviction prevention. *See Id.* ¶¶ 1-3*;* Exh. 4 to Katz Decl., John ("Jay") Young Deposition ("Young Dep.") 6:25 – 9:2; 11:18 - 12:22; 16:6-19. Mr. Young explained how eviction proceedings stain a person's record, which is extremely damaging to persons looking for housing. Young Decl. ¶ 3; Exh. 4 to Katz Decl., Young Dep. 17:4-19:4. Mr. Young also explained how the Governor's Executive Orders still allow landlords to get money judgments against tenants, including fees and penalties, which cause all of the problems discussed above. Young Decl. ¶ 4; Exh. 4 to Katz Decl., Young Dep. 19:7-20:15. These harms can make it difficult or impossible for a person with a judgment of eviction against them to find safe and affordable housing again. Young Decl. at ¶ 5. Evictions can lead to job loss, changing or loss of medical providers, loss of personal belongings, and "in many cases, homelessness." *Id.* ¶¶ 6-7; Exh. 4 to Katz Decl., Young Dep. 19:19-20:15. Mr. Young and his organization work with tenants statewide who become homeless after an eviction due to many of these reasons. Young Decl. ¶ 8; Exh. 4 to Katz Decl., Young Dep. 20:16-22:18. Mr. Young explained that part of his job is to monitor whether evictions and threatened evictions are still happening, and they are. They continue to receive notice of tenants receiving "the five-day notice all the way to … actually being evicted." *See* Exh. 4 to Katz Decl., Young Dep. 30:7 – 32:3. His statewide organization continues to receive calls from the Phoenix area, and he believes "with confidence that these things are happening to folks in Phoenix." *Id.* 32:11-35:4; *see also id.* 35:13-38: Mr. Young also pointed out that the CDC Order continues to allow a landlord to charge late fees and penalties and does not address the root problem that tenants lack sufficient income to pay rent because of the loss of employment due to the pandemic. Evictions will likely spike dramatically after the order expires because

---

Supplemental Declaration, LV was still expecting another statement from her mobile home park. She is several hundred dollars behind on her utilities. LV Supp. Decl. ¶ 4.

tenants will still owe back rent and late fees.  Young Decl. ¶¶ 8-9; Exh. 4 to Katz Decl., Young Dep. 24:2-25:17.

Mr. Young also reviewed the threatening letter that LV received from her mobile home park landlord (summarized above), and confirmed that these types of threats are typical, and are continuing to happen "through current day." *Id*. 32:19-34:10.  These are the types of "intangible" harms that warrant injunctive relief.

**National, State, and Local Studies and Reports.**  The evidence described above is entirely consistent with and confirmed by national and local studies. Increased evictions and foreclosures are expected once the federal and state orders are lifted.[10] Undocumented immigrants are especially susceptible to evictions.[11]  Homeowners are also vulnerable to foreclosures.[12] Like evictions, foreclosures have "painful ramifications that extend far beyond the immediate financial damage."[13]

---

[10]    Katherine Lucas McKay et al., *20 Million Renters are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship*, The Aspen Institute (June 19, 2020), https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-eviction/.

[11]    Steve Holt et al., *Strong Foundations: Financial Security Starts with Affordable, Stable Housing,* The Aspen Institute at 21 (January 2020), https://assets.aspeninstitute.org /content/uploads/2020/01/Financial-Security-Starts-with-Affordable-Stable-Housing_ 2020.pdf; Caitlin Dickerson, *Sleeping Outside in a Pandemic: Vulnerable Renters Face Evictions*, The New York Times (June 4, 2020, updated Sept. 24, 2020), https://www.nytimes.com/2020/07/04/us/coronavirus-evictions-renters-immigrants.html (explaining that undocumented immigrants may be hesitant to file complaints about landlords due to fear of deportation); Marketplace, *For Many Immigrants, the Eviction Crisis has Already Begun*, NPR (Sept. 1, 2020), https://www.marketplace. org/2020/09/01/covid-19-evictions-landlords-tenants-california-mor-atorium-undocuent-ed-immigrants/ (detailing illegal lockouts, harassment, and utility shut-offs that landlords are currently using against undocumented renters in California).

[12]    Michal Grinstein-Weiss et al., *Housing Hardships Reach Unprecedented Heights During the COVID-19 Pandemic*, Brookings (June 1, 2020), https://www.brookings.edu/ blog/up-front/2020/06/01/housing-hardships-reach-unprecedented-heights-during-the-covid-19-pandemic/.

[13]    Krysten Crawford, *Stanford Study Finds Home Foreclosures Can Have Devastating, Long-term Impacts*, Stanford News (June 22, 2020), https://news.stanford. edu/2020/06/22/home-foreclosures-can-devastating-long-term-impacts/.

1  Importantly, the federal and state orders have not completely stopped evictions.[14]

2  According to a New York Times report, "[t]he issue of CARES Act violations may be

3  worst in Arizona."[15]  In Arizona, evictions are expected to soar after the orders are lifted.

4  More than 5,000 evictions were expected in Maricopa County alone prior to the extension

5  of the moratorium that was set to expire in July.[16] A Princeton University study found that

6  between March 15 and September 19, there have been more than 10,900 evictions filed in

7  Phoenix.[17]  The Eviction Lab (the "Lab") at Princeton University has been tracking

8  evictions in Maricopa County since March 15, 2020.[18]  In the week that ended September

9  27, the Lab recorded 685 eviction filings in Maricopa County.

10  **B.     The Types of Harm Occurring and Likely to Occur Absent Relief
         Constitute the Types of Harm that Justify Relief**

12  It is noteworthy that Defendant has not rebutted Plaintiffs' evidence.  The City

13  never found or disclosed a witness to challenge how hard the pandemic has hurt the

14  immigrant community.  Nor has any witness or disclosure rebutted the terrible harms that

15  befall persons who fall behind on their rent or mortgage and are threatened with eviction

16  even in the face of the moratorium.  And, of course, those moratoria will expire, further

17  exposing the immigrant community to all of the harms described above.  Being denied

---

[14]     Chris Arnold, *Despite a New Federal Ban, Many Renters are Still Getting Evicted*, NPR (Sept. 14, 2020, 5:00 AM), https://www.kut.org/post/despite-new-federal-ban-many-renters-are-still-getting-evicted.

[15]     Matthew Goldstein, *Landlords Jump the Gun as Eviction Moratorium Wanes*, The New York Times (July 23, 2020, updated Sept. 2, 2020), https://www.nytimes.com/2020/07/23/business/evictions-moratorium-cares-act.html.

[16]     Catherine Reagor, *Phoenix and Housing Groups Ask Ducey to Extend Arizona's Halt on Evictions Until End of 2020*, AZ Central (July 12, 2020, 7:15 AM), https://www.azcentral.com/story/money/real-estate/catherine-reagor/2020/07/12/housing-groups-ask-gov-ducey-extend-arizona-eviction-moratorium-until-end-2020/5391583002/.

[17]     Bram Sabel-Smith et al., *Evictions Damage Public Health. The CDC Aims to Curb Them – For Now*, Kaiser Health News (October 2, 2020), https://khn.org/news/evictions-damage-public-health-cdc-aims-to-protect-residents-during-pandemic/.

[18]     Eviction Tracking: Phoenix, Arizona, Eviction Lab, https://evictionlab.org/eviction-tracking/phoenix-az/ (last visited Oct. 9, 2020).

the opportunity to apply for and participate in the City's Program has caused, is causing and will continue to cause irreparable harm.

In this case, immigrants have been denied the opportunity to apply for the emergency housing benefits.  That is sufficient to establish an injury.  There is no requirement that Plaintiffs show that they would have been approved for the funds.  *See Ne. Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656, 665-66 (1993) (collecting cases that stand for the propositions that if the government erects a barrier  to a group to obtain a benefit, the group need not allege that they would have obtained the benefit but for the barrier).  The intangible harms that evictions cause as described above also constitute harm. *See Planned Parenthood of Greater Wash. and N. Idaho, et al v. U.S. Dep't. of Health and Hum. Servs.*, 328 F. Supp.3d 1133, 1149-1150 (E.D. Wash. 2018) (intangible injuries such as damage to recruitment efforts or good will are irreparable harm).

The Ninth Circuit has consistently found irreparable harm where a local law, policy, or practice was preempted by federal law. *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014), discussed many of the ways in which denial of a drivers' license can cause further harm.  Doc. 40, Order at 21. Here, Plaintiffs have made a detailed showing about the types of harms immigrants have experienced and will continue to experience as a result of the inability to participate in the City's Program during the pandemic.  Further, being wrongfully denied the ability to participate in the City's Program, so they do not fall farther behind in their rent and mortgage payments, and thus expose themselves to a greater likelihood of eviction, is the type of harm that justifies relief.

### C.    The Balance Of Hardships Favors Plaintiffs, and the Public Interest Would Not Be Disserved by a Permanent Injunction

Because Plaintiffs have established success on the merits, it is clear that the balance of hardships weighs heavily in Plaintiffs' favor.  As the Ninth Circuit stated in *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)*:*

> It is not only the harm to the individuals what we must consider in assessing the public interest.  Our society as a whole suffers when we neglect the poor, the hungry, the disabled, *or when we deprive them of their rights and privileges.  Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required.*  (emphasis added).

Importantly, this issue now presents the flip side of the same coin identified by the Court in ruling on the Motion for Preliminary Injunction.  As the Court stated, "If Plaintiffs were awarded benefits via a preliminary injunction, only for the City to ultimately prevail on the merits, this would diminish the funds available to others."  Doc. 40, Order at 3, 28 (because the funds are limited, this is a "zero-sum game").

Plaintiffs have demonstrated actual success on the merits.  Thus, because – as the Court has recognized – this is a "zero-sum game," if the City continues to wrongfully exclude immigrants from the Program, this will necessarily diminish the funds available to immigrants who are being wrongfully excluded.

For all the reasons discussed above, the public interest favors granting Plaintiffs a permanent injunction as requested. Doc. 24, First Amended Complaint, at 19 (C) (prayer for relief).

## IV.   Plaintiffs Satisfy the Requirements for a Declaratory Judgment

Plaintiffs request a declaratory judgment that the City's immigration status requirement for eligibility for the emergency housing funds violates federal law. 28 U.S.C. § 2201. Doc. 24, First Amended Complaint at 19 (B) (prayer for relief).  As the pleadings is this case show, there is a case or controversy between the parties.  There are two criteria for a declaratory judgment.  The declaratory judgment will (1) serve the useful purpose of clarifying and settling the legal issues and (2) terminate and afford relief from controversy giving rise to the case.  *McGraw-Edison Co. v. Preformed Line Products Co*, 362 F.2d 339, 342 (9th Cir. 1966).  A declaratory judgment is appropriate where a public entity has failed to follow the law.  *See, e.g., Ak-Chin Indian Community v. Central Arizona Water Conservation District*, 378 F.Supp.3d 797, 814 (D. Ariz.  Sept.

3, 2009) (where water district failed to deliver water as required by law to Indian Community, declaratory judge appropriate). A declaratory judgment in this case will meet both prongs of the declaratory statute.  It will allow all immigrants to apply for the housing funds.  It will send a message to the public and have significant educational importance.  *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1471 (9th Cir. 1984).

## CONCLUSION

For all the above reasons, Plaintiffs request that the Court find that the City has violated federal law and grant Plaintiffs a permanent injunction and a declaratory judgment.

Respectfully submitted this 15th day of October 2020.

ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST

WILLIAM E. MORRIS INSTITUTE FOR JUSTICE

By   /s/Ellen Sue Katz
      Ellen Sue Katz

      Attorneys for Plaintiffs

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on the 15th day of October 2020, I caused the foregoing

3   document to be electronically transmitted to the Clerk's Office using the CM/ECF

4   System for filing and transmittal to the following CM/ECF Registrants:

5   Mary R. O'Grady
    Kristen L. Windtberg
6   Emma J. Cone-Roddy
    Osborn Maledon, P.A.
7   2929 North Central Avenue, Suite 2100
8   Phoenix, Arizona 85012-2793
9   mogrady@omlaw.com
    econe-roddy@omlaw.com
10  kwindtberg@omlaw.com

11
    Cris Meyer, City Attorney
12  Les S. Tuskai, Assistant Chief Counsel
13  Office of the City Attorney
    200 West Washington Street, Suite 1300
14  Phoenix, Arizona 85003-1611
    cris.meyer@phoenix.gov
15  les.tuskai@phoenix.gov

16
    Attorneys for Defendant
17

18

19                              /s/ Ellen Sue Katz

20

21

22

23

24

25

26

27

28