ELLEN SUE KATZ, AZ Bar. No. 012214
BRENDA MUÑOZ FURNISH, AZ Bar No. 027280
ORIEN NELSON, AZ Bar No. 032861
WILLIAM E. MORRIS INSTITUTE FOR JUSTICE
3707 North Seventh Street, Suite 300
Phoenix, Arizona 85014
(602) 252-3432
eskatz@qwestoffice.net
bmfurnish@qwestoffice.net
onelson@qwestoffice.net

DANIEL J. ADELMAN AZ Bar No. 011368
ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
514 West Roosevelt Street
Phoenix, Arizona 85003
(602) 258-8850
danny@aclpi.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition. an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated, | No. CV 20-01429-DWL |
| Plaintiffs, | DECLARATION OF DAVID A. SUPER |
| v. | |
| The City of Phoenix, a municipal corporation, | |
| Defendant. | |

I, David A. Super, declare as follows:

**I. Qualifications**

1.      I am Carmack Waterhouse Professor of Law and Economics at Georgetown University Law Center. I have been a professor of law since 2004 and have also taught at Columbia, Harvard, Howard, Maryland, Penn, Washington & Lee, and Yale. My research focuses on Administrative Law, Constitutional Law, Immigration, Legislation,

Local Government Law, and Public Welfare Law. I am the author of the casebook Public Welfare Law published in 2017 by Foundation Press.

2. A copy of my resume is attached hereto as Exhibit A. A list of my publications to the best of my recollection is attached hereto as Exhibit B. I have previously testified as an expert in *Briggs v. Bremby*, Civil Action No. 3:12-CV-00324 (VLB) in the United States District Court for the District of Connecticut, a case involving the processing of applications for public benefits. I have previously testified in similar cases in Indiana and Maryland. To the best of my recollection, I have not testified as an expert in any other cases within the past four years. I have not been promised compensation for the study and testimony in this case.

3. My primary area of expertise is public benefit programs, including the Supplemental Nutrition Assistance Program (SNAP), Medicaid, Social Security, Supplemental Security Income, housing assistance, and cash assistance. The law, policy, and administration of these programs have been a major focus of my work since 1983. I have numerous written articles on public benefit program policy and closely followed changes and developments in these programs at the state and federal state levels. Prior to becoming a full-time academic in 2004, I regularly participated in annual and quarterly meetings of the American Public Welfare Association (APWA), the American Association of Food Stamp Directors (AAFSD), on occasion attended meetings of NAPIPM (the professional association of state officials responsible for measuring programs' performance). I gave invited presentations to meetings of various organizations of state human services administrators on more than two dozen occasions. Both before and since becoming a full-time academic I have given invited presentations on these programs to groups ranging from the National Welfare Rights Organization to the Federalist Society. Over the past three decades, I have met routinely with senior and mid-level officials of the U.S. Department of Health and Human Services (HHS), the U.S. Department of Agriculture (USDA), and the White House's Office of Management and Budget (OMB) and Domestic Policy Council (DPC) officials, among other agencies. I developed close

working relationships with many officials in these entities. Researchers beginning studies of public benefit programs regularly have met with me to get my advice on the design and methodology of their studies. I have been invited to numerous research conferences on public benefit programs. At USDA's request, I have peer reviewed proposals for grants to conduct such research. Through this work, I have extensive knowledge of the history, implementation, and functioning of public benefit programs and the statutes and regulations governing these programs.

4. Very few professionals in law, policy, or public administration simultaneously have expertise in public benefit programs and immigration. Both fields are complex, and even people with interests in both typically conclude early in their careers that they must specialize in one or the other to stay current. Relatively few professional positions demand expertise in both fields or provide an opportunity to work regularly in both fields.

5. Since I served as General Counsel for the Center on Budget and Policy Priorities, I have maintained expertise in both areas. I was the first member of the Center's staff to focus significantly on the interaction between public benefit programs and immigration and authored the Center's first significant reports in this area. I provided training on this intersection to other Center staff, to staff of other non-profit organizations, to career staff of USDA's Food and Nutrition Service, and to attorneys in several states (including Arizona) through continuing legal education courses. Beginning in the early 1990s, I have closely monitored proposed federal legislation affecting immigrant families' ability to receive public benefits and the immigration consequences of such receipt. One of the twelve chapters in my *Public Benefits Law* casebook is devoted to issues affecting immigrant families. My most recent major publication in this field is *The Future of U.S. Immigration Law*, 53 U.C. DAVIS L. REV. 509 (2019). I have been quoted on issues relating to immigrants' receipt of public benefits in numerous major publications, including the *New York Times*.

**II. Welfare and Immigration Legislation in 1996**

1  6.  By far the most important piece of federal legislation affecting non-healthcare public benefit programs in the past four decades was the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which was enacted in 1996 as Public Law No. 104-193. PRWORA was the second of three major pieces of legislation that passed that year affecting immigrants and immigration.

7.  The third of those pieces of legislation was the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which was enacted as Division C of the much larger annual appropriations legislation for federal fiscal year 1997, Public Law No. 104–208.

8.  Legislation that ultimately became PRWORA and IIRIRA was under consideration for many months before Congress enacted, and the President signed, the final versions. The political dynamics surrounding both bills were broadly similar: each contained many provisions that enjoyed broad bipartisan support as well as some that were intensely controversial, with congressional Republicans seeking to get President Clinton to sign legislation containing provisions that many Democrats opposed. This resulted in intensive negotiations at several critical junctures as the respective pieces of legislation was taking form.

9.  The Administration was represented by staff from different agencies as Congress formulated these large bills. For example, staff from USDA represented the Administration in discussions about the Food Stamp Program (now SNAP) and child nutrition programs while HHS represented the Administration in discussions about the cash assistance, health care, foster care and adoption assistance, child welfare, child care, and other programs that it administered. The Administration's views on the parts of IIRIRA not related to public benefit programs were expressed primarily by the U.S. Department of Justice, which at the time included the Immigration and Nationalization Service (INS), the predecessor to today's Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Patrol (CBP).

10.     On the immigration title of PRWORA and the aspects of IIRIRA affecting immigrants' access to public benefits, the Administration was represented primarily by HHS.  Part of the reason for this is that the first important drafts of this legislation were formulated in the House Ways and Means Committee and the Senate Finance Committee, both of which have jurisdiction over numerous HHS programs and were accustomed to working with HHS.  The more important reason for HHS to take the primary role in monitoring this legislation and to represent the Administration's views in discussions with Members of Congress and their staffs was that HHS, unlike other departments, had staff with expertise in the interaction between immigration and public benefits programs.  This staff primarily worked for HHS's Assistant Secretary for Planning and Evaluation (ASPE).  Some of this expertise was developed in the course of designing restrictions on immigrants' eligibility for public benefits that were part of President Clinton's welfare reform proposal, which did not pass, and his proposal to extend emergency unemployment benefits, which did.

11.     Staff of other departments directed their questions and comments to the ASPE staff engaged with this legislation, and the ASPE staff reached out to the other departments when issues arose affecting their activities.  As the person responsible for monitoring the immigrant-related parts of what became PRWORA and IIRIRA, I also had regular conversation with the ASPE staff engaged with these components of the pending legislation.  I knew well the analysts at the Office of Management and Budget (OMB) and the Congressional Budget Office (CBO) that were working on the components of this legislation affecting immigrants' receipt of public benefits.  Both these analysts relied heavily on the ASPE staff for information from which to estimate the fiscal implications of various pending proposals.

12.     Because ASPE's staff is composed of non-partisan career civil servants, they shared their expertise freely with people on all sides of the issues and in particular with Members of Congress and their staff of both parties and on all sides of the issues.  They were widely trusted by Members and staff of both political parties, both chambers,

and several committees. Congress demonstrated the special trust it had in HHS when it required (in both section 432 of PRWORA and section 504 of IIRIRA) the Department of Justice to consult with HHS in issuing guidance on how citizenship or immigration status should be verified for applicants for federal public benefits. Sections 432 and 504 contain no consultation requirements for any of the many other federal agencies administering programs for which individuals apply.

13. The close involvement of ASPE staff with the evolution of PRWORA and IIRIRA meant that they were aware of major turns in the legislative deliberations as they were happening. For example, they were aware of the threat of Democratic senators to raise a point of order against the definition of "federal means-tested public benefit" in the draft version of PRWORA. This point of order, under the "Byrd Rule" (2 U.S.C. § 644(b)(1)(D)), would have required sixty votes to overcome. Because the Republican managers of the legislation did not have sixty votes, they deleted that definition from what became section 403 of PRWORA. ASPE staff also were privy to discussions about whether a similar point of order might be raised against the definition of a "federal public benefit" in PRWORA and the negotiations and understandings that averted such a point of order. And ASPE staff was deeply involved in the complex negotiations concerning the final form of IIRIRA.

14. When Congress finalized PRWORA, between July 27 and August 1, 1996, President Clinton was widely regarded as being apprehensive about his re-election chances and unlikely to veto any bill Congress sent to him. This reduced, but did not eliminate, the Administration's leverage in negotiations with Congress. The Republican leaders finalizing the legislation's content nonetheless sought to avoid especially provoking provisions and were constrained both by the threat of points of order in the Senate and by the need to hold the support of Republicans in both chambers who opposed harsh treatment of immigrants.

15. The provisions of IIRIRA relating to immigrants' receipt of public benefits involve a significantly different approach from those previously enacted in PRWORA

because the political context had changed significantly in the intervening two months. By the time Congress was finalizing IIRIRA in late September 1996, President Clinton's re-election was widely regarded as almost assured. Congressional Republicans had become concerned about protecting their majorities in both chambers and were anxious to secure the President's signature on IIRIRA. Because IIRIRA could have been delayed, and likely killed, by a filibuster in the Senate, congressional Republicans attached it to the omnibus appropriations bill to keep the government open after September 30. Had President Clinton vetoed that legislation over his dislike for IIRIRA, the result would have been a partial shutdown of the federal government. During the previous year, partial government shutdowns had occurred in confrontations between the new Republican majorities in Congress and President Clinton, with the result widely believed to have favored President Clinton in public opinion. Congressional Republicans were eager to avoid another partial government shutdown in the weeks before the election that could have further inflamed voters against them. They were not optimistic about their ability to blame President Clinton for a shutdown over his opposition to IIRIRA because he had already signed to major pieces of legislation that year imposing restrictions on immigrants, PRWORA and the earlier Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law No. 104-132. Congressional Republicans therefore were willing to negotiate with the Administration and to make much more substantial concessions than they had been when passing PRWORA two months earlier. For his part, President Clinton had taken substantial criticism from other Democrats and immigrants' advocates for signing AEDPA and PRWORA and his advisors were becoming concerned that turn-out in the November elections could suffer if he were to sign another piece of legislation widely perceived as unreasonably restrictive on immigrants. Accordingly, the Administration took a very aggressive position in negotiations on IIRIRA, seeking and obtaining concessions that likely would have been impossible two months earlier.

16.    One theme that pervaded congressional deliberations about public benefit programs during this period was a strong preference for private non-profit charities over

governmental bureaucracies as a means of dispensing aid to low-income people. Thus, for example, although PRWORA obtained roughly half its overall savings from deep cuts to the Food Stamp Program, it added $600 million to The Emergency Food Assistance Program (TEFAP) for the purchase of commodities that would be distributed through food banks, soup kitchens, and other non-profits. During and after PRWORA's consideration, numerous Members of Congress advocated legislation as well as federal and state administrative actions to increase the role that private non-profits, especially faith-based communities, play in administering social services programs. Some of this interest, particularly on the part of conservative Members, sprang from the influence at that time of Charles Murray's 1984 book *Losing Ground*, which argued that receiving benefits from the federal or state governments corrupted the morality of low-income people but that aid from neighbors through non-governmental organizations could be positive. Some of this interest on the part of Members across the political spectrum came from their own experiences in churches and synagogues and the experiences of faith-based and other non-profits in their home states.

17.    Several Members of Congress argued that the restrictions on immigrants' eligibility for public benefits being contemplated in pending versions of the legislation that became PRWORA and IIRIRA would require more complex determinations of eligibility in those programs and that this, in turn, would reduce the ability or willingness of non-profit organizations to administer these programs. Many of these non-profits depend heavily on volunteers who may be able to make simple eligibility determinations but cannot feasibly be trained on the complexities of various immigration statuses and the kinds of documentation that signify those statuses.

18.    Members of Congress argued that requiring non-profits to determine persons' immigration status before providing assistance would disadvantage U.S. citizens as well as non-citizens because it would cause potentially beneficial non-profits to drop out of program administration and because the more complex and burdensome eligibility determination process would slow the provision of aid in times of need. Avoiding harm

to U.S. citizens from more complex eligibility determination processes was a common theme during the consideration of the legislation that became PRWORA and IIRIRA. For example, concern that urgent medical treatment to U.S. citizens might be slowed if public coverage for emergency medical treatment was contingent on determinations of immigration status contributed to Congress's exemption of all such coverage from PRWORA's immigrant eligibility provisions. *See* PRWORA §§ 401(b)(1)(A), 403(c)(2)(A), 411(b)(1), and 422(b)(1) (8 U.S.C. §§ 1611(b)(1)(A), 1613(c)(2)(A), 1621(b)(1), and 1632(b)(1)). Similarly, concern that disaster relief to U.S. citizens might be delayed if they had to establish that status led Congress to exempt disaster assistance from otherwise applicable restrictions. *See* PRWORA §§ 401(b)(1)(B), 403(c)(2)(B), 411(b)(2), and 422(b)(2) (8 U.S.C. §§ 1611(b)(1)(B), 1613(c)(2)(B), 1621(b)(2), and 1632(b)(2)). And concern that schools, whose expertise is in education rather than verification, would deny meals to U.S. citizens or eligible immigrant children, or even drop out of child nutrition programs, prompted Congress to exempt those programs from PRWORA's immigrant eligibility restrictions. *See* PRWORA §§ 403(c)(2)(C) and (D), 422(b)(3) and (4), and 742(a) (8 U.S.C. §§ 1613(c)(2)(C) and (D), 1615(a), and 1632(b)(3) and (4)).

19. Various approaches to preventing immigrant eligibility restrictions from increasing non-profit agencies' administrative burdens were considered throughout the pendency of the legislation leading to PRWORA and IIRIRA. Some Members of Congress were reluctant to allow non-profits to provide assistance without applying the new immigrant eligibility restrictions and sought to have federal, state, or local government agencies apply those restrictions before passing applicants who passed on to the non-profits. Some non-profits, however, objected to having that much governmental involvement in their administration of programs and indicated that they might not participate if their roles were so tightly constrained. This method also struck many Members of Congress as inconsistent with their goal of removing government from

administration of anti-poverty programs where possible and turning over resources with minimal constraints to faith-based communities and other non-profits.

20. Because PRWORA was passed under the special "reconciliation" procedures of 2 U.S.C. § 641 to prevent a filibuster in the Senate, the Byrd Rule precluded addressing the role of non-profits relative to the immigrant eligibility restrictions in that legislation because any non-profit exemption would not primarily or substantially change federal outlays. In IIRIRA, however, Members of Congress concerned about maintaining and enhancing non-profits' roles in administering anti-poverty programs insisted that an exception for non-profits be inserted. The Senate had earlier sought to exempt benefits provided by non-profits from some of the restrictions on benefits that immigrants could receive. S. Rep. No. 249, at 22 (April 10, 1996). The initial House-Senate conference agreement, however, required that public agencies perform an immigration status check on behalf of the non-profits. *See, e.g.*, H. Conf. Rep. No. 104-828, at 135-36 (Sept. 24, 1996).

21. As one of the conditions the President set on his willingness to sign the legislation, the Administration demanded that no immigration check be required for benefits provided by non-profit organizations. This allowed him to say that he had softened some of the restrictions on immigrants' access to public benefits that he had criticized when he agreed to sign PRWORA and that had brought him under strong criticism. Senator Kennedy confirmed that this change was one of those made to gain bipartisan support for the legislation, including the President's signature. 142 Cong. Rec. S11863, S11864 (daily ed. Sept. 30, 1996). Senator Kennedy explained that this change "allows non-profit organizations, such as Catholic Charities, church social service programs, or community-based organizations to continue to assist communities with Government funds, without having to check the citizenship and green cards of everyone who walks in their doors. Rather than making harsh welfare reforms even harsher for legal immigrants, this bipartisan agreement provides modest but needed improvements

over those reforms for battered immigrants and for charities and other non-profit organizations that are a lifeline to immigrant communities." *Id.*

22.    The change to the non-profit exemption to eliminate the need for government agencies to perform immigration status checks on benefits distributed by non-profit organizations was made when the version of IIRIRA that was in the conference report was modified for inclusion in the year-end appropriations bill that ultimately passed. The impact of this provision was tolerable to advocates of strong restrictions on immigrants' receipt of public benefits because the largest public benefit programs, such as Medicaid, food stamps, and Supplemental Security Income, were already required by law to have eligibility determinations made by public agencies. Some Members of Congress saw this provision as making an acceptable trade-off between two of their priorities, limiting immigrants' ability to receive public benefits and expanding the role of non-profit organizations in distributing aid to low-income people. This was true because restrictions on immigrants' access to benefits would be weakened only in cases where the role of non-profits, including faith-based organizations, would be expanded.

### III. HHS Guidance in 1997 and 1998

23.    After PRWORA and IIRIRA were enacted, all federal agencies involved in administering programs assisting individuals looked to HHS, especially ASPE, for guidance on what changes were required in their programs. Those agencies, as well as OMB, knew that only ASPE had the detailed involvement with the formulation of the legislation to understand how to interpret its relatively general language to the particular programs they operated. It therefore was widely assumed that HHS would issue authoritative interpretations of crucial terms such as "federal public benefit" and "federal means-tested public benefit" contained in PRWORA and IIRIRA. Congress reflected this expectation in section 432 of PRWORA and section 504 of IIRIRA when it directed the Department of Justice, which at the time was the primary department with jurisdiction over immigration, to consult with HHS before issuing guidance on the verification of

citizenship or immigration status for persons applying for federal public benefits programs.

24. Consistent with these expectations, HHS undertook to do just that. It consulted closely with the U.S. Department of Justice, as required by section 432(a) of PRWORA, as amended by section 504 of IIRIRA, (8 U.S.C. § 1642) on the guidance Congress directed the Justice Department to issue on methods of verifying immigration status. As part of those consultations, it also obtained the Justice Department's input into the guidance it was preparing on the interpretation of key parts of PRWORA. With OMB's help, HHS also obtained input from other affected federal agencies. These extensive consultative processes delayed the issuance of these two pieces of guidance considerably but avoided any conflicts between or within any of the pertinent agencies.

25. Administratively, publishing documents in the *Federal Register* jointly from two different cabinet departments is quite difficult, multiplying the delays in the formal clearance process. Accordingly, HHS did not attempt to do so. Even with the Department of Justice, the department with which HHS had been working most closely on this matter, HHS did not attempt to publish joint guidance but rather coordinated the timing of its guidance to appear the same day as the Department of Justice's proposed rules on the verification of citizenship or immigration status. *Compare* Department of Justice, *Proposed Rule: Verification of Eligibility for Public Benefits*, 63 Fed. Reg. 41,662 (Aug. 4, 1998), *with* Department of Health and Human Services, *Notice: Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"*, 63 Fed. Reg. 41,658 (Aug. 4, 1998). To facilitate further coordination, the two departments specified the same date, October 5, 1998, as the deadline for receiving comments on their respective documents.

26. In part to signify its importance as government-wide policy, the HHS interpretive guidance was signed by the Secretary of Health and Human Services herself, which is relatively unusual for *Federal Register* documents. Other agencies administering public benefit programs, such as the Food and Nutrition Service of the U.S.

Department of Agriculture, understood from OMB and from inter-agency meetings that HHS's guidance reflected government-wide policy. Because of HHS's expertise, because HHS had incorporated other agencies' input, and because HHS was understood to be providing the authoritative interpretation for the U.S. Government, no other agency made any attempt to publish a comparable exegesis on the pertinent provisions of PRWORA and IIRIRA, although as necessary some did publish lists of their own programs that did or did not meet the definitions as HHS had interpreted them.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 10, 2020, in Washington, D.C.

*David A. Super*

_____

David A. Super

# EXHIBIT A

## DAVID A. SUPER
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, DC  20001-2075
(202) 661-6656 (o)/(202) 662-9412 (fax)
E-mail: das62@georgetown.edu

## EDUCATION

**Harvard Law School**, J.D. with honors, 1983; staff editor, comments editor, Harv. C.R.C.L. L. Rev.
**Princeton University**, A.B. in Politics *magna cum laude,* 1980; N.Y. Herald-Tribune Prize

## TEACHING EXPERIENCE

**Georgetown University Law Center**, Washington, DC, 2003, 2008-present
*Adjunct Professor of Law* (2003, 2008, 2009, 2010); *Visiting Professor of Law* (2010-2011); *Professor of Law* (2011—)
*Courses:* Administrative Law; Bargain, Exchange and Liability; Contracts; Evidence; Federal Income Taxation; Legislation; Local Government Law; Property; Public Welfare Law; Torts
*Committees:* Academic Standards; Appointments; Diversity and Professionalism; Experiential Learning; Law Fellows and Teaching Careers; Public Interest (chair)
*Award:* Frank F. Flegal Excellence in Teaching Award (2018-19)

**Columbia Law School**, New York, NY, 2001-2008          *Visiting Lecturer in Law; Adjunct Prof. of Law*
*Course:* Public Benefits Law in Changing Times

**Harvard Law School**, Cambridge, MA, 2007-08                          *Visiting Professor of Law*
*Courses:* Administrative Law; Legislation; Local Government Law

**Howard University Law School**, Washington, DC, 1999, 2001, and 2002      *Adjunct Professor of Law*
*Course:* Administrative Law

**Princeton University**, Princeton, NJ, 2000 and 2003          *Visiting Lecturer in Public and Int'l Affairs*
*Courses:* Task forces (seminars) in welfare policy (taught in Princeton's Woodrow Wilson School)

**University of Maryland Law School**, Baltimore, MD 2004-2011                  *Professor of Law*
*Courses:* Administrative Law; Evidence; Legal Analysis, Writing, and Research; Professional Responsibility; Property; Public Welfare Law; Regulatory Theory; Statutory Interpretation; Torts
*Committees:* Appointments; Curriculum (chair); Loan Repayment Assistance Program Faculty Board; Promotions and Tenure (subcommittee chair)
*Awards:* Black Law Students' Association Professor of the Year (2010); Evening Division Students' Service Award (2010); Student Bar Association Outstanding Faculty Member of the Year (2010); Distinguished Research Professor (2010-11)

**University of Pennsylvania Law School**, Philadelphia, PA, 2003                  *Lecturer in Law*
*Course:* American Public Benefits Law

**Washington and Lee University Law School**, Lexington, VA, 1999-2004
*Adjunct Professor of Law* (1999-2001, 2003); *Visiting Professor of Law* (Spring 2002 and 2004)
*Courses:*  Advanced Problems in Admin. Law; Administrative Law (first-year course with writing and advocacy component); Federal Courts; Legislation; Local Government Law; Public Welfare Law

**Yale Law School**, New Haven, CT, 2002, 2004, 2006-07, 2016, 2021 *Vis. Lecturer; Vis. Prof. of Law*
*Courses:* Legislation; Local Government and Education Law; Procedure; Public Welfare Law

## OTHER EMPLOYMENT

**Center on Budget and Policy Priorities**, Washington, DC, 1993-2004        *General Counsel*

**National Health Law Program (NHeLP)**, Washington, DC, 1992-93        *Staff Attorney*

**Food Research and Action Center (FRAC)**, Washington, DC, 1987-92
*Legal Director, 1989-92; Staff Attorney and Policy Analyst, 1987-1989*

**Community Legal Services**, Philadelphia, PA, 1983-87        *Staff Attorney*

**Professor Laurence H. Tribe, Harvard Law School**, Cambridge, MA, 1983        *Research Assistant*

## SCHOLARLY ARTICLES

*Offering an Invisible Hand: The Rise of the Personal Choice Model for Rationing Public Benefits*, 113 YALE L.J. 815 (2004).

*The Political Economy of Entitlement*, 104 COLUM. L. REV. 633 (2004).

*The Quiet "Welfare" Revolution: Resurrecting the Food Stamp Program in the Wake of the 1996 Welfare Law*, 79 N.Y.U. L. REV. 1271 (2004).

*The New Moralizers: Transforming the Conservative Legal Agenda*, 104 COLUM. L. REV. 2032 (2004).

*Rethinking Fiscal Federalism*, 118 HARV. L. REV. 2544 (2005).

*Are Rights Efficient? Challenging the Managerial Critique of Individual Rights*, 93 CALIF. L. REV. 1051 (2005).

*Privatization, Policy Paralysis, and the Poor*, 96 CALIF. L. REV. 393 (2008).

*Laboratories of Destitution: Democratic Experimentalism and the Failure of Anti-Poverty Law*, 157 U. PA. L. REV. 541 (2008).

*From the Greenhouse to the Poorhouse: Carbon Emissions Regulation and the Rules of Legislative Joinder*, 158 U. PA. L. REV. 1093 (2010).

*The Rise and Fall of the Implied Warranty of Habitability*, 99 CALIF. L. REV. 389 (2011).

*Against Flexibility*, 96 CORNELL L. REV. 1375 (2011).

*A New New Property*, 113 COLUM. L. REV. 1773 (2013).

*The Modernization of American Public Law: Health Care Reform and Popular Constitutionalism*, 66 STAN. L. REV. 873 (2014).

*Protecting Civil Rights in the Shadows*, 123 YALE L.J. 2806 (2014).

*A Hiatus in Soft-Power Administrative Law: The Case of Medicaid Eligibility Waivers*, 65 UCLA L. REV. 1590 (2018).

*Temporal Equal Protection*, 97 No. CAR. L. REV. 59 (2019).

*The Future of U.S. Immigration Law*, 53 U.C. DAVIS L. REV. 509 (2019).

*Acute Poverty: The Fatal Flaw in U.S. Anti-Poverty Law*, 9 U.C. IRVINE L. REV. 1273 (2020).

## BOOKS AND BOOK CHAPTERS

FRAC'S GUIDE TO THE FOOD STAMP PROGRAM (1988) (130-pp. manual for legal services attorneys).

*Federal-State Budgetary Interactions*, *in* FISCAL CHALLENGES: AN INTERDISCIPLINARY APPROACH TO BUDGET POLICY 366 (Elizabeth Garrett et al., eds., 2008).

GET A RUNNING START: YOUR COMPREHENSIVE GUIDE TO FIRST YEAR CURRICULUM (West 2016) (with David C. Gray and others).

PUBLIC WELFARE LAW (Foundation Press 2017).

*States' Evolving Role in SNAP*, *in* HOLES IN THE SAFETY NET: FEDERALISM AND POVERTY (Ezra Rosser, ed., Cambridge University Press 2019).

## OTHER PUBLICATIONS

*Offsetting the Effects of Medical Expenses on Older Adults' Household Food Budgets: An Analysis of the Standard Medical Expense Deduction*, 57 GERONTOLOGIST 359 (2017) (with Grace Bagwell-Adams, Jung Sun Lee and Vibha Bhargava).

*Preventing Terminations of SNAP When States Fail to Recertify Households on Time*, 46 CLEARINGHOUSE REV. 250 (2012).

*Protecting Households as States Stagger SNAP Issuance*, 46 CLEARINGHOUSE REV. 272 (2012).

*SNAP Eligibility for Low-Income College Students*, 44 CLEARINGHOUSE REV. 508 (2011).

*Congress Secures Private Right of Action for Low-Income Households Seeking Food Assistance*, 44 CLEARINGHOUSE REV. 379 (2010).

*The Mortgage Foreclosure Crisis: Seeking a Role for Equity*, 42 CLEARINGHOUSE REV. 104 (2009).

*Judicial Deference to Administrative Agencies and Its Limits*, 40 CLEARINGHOUSE REV. 596 (2007) (with Graham G. Martin).

*Improving Fairness and Accuracy in Food Stamp Fraud Investigations: Advocating Reform under Food Stamp Regulations*, 39 CLEARINGHOUSE REV. 73 (2005).

*Encouraging Moderation in State Policies on Collecting Food Stamp Claims*, 39 CLEARINGHOUSE REV. 349 (2005).

*Food Stamps and the Criminal Justice System*, 25 THE CHAMPION, No. 9, p. 20 (November 2001).

*Income Supports for Lower-Income Working Families*, 34 CLEARINGHOUSE REV. 509 (2001) (with Maurice Emsellem, Rick McHugh, Sherry Leiwant, and Michael O'Connor).

*1990 Farm Bill's Inaccessible-Resource Provision Applies to Vehicles*, 26 CLEARINGHOUSE REV. 1343 (1993).

*Fighting Hunger in the Sun: Opportunities to Expand the Summer Food Program for Children*, 25 CLEARINGHOUSE REV. 1006 (1991) (with Sharon Lee Schwartz and Mary Ellen Natale).

*Questionable Rule Denies Food Stamps to Self-Employed Workers*, 25 CLEARINGHOUSE REV. 93 (1991) (with Marilyn Katz).

*The Case Against the Thrifty Food Plan as the Basis for the Food Component of the AFDC Standard of Need*, 25 CLEARINGHOUSE REV. 86 (1991) (with Mary Ellen Natale).

*The Rights of the Disabled in the Food Stamp Program*, 25 CLEARINGHOUSE REV. 68 (1991) (with Eve H. Shapiro).

*Introduction to the WIC and CSFP Programs*, 24 CLEARINGHOUSE REV. 820 (1990) (with Helen Hershkoff and Ellen Teller).

*USDA Expands Eligibility for Emergency Food Stamps*, 24 CLEARINGHOUSE REV. 683 (1990) (with Eve H. Shapiro).

*Securing Access to the Food Stamp Program for the Non-English-Speaking Poor*, 23 CLEARINGHOUSE REV. 954 (1989) (with Mary Ellen Natale).

*Introduction to the Food Stamp Program*, 23 CLEARINGHOUSE REV. 870 (1989).

Numerous columns in *The New York Times, The Los Angeles Times, The Washington Post, Newsday, The Philadelphia Inquirer, The Baltimore Sun, The Christian Science Monitor, The Hill, Bloomberg BNA, SCOTUS Blog,* and other publications on a wide range of topics including civil rights, Middle-Eastern democracy, health care financing, taxation, the federal budget, constitutional conventions, natural resources, environmental protection, congressional procedure, elections, anti-poverty programs, technology, and other issues.

Regular poster on *Balkinization* public law blog.

**EXHIBIT A**

# EXHIBIT B

# Publications of David A. Super

## Scholarly Articles

*Offering an Invisible Hand: The Rise of the Personal Choice Model for Rationing Public Benefits*, 113 YALE L.J. 815 (2004).

*The Political Economy of Entitlement*, 104 COLUM. L. REV. 633 (2004).

*The Quiet "Welfare" Revolution: Resurrecting the Food Stamp Program in the Wake of the 1996 Welfare Law*, 79 N.Y.U. L. REV. 1271 (2004).

*The New Moralizers: Transforming the Conservative Legal Agenda*, 104 COLUM. L. REV. 2032 (2004).

*Rethinking Fiscal Federalism*, 118 HARV. L. REV. 2544 (2005).

*Are Rights Efficient? Challenging the Managerial Critique of Individual Rights*, 93 CALIF. L. REV. 1051 (2005).

*Privatization, Policy Paralysis, and the Poor*, 96 CALIF. L. REV. 393 (2008).

*Laboratories of Destitution: Democratic Experimentalism and the Failure of Anti-Poverty Law*, 157 U. PA. L. REV. 541 (2008).

*From the Greenhouse to the Poorhouse: Carbon Emissions Regulation and the Rules of Legislative Joinder*, 158 U. PA. L. REV. 1093 (2010).

*The Rise and Fall of the Implied Warranty of Habitability*, 99 CALIF. L. REV. 389 (2011).

*Against Flexibility*, 96 CORNELL L. REV. 1375 (2011).

*A New New Property*, 113 COLUM. L. REV. 1773 (2013).

*The Modernization of American Public Law: Health Care Reform and Popular Constitutionalism*, 66 STAN. L. REV. 873 (2014).

*Protecting Civil Rights in the Shadows*, 123 YALE L.J. 2806 (2014).

*Offsetting the Effects of Medical Expenses on Older Adults' Household Food Budgets: An Analysis of the Standard Medical Expense Deduction*, 57 GERONTOLOGIST 359 (2017) (with Grace Bagwell-Adams, Jung Sun Lee and Vibha Bhargava).

*A Hiatus in Soft-Power Administrative Law: The Case of Medicaid Eligibility Waivers*, 65 UCLA L. REV. 1590 (2018).

*Temporal Equal Protection*, 97 No. CAR. L. REV. 59 (2019).

*The Future of U.S. Immigration Law*, 53 U.C. DAVIS L. REV. 509 (2019).

*Acute Poverty: The Fatal Flaw in U.S. Anti-Poverty Law*, 9 U.C. IRVINE L. REV. 1273 (2020).

**Books and Book Chapters**

FRAC'S GUIDE TO THE FOOD STAMP PROGRAM (1988) (130-pp. manual for legal services attorneys).

*Federal-State Budgetary Interactions, in* FISCAL CHALLENGES: AN INTERDISCIPLINARY APPROACH TO BUDGET POLICY 366 (Elizabeth Garrett et al., eds., 2008).

GET A RUNNING START: YOUR COMPREHENSIVE GUIDE TO FIRST YEAR CURRICULUM (West 2016) (with David C. Gray and others).

PUBLIC WELFARE LAW (Foundation Press 2017).

*States' Evolving Role in SNAP, in* HOLES IN THE SAFETY NET: FEDERALISM AND POVERTY 173 (Ezra Rosser, ed., Cambridge University Press 2019).

**Practitioner-Oriented Articles**

*Preventing Terminations of SNAP When States Fail to Recertify Households on Time*, 46 CLEARING-HOUSE REV. 250 (2012).

*Protecting Households as States Stagger SNAP Issuance*, 46 CLEARINGHOUSE REV. 272 (2012).

*SNAP Eligibility for Low-Income College Students*, 44 CLEARINGHOUSE REV. 508 (2011).

*Congress Secures Private Right of Action for Low-Income Households Seeking Food Assistance*, 44 CLEARINGHOUSE REV. 379 (2010).

*The Mortgage Foreclosure Crisis: Seeking a Role for Equity*, 42 CLEARINGHOUSE REV. 104 (2009).

*Judicial Deference to Administrative Agencies and Its Limits*, 40 CLEARINGHOUSE REV. 596 (2007) (with Graham G. Martin).

*Improving Fairness and Accuracy in Food Stamp Fraud Investigations: Advocating Reform under Food Stamp Regulations*, 39 CLEARINGHOUSE REV. 73 (2005).

*Encouraging Moderation in State Policies on Collecting Food Stamp Claims*, 39 CLEARINGHOUSE REV. 349 (2005).

*Food Stamps and the Criminal Justice System*, 25 THE CHAMPION, No. 9, p. 20 (November 2001).

*Income Supports for Lower-Income Working Families*, 34 CLEARINGHOUSE REV. 509 (2001) (with Maurice Emsellem, Rick McHugh, Sherry Leiwant, and Michael O'Connor).

*1990 Farm Bill's Inaccessible-Resource Provision Applies to Vehicles*, 26 CLEARINGHOUSE REV. 1343 (1993).

*Fighting Hunger in the Sun: Opportunities to Expand the Summer Food Program for Children*, 25 CLEARINGHOUSE REV. 1006 (1991) (with Sharon Lee Schwartz and Mary Ellen Natale).

*Questionable Rule Denies Food Stamps to Self-Employed Workers*, 25 CLEARINGHOUSE REV. 93 (1991) (with Marilyn Katz).

*The Case Against the Thrifty Food Plan as the Basis for the Food Component of the AFDC Standard of Need*, 25 CLEARINGHOUSE REV. 86 (1991) (with Mary Ellen Natale).

*The Rights of the Disabled in the Food Stamp Program*, 25 CLEARINGHOUSE REV. 68 (1991) (with Eve H. Shapiro).

*Introduction to the WIC and CSFP Programs*, 24 CLEARINGHOUSE REV. 820 (1990) (with Helen Hershkoff and Ellen Teller).

*USDA Expands Eligibility for Emergency Food Stamps*, 24 CLEARINGHOUSE REV. 683 (1990) (with Eve H. Shapiro).

*Securing Access to the Food Stamp Program for the Non-English-Speaking Poor*, 23 CLEARINGHOUSE REV. 954 (1989) (with Mary Ellen Natale).

*Introduction to the Food Stamp Program*, 23 CLEARINGHOUSE REV. 870 (1989).

**Commentary**

### *The Hill*

*The House GOP's puzzling ObamaCare replacement*, THE HILL (Mar. 10, 2017), https://thehill.com/blogs/pundits-blog/healthcare/323413-the-house-gops-puzzling-obamacare-replacement

*If TrumpCare stalls in Senate, House Republicans better watch their backs*, THE HILL (Mar. 20, 2017),

*Congress, don't let logging industry decide fate of American forests*, THE HILL (July 19, 2017), thehill.com/blogs/pundits-blog/energy-environment/342767-congress-dont-let-the-logging-industry-decide-the-fate

*Stop the costly, unnecessary road through Alaska wildlife refuge*, THE HILL (July 27, 2017), http://thehill.com/blogs/pundits-blog/energy-environment/344209-stop-the-costly-unnecessary-road-through-alaska

*Climate change and oil prices should bury Arctic drilling forever*, THE HILL (Aug. 3, 2017), thehill.com/blogs/pundits-blog/energy-environment/345241-climate-change-and-oil-prices-should-bury-arctic

*Congress, keep the West wild — or at least what's left of it*, THE HILL (Aug. 15, 2017), thehill.com/blogs/pundits-blog/energy-environment/346656-congress-keep-the-west-wild-or-at-least-whats-left-of

*Don't let funding for US Forest Service go up in flames*, THE HILL (Aug. 21, 2017),

thehill.com/blogs/pundits-blog/energy-environment/347404-dont-let-funding-for-us-forest-service-go-up-in-flames

*Trump, Tillerson make right move challenging Egypt's repressive regime*, THE HILL (Aug. 27, 2017), https://thehill.com/blogs/pundits-blog/foreign-policy/348186-trump-tillerson-make-right-move-challenging-egypts

*Trump's infrastructure order falls far short of his campaign promises*, THE HILL (Sept. 9, 2017), http://thehill.com/blogs/pundits-blog/energy-environment/349892-trumps-infrastructure-order-falls-far-short-of-his

*Senate environmental consultation bill a classic case in overreaction*, THE HILL (Sept. 22, 2017), thehill.com/opinion/energy-environment/351943-senates-environmental-consultation-bill-a-classic-case-in

*Congress pursues policy of deliberate ignorance with forest logging*, THE HILL (Sept. 26, 2017), thehill.com/opinion/energy-environment/352547-congress-pursues-policy-of-deliberate-ignorance-with-forest

*Interior's bad-faith plan for wildlife refuge puts future reform at risk*, THE HILL (Oct. 23, 2017), http://thehill.com/opinion/energy-environment/356699-interiors-bad-faith-plan-for-wildlife-refuge-puts-reform-at-risk

*Keep opportunistic pork out of Forest Service's fire-fighting budget*, THE HILL (Nov. 1, 2017), http://thehill.com/opinion/energy-environment/358093-keep-opportunistic-pork-out-of-fire-fighting-budget

*Has Congress already forgotten our last oil spill disaster?*, THE HILL (Nov. 15, 2017), https://thehill.com/opinion/energy-environment/360462-has-congress-already-forgotten-our-last-oil-spill-disaster

*GOP could cut environmental review policy like loggers clear forests*, THE HILL (Dec. 4, 2017), thehill.com/opinion/energy-environment/363066-gop-would-cut-environmental-review-policy-like-loggers-clear

*Another 'emergency,' another rollback of environment protections*, THE HILL (Dec. 13, 2017), thehill.com/opinion/energy-environment/364735-another-emergency-another-rollback-of-environmental-protections

*One wrong move and Trump's infrastructure goals will come to a screeching halt*, THE HILL (Dec. 30, 2017), http://thehill.com/opinion/technology/366853-one-wrong-move-and-trumps-infrastructure-goals-will-crash-and-burn

*Trump's White House quietly undercut environmental harm mitigation rules*, THE HILL (Feb. 1, 2018), http://thehill.com/opinion/energy-environment/371758-trumps-white-house-quietly-undercut-environmental-harm-mitigation

*Keep anti-environment riders for Alaska out of spending bill*, THE HILL (Mar. 15, 2018), http://thehill.com/opinion/energy-environment/378656-keep-anti-environment-riders-for-alaska-out-of-spending-bill

*Interior change removes all incentive for industry to protect migratory birds*, THE HILL (Mar. 24, 2018), thehill.com/opinion/energy-environment/380056-interior-dept-change-removes-all-incentive-for-industry-to-protect

*A 'Convention of States' is the last thing America needs right now*, THE HILL (Mar. 27, 2018), https://thehill.com/opinion/campaign/380467-a-convention-of-states-is-the-last-thing-america-needs-right-now

*Kill off anti-environmental excesses in the farm bill*, THE HILL (Apr. 18, 2018), http://thehill.com/opinion/energy-environment/383680-kill-off-anti-environmental-excesses-in-the-farm-bill

*Don't undermine local voices in environmental decisions*, THE HILL (Apr. 27, 2018), https://thehill.com/opinion/energy-environment/385225-dont-undermine-local-voices-in-environmental-decisions

*In Egypt, when social media gets shut down, democracy gets shut out*, THE HILL (June 1, 2018), https://thehill.com/opinion/international/390238-in-egypt-when-social-media-gets-shut-down-democracy-gets-shut-out

*Logic of Supreme Court's travel ban ruling leaves a bad taste*, THE HILL (June 30, 2018), https://thehill.com/opinion/judiciary/395008-logic-of-supreme-courts-travel-ban-ruling-leaves-a-bad-taste

*An end game on Supreme Court nominations*, THE HILL (July 8, 2018), https://thehill.com/opinion/judiciary/395535-an-end-game-on-supreme-court-nominations

*Kavanaugh hearing highlights issue of how we deal with campus sexual assault*, THE HILL (Sept. 28, 2018), https://thehill.com/opinion/education/408837-kavanaugh-hearing-highlights-issue-of-how-we-deal-with-campus-sexual

*Common thread in 2016 election stories: Giving ourselves a pass*, THE HILL (Nov. 4, 2018), https://thehill.com/opinion/campaign/414335-common-thread-in-2016-election-stories-giving-ourselves-a-pass

*Trump administration's shameless opportunism on forest fires*, THE HILL (Nov. 27, 2018), https://thehill.com/opinion/white-house/418373-shameless-opportunism-on-forest-fires

*When is a deal not a deal? When there's a wildlife refuge to be exploited*, THE HILL (Dec. 17, 2018), https://thehill.com/opinion/energy-environment/421616-when-is-a-deal-not-a-deal-when-theres-a-wildlife-refuge-to-be

*The progressive case for pay-as-you-go budget rules*, THE HILL (Jan. 8, 2019), https://thehill.com/opinion/finance/424291-the-progressive-case-for-pay-as-you-go-budget-rules

*Stop making excuses for Middle East's monsters and siding with 'lesser of evils'*, THE HILL (Feb. 10, 2019), https://thehill.com/opinion/international/429286-stop-making-excuses-for-monsters-in-the-middle-east

*America's do-over in the Middle East*, THE HILL (May 12, 2019), https://thehill.com/opinion/international/443284-americas-do-over-in-the-middle-east

*Will we learn from the Greece austerity debacle?*, THE HILL (July 14, 2019),
https://thehill.com/opinion/finance/452939-will-we-learn-from-the-greece-austerity-debacle

*Bipartisan Enzi-Whitehouse budget bill a very bad fix for deficits*, THE HILL (Nov. 6, 2019),
https://thehill.com/opinion/finance/469180-bipartisan-enzi-whitehouse-budget-bill-a-very-bad-fix-for-deficits

*Budget process quick fixes: Fixing the wrong problem*, THE HILL (Nov. 20, 2019),
https://thehill.com/opinion/finance/471242-budget-process-quick-fixes-fixing-the-wrong-problem

*Conservatives should note the Trump administration's flippant federalism*, THE HILL (Dec. 4, 2019),
https://thehill.com/opinion/white-house/472936-conservatives-should-note-the-trump-administrations-flippant-federalism

*Hidden lessons from the UK election for the US*, THE HILL (Dec. 18, 2019),
https://thehill.com/opinion/campaign/475028-hidden-lessons-from-the-uk-election-for-the-us

*We must work to resist the culture of cruelty*, THE HILL (Jan. 1, 2020), https://thehill.com/opinion/white-house/476399-we-must-work-to-resist-the-culture-of-cruelty

*Congressional leaders have been shadow boxing on impeachment*, THE HILL (Jan. 11, 2020),
https://thehill.com/opinion/white-house/477816-congressional-leaders-have-been-shadow-boxing-on-impeachment

*We're talking past one another: A lesson Democrats must understand*, THE HILL (Mar. 8, 2020),
https://thehill.com/opinion/campaign/486478-were-talking-past-one-another-a-lesson-democrats-must-understand

*COVID-19 highlights — and intensifies — our mistreatment of the poor*, THE HILL (Apr. 14, 2020),
https://thehill.com/opinion/finance/492487-covid-19-highlights-and-intensifies-our-mistreatment-of-the-poor

*Placing opportunism above the public good*, THE HILL (Apr. 29, 2020), https://thehill.com/opinion/white-house/495219-placing-opportunism-above-the-public-good

*Fighting vulnerable workers instead of the virus*, (May 19, 2020),
https://thehill.com/opinion/finance/498441-fighting-vulnerable-workers-instead-of-the-virus

*Fighting mutations of the racism virus*, THE HILL (June 20, 2020), https://thehill.com/opinion/civil-rights/503697-fighting-mutations-of-the-racism-virus

*McConnell proposal would abandon sick workers*, THE HILL (July 14, 2020),
https://thehill.com/opinion/judiciary/507148-mcconnell-proposal-would-abandon-sick-workers

*Economic, political and moral decision-making all fail us in the pandemic*, THE HILL (July 30, 2020),
https://thehill.com/opinion/white-house/509740-economic-political-and-moral-decision-making-all-fail-us-in-the-pandemic

*Republicans are abandoning the states*, THE HILL (Aug. 21, 2020),
https://thehill.com/opinion/white-house/513058-republicans-are-abandoning-the-states

*Balkinization*

*Lessons From the States on the Debt Ceiling Crisis*, BALKINIZATION (July 29, 2011),
https://balkin.blogspot.com/2011/07/lessons-from-states-on-debt-ceiling.html

*Indiana Court Autopsies Welfare Privatization Effort*, BALKINIZATION (Aug, 3, 2012),
https://balkin.blogspot.com/2012/08/indiana-court-autopsies-welfare.html

*Inside the Strange World of "Reconciliation"* BALKINIZATION (Dec. 4, 2016),
https://balkin.blogspot.com/2016/12/inside-strange-world-of-reconciliation.html

*How Reconciliation Works: What it Can and Cannot Do*, BALKINIZATION (Dec. 5, 2016),
https://balkin.blogspot.com/2016/12/how-reconciliation-works-what-it-can.html

*What the New Majority Will Do – And How They Will Do It*, BALKINIZATION (Dec. 6, 2016),
https://balkin.blogspot.com/2016/12/what-new-majority-will-do-and-how-they.html

*What is a Work Requirement?*, BALKINIZATION (May 24, 2017),
https://balkin.blogspot.com/2017/05/what-is-work-requirement.html

*Health Care and Reconciliation*, BALKINIZATION (June 20, 2017),
https://balkin.blogspot.com/2017/06/health-care-andreconciliation-last.html

*This is not the health care bill you were looking for. Move along.*, BALKINIZATION (June 25, 2017),
http://balkin.blogspot.com/2017/06/this-is-not-health-care-bill-you-were.html

*Taxes, program cuts, and reconciliation: the path forward*, BALKINIZATION (June 26, 2017),
https://balkin.blogspot.com/2017/06/taxes-program-cuts-and-reconciliation.html

*How Does This Work? The Senate and Health Care Reconciliation*, BALKINIZATION (July 25, 2017),
https://balkin.blogspot.com/2017/07/how-does-this-work-senate-and-health.html

*Is the Republican Effort to Destroy the ACA Dead?*, (July 30, 2017),
https://balkin.blogspot.com/2017/07/is-republican-effort-to-destroy-aca-dead.html

*They're back!*, BALKINIZATION (Sept. 18, 2017), https://balkin.blogspot.com/2017/09/theyre-back.html

*The Enduring Significance of the Defeat of "Repeal and Replace"*, BALKINIZATION (Sept. 30, 2017),
https://balkin.blogspot.com/2017/09/the-enduring-significance-of-defeat-of.html

*Can Republicans expand the federal judiciary through reconciliation?*, BALKINIZATION (Nov. 23, 2017),
https://balkin.blogspot.com/2017/11/can-republicans-expand-federal.html

*Procedural Misconceptions about the Senate Tax Bill*, BALKINIZATION (Nov. 27, 2017),
https://balkin.blogspot.com/2017/11/procedural-misconceptions-about-senate.html

*The Art of the Rescission*, BALKINIZATION (May 7, 2018), https://balkin.blogspot.com/2018/05/the-art-of-rescission.html

*The Loss of the Filibuster and Judicial Confirmation Reform*, BALKINIZATION (July 15, 2018),
https://balkin.blogspot.com/2018/07/the-loss-of-filibuster-and-judicial.html

*A Backdoor Approach to Calling an Article V Convention*, BALKINIZATION (Nov. 4, 2018),
https://balkin.blogspot.com/2018/11/a-backdoor-approach-to-calling-article.html

*Procedural Implications of the Midterm Elections*, BALKINIZATION (Nov. 25, 2018),
https://balkin.blogspot.com/2018/11/procedural-implications-of-midterm.html

*Congressional Responses to Emergency Declarations*, BALKINIZATION (Feb. 19, 2019),
https://balkin.blogspot.com/2019/02/congressional-responses-to-emergency.html

*Understanding the President's Budget Proposal*, BALKINIZATION (Mar. 13, 2019),
https://balkin.blogspot.com/2019/03/understanding-presidents-budget-proposal.html

*Learning from the AOC Phenomenon*, BALKINIZATION (Mar. 22, 2019),
https://balkin.blogspot.com/2019/03/learning-from-aoc-phenomenon.html

*The Congress-centric Case Against Court-Packing*, BALKINIZATION (Apr. 14, 2019),
https://balkin.blogspot.com/2019/04/the-congress-centric-case-against-court.html

*What is Congress Doing?*, BALKINIZATION (July 11, 2019), https://balkin.blogspot.com/2019/07/what-is-congress-doing.html

*Practical and Idealistic Themes in Political Reform*, BALKINIZATION (July 15, 2019),
https://balkin.blogspot.com/2019/07/practical-and-idealistic-themes-in.html

*How Sen. McConnell Would Justify Not Convening an Impeachment Trial*, BALKINIZATION (July 27, 2019), https://balkin.blogspot.com/2019/07/how-sen-mcconnell-would-justify-not.html

*What Congress's Budget Deal Does*, BALKINIZATION (Aug. 8, 2019),
https://balkin.blogspot.com/2019/08/what-congresss-budget-deal-does.html

*How Will the Senate Proceed on Impeachment?*, BALKINIZATION (Dec. 17, 2019),
https://balkin.blogspot.com/2019/12/how-will-senate-proceed-on-impeachment.html

*A Very Strange Debate*, BALKINIZATION (Dec. 23, 2019), https://balkin.blogspot.com/2019/12/a-very-strange-debate.html

*Who is in Charge Here?*, BALKINIZATION (Jan. 8, 2020), https://balkin.blogspot.com/2020/01/who-is-in-charge-here.html

*My latest on procedures for the impeachment trial*, BALKINIZATION (Jan. 11, 2020),
https://balkin.blogspot.com/2020/01/my-latest-on-procedures-for-impeachment.html

*Collective Amnesia and Public Policy: The Case of Title IX*, BALKINIZATION (Feb. 24, 2020),
https://balkin.blogspot.com/2020/02/collective-amnesia-and-public-policy.html

*President Trump, the CDC Budget, and Fiscal Irresponsibility*, BALKINIZATION (March 3, 2020),
https://balkin.blogspot.com/2020/03/president-trump-cdc-budget-and-fiscal.html

*The Congressional Process and Disaster Response*, BALKINIZATION (March 16, 2020),
https://balkin.blogspot.com/2020/03/the-congressional-process-and-disaster.html

*Negotiating Big Legislative Deals*, BALKINIZATION (March 22, 2020),
https://balkin.blogspot.com/2020/03/negotiating-big-legislative-deals.html

*How Dysfunctional is Congress Now?*, BALKINIZATION (April 15, 2020),
https://balkin.blogspot.com/2020/04/how-dysfunctional-is-congress-now.html

*More Thoughts on a Cancelled Election*, BALKINIZATION (April 19, 2020),
https://balkin.blogspot.com/2020/04/more-thoughts-on-cancelled-election.html

*The Court Acts to Tame Government Shutdowns*, BALKINIZATION (April 28, 2020),
https://balkin.blogspot.com/2020/04/the-court-acts-to-tame-government.html

*Will Congress Act?*, BALKINIZATION (May 22, 2020), https://balkin.blogspot.com/2020/05/will-congress-act.html

*The Crisis is Exposing the Harm Structural Attacks on Anti-Poverty Programs Have Done*,
BALKINIZATION (May 23, 2020), https://balkin.blogspot.com/2020/05/the-crisis-is-exposing-harm-structural.html

*Observations on Police "Riots" and the Current Moment*, BALKINIZATION (June 7, 2020),
https://balkin.blogspot.com/2020/06/observations-on-police-riots-and.html

*Can This Administration Absolve Its Friends of Crime?*, BALKINIZATION (June 25, 2020),
https://balkin.blogspot.com/2020/06/can-this-administration-absolve-its.html

*Masks and Rights Talk*, BALKINIZATION (June 28, 2020), https://balkin.blogspot.com/2020/06/masks-and-rights-talk.html

*Brinksmanship in Free-Fall*, BALKINIZATION (July 15, 2020),
https://balkin.blogspot.com/2020/07/brinksmanship-in-free-fall.html

*Gov. Scott Walker's Proposed Mandamus to Compel Congress to Call an Article V Convention*,
BALKINIZATION (July 31, 2020), https://balkin.blogspot.com/2020/07/gov-scott-walkers-proposed-mandamus-to.html

*Inadequate, Unworkable, and Unlawful: The Trump Unemployment Aid Program*, BALKINIZATION (Aug.
8, 2020), https://balkin.blogspot.com/2020/08/inadequate-unworkable-and-unlawful.html

*The Continuing Travails of the President's Attempt to Legislate a New Unemployment Assistance
Program by Executive Fiat*, BALKINIZATION (Aug. 10, 2020), https://balkin.blogspot.com/2020/08/the-continuing-travails-of-presidents.html

*The Stakes in the Administration's Problematic Unemployment Plan*, BALKINIZATION (Aug. 13, 2020),
https://balkin.blogspot.com/2020/08/the-stakes-in-administrations.html

**Other Publications**

*Policy Considerations Relating to Privatization in the Food Stamp Program*, CTR. ON BUDGET & POL'Y PRIORITIES (Oct. 28, 2004), https://www.cbpp.org/research/policy-considerations-relating-to-privatization-in-the-food-stamp-program

*How Much Would A State Earned Income Tax Credit Cost in 2008?*, CTR. ON BUDGET & POL'Y PRIORITIES (Feb. 9, 2007), https://www.cbpp.org/research/how-much-would-a-state-earned-income-tax-credit-cost-in-2008 (with Sloane Kuney and Jason Levitis)

*In Egypt, treading the path of civil rights*, BALTIMORE SUN (Feb. 14, 2011), http://articles.baltimoresun.com/2011-02-14/news/bs-ed-egypt-rights-20110214_1_civil-rights-movement-farmworkers-egypt-s-muslim-brotherhood

*Time for the U.S. to use its influence in Egypt*, L.A. TIMES (Aug. 23, 2011), https://www.latimes.com/opinion/la-xpm-2011-aug-23-la-oe-super-egypt-20110823-story.html

*Crowding out Egypt's secular democrats*, NEWSDAY (Aug. 15, 2012), http://www.newsday.com/opinion/oped/super-crowding-out-egypt-s-secular-democrats-1.3906447

*Bring On the Fiscal Cliff*, N.Y. TIMES (Dec. 17, 2012), https://www.nytimes.com/2012/12/18/opinion/forget-the-warnings-lets-drive-over-the-fiscal-cliff.html

*Be inclusive, Morsi, or you may face a second Egyptian revolution*, CHRISTIAN SCIENCE MONITOR (June 28, 2013), http://www.csmonitor.com/Commentary/Opinion/2013/0628/Be-inclusive-Morsi-or-you-may-face-a-second-Egyptian-revolution?nav=90-csm_category-topStories

*Egypt's students of democracy*, L.A. TIMES (July 3, 2013), https://www.latimes.com/opinion/la-xpm-2013-jul-03-la-oe-super-egypt-morsi-coup-20130703-story.html

*An Error Message for the Poor*, N.Y. TIMES (Jan. 3, 2014), https://www.nytimes.com/2014/01/04/opinion/an-error-message-for-the-poor.html

*We have failed Egypt*, BALTIMORE SUN (Feb. 23, 2014), http://www.baltimoresun.com/news/opinion/oped/bs-ed-egytian-uprising-20140223,0,5655766.story

*U.S. is short-sighted in Egypt*, BALTIMORE SUN (Nov. 10, 2014), http://www.baltimoresun.com/news/opinion/oped/bs-ed-egypt-20141110-story.html

*A Costly and Outrageous Tax Break*, N.Y. TIMES (Dec. 2, 2014), https://www.nytimes.com/2014/12/03/opinion/a-costly-and-outrageous-tax-break.html

*Implementing the Three-Month Time Limit on SNAP for Unemployed 18- to 49-Year-Olds* Georgetown Univ. Law Ctr. Papers (July 27, 2015), https://repository.library.georgetown.edu/handle/10822/761445

*Fight ISIS 'theology of rape' with human rights, democracy*, PHILA. INQ. (Aug. 25, 2015), https://www.inquirer.com/philly/blogs/thinktank/Fight-ISIS-theology-of-rape-with-human-rights-democracy.html

*Buddy, can you spare a rate hike?*, L.A. TIMES (Sept. 18, 2015), https://www.latimes.com/opinion/op-ed/la-oe-super-fed-rate-min-wage-20150918-story.html

*A constitutional convention would be a Brexit-scale crisis for the U.S.*, L.A. TIMES (July 7, 2016), https://www.latimes.com/opinion/op-ed/la-oe-super-constitutional-convention-balanced-budget-amendment-20160706-snap-story.html

*States Likely Could Not Control Constitutional Convention on Balanced Budget Amendment or Other Issues*, CTR. ON BUDGET & POL'Y PRIORITIES (Jan. 19, 2017), https://www.cbpp.org/research/states-likely-could-not-control-constitutional-convention-on-balanced-budget-amendment-or (with Michael Leachman)

*A constitutional convention is the last thing America needs*, L.A. TIMES (Mar. 15, 2017), https://www.latimes.com/opinion/op-ed/la-oe-super-constitutional-convention-20170315-story.html

*As Trump embraces the enemy, he should keep an eye out for their tricks*, BALTIMORE SUN (May 7, 2017), https://www.baltimoresun.com/opinion/op-ed/bs-ed-coddling-dictators-20170507-story.html

*Border wall endangers animal communities too*, BALTIMORE SUN (Sept. 13, 2017), https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0915-wall-animals-20170913-story.html

*'Work requirements' for public benefits are really just time limits*, L.A. TIMES (Jan. 15, 2018), https://www.latimes.com/opinion/op-ed/la-oe-super-work-requirements-20180115-story.html

*Program's discontinuation sentences asylum seekers to 'grim fates'*, BALTIMORE SUN (Apr. 28, 2018), https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0429-legal-orientation-20180426-story.html

*We Don't Need a National Data Center of the Poor*, SLATE (May 8, 2018), https://slate.com/technology/2018/05/the-national-food-stamp-database-proposed-by-house-republicans-is-a-potential-nightmare.html (with Danielle Citron)

*The new Republican farm bill will dismantle our programs to feed the needy*, L.A. TIMES (May 11, 2018), https://www.latimes.com/opinion/op-ed/la-oe-super-farm-bill-snap-20180511-story.html

*What Brett Kavanaugh could mean for the future of abortion, marriage equality and much more*, L.A. TIMES (July 9, 2018), https://www.latimes.com/opinion/op-ed/la-oe-super-supreme-court-20180709-story.html

*Trump's 'public charge' rule for immigrants attacks a problem that doesn't exist*, L.A. TIMES (Sept. 28, 2018), https://www.latimes.com/opinion/op-ed/la-oe-super-public-charge-rule-20180928-story.html

*Argument preview: Justices to consider social security disability claimants' ability to scrutinize data on which benefits denials are based*, SCOTUSBLOG (Nov. 27, 2018), https://www.scotusblog.com/2018/11/argument-preview-justices-to-consider-social-security-disability-claimants-ability-to-scrutinize-data-on-which-benefits-denials-are-based/

*Argument analysis: Justices wrestle with scope of cross-examination of social security experts*, SCOTUSBLOG (Dec. 6, 2018), https://www.scotusblog.com/2018/12/argument-analysis-justices-wrestle-with-scope-of-cross-examination-of-social-security-experts/

*A balanced budget amendment would bring on more and worse shutdowns*, L.A. TIMES (Jan. 31, 2019), https://www.latimes.com/opinion/op-ed/la-oe-super-balanced-budget-amendment-will-cause-shutdowns-20190131-story.html

*Trump's 'public charge' rule for immigrants attacks a problem that doesn't exist*, L.A. TIMES (Sept. 28, 2018), https://www.latimes.com/opinion/op-ed/la-oe-super-public-charge-rule-20180928-story.html

*INSIGHT: House Appropriators Likely Next to Step in Border Wall Funding Collision*, BLOOMBERG BNA (Feb. 26, 2019), https://news.bloomberglaw.com/us-law-week/insight-house-appropriators-likely-next-to-step-in-border-wall-funding-collision-1

*Opinion analysis: Court rejects per se rule on cross-examination in Social Security disability cases*, SCOTUSBLOG (Apr. 2, 2019), https://www.scotusblog.com/2019/04/opinion-analysis-court-rejects-per-se-rule-on-cross-examination-in-social-security-disability-cases/

*The Hidden Threat to Our Constitution*, ACS EXPERT FORUM (June 19, 2019), https://www.acslaw.org/expertforum/the-hidden-threat-to-our-constitution/

*The Cruelty of Trump's Poverty Policy*, N.Y. TIMES (July 24, 2019), https://www.nytimes.com/2019/07/24/opinion/trump-poverty-policy.html

*Dictators are exploiting relationship with Trump administration*, BALTIMORE SUN (Oct. 31, 2019), https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-1101-egypt-20191031-hir7tpo4fnb6jmbgkvgan7p2wq-story.html

*McConnell has less power to shape the impeachment trial than Democrats think*, WASH. POST (Dec. 23, 2019), https://www.washingtonpost.com/outlook/2019/12/23/mcconnell-has-less-power-shape-impeachment-trial-than-democrats-think/

*Fed Govt's Paltry Effort On Heightened Hunger Amid COVID Will Prove Unforgivable*, TALKING POINTS MEMO (May 6 ,2020), https://talkingpointsmemo.com/cafe/cafe-federal-government-attempt-address-hunger-covid-prove-unforgivable

*Could Trump Use the Virus to Stay in Power?*, POLITICO (April 17, 2020), https://www.politico.com/news/magazine/2020/04/17/could-trump-use-the-virus-to-stay-in-power-192883

*Even if Congress rescues the post office, Trump can block the funds*, WASH. POST (Aug. 18, 2020), https://www.washingtonpost.com/outlook/2020/08/18/even-if-congress-rescues-post-office-trump-can-block-funds/

**EXHIBIT B**

# CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal to the following CM/ECF Registrants:

Mary R. O'Grady
Kristen L. Windtberg
Emma J. Cone-Roddy
Osborn Maledon, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
mogrady@omlaw.com
econe-roddy@omlaw.com
kwindtberg@omlaw.com

Cris Meyer, City Attorney
Les S. Tuskai, Assistant Chief Counsel
Office of the City Attorney
200 West Washington Street, Suite 1300
Phoenix, Arizona 85003-1611
cris.meyer@phoenix.gov
les.tuskai@phoenix.gov

Attorneys for Defendant


                                    /s/ Ellen Sue Katz