Cris Meyer, 012262
Les S. Tuskai, 012582
City Attorney
City of Phoenix
200 West Washington Street
13th Floor
Phoenix, Arizona 85003
(602) 262-6761
law.civil.minute.entries@phoenix.gov

Mary R. O'Grady, 011434
Kristin L. Windtberg, 024804
Emma J. Cone-Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
kwindtberg@omlaw.com
econe-roddy@omlaw.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>The City of Phoenix, a municipal corporation,<br><br>Defendant. | No. CV-20-01429-DWL<br><br>**DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF DAVID SUPER UNDER RULES 702 AND *DAUBERT***<br><br>(***Oral Argument Requested***) |

This Court should exclude the opinions proffered by Plaintiffs' expert David Super.[1] Super offers inconsistent and unreliable testimony, admits that the primary basis of most, if not all, of his opinions is his recollection of unreliable hearsay he collected as part of his work as an advocate decades ago, and nakedly attempts to invade the province of the Court by opining on the law.

Super's opinions should be excluded because they fail the requirements of Rule 702: His opinions are not based on sufficient specialized knowledge, facts, or data, are not the product of reliable principles and methods, and Super has not reliably applied any principles and methods to the facts of the case. Super's opinions are not reliable and will not be helpful to the Court.

I.  **Plaintiffs' Burden Under Rule 702, and *Daubert*.**

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702. "The proffering party must demonstrate expert testimony's admissibility by a preponderance of the evidence." *Spedale v. Constellation Pharm. Inc.*, 2019 WL 3858901, at *6 (D. Ariz. Aug. 16, 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n 10 (1993)).

---

[1] To the extent it is necessary to comply with Local Rule of Civil Procedure 7.2(l), the City met and conferred with Plaintiffs' Counsel on October 16, 2020 and could not reach an agreement on the admissibility of Super's declaration and testimony.

**II.     Super's opinions are outside his qualifications.**

Super's opinions consist primarily of a historical study. He offers his views on the atmosphere and political tensions at issue in the summer of 1996, the beliefs of various elected officials, and perceptions (not his) about the beliefs of President Clinton during the negotiations of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193.

But Super is not a historian. When asked if he was, Super confirmed "I have no history degree." (Excerpts of the Dep. of David Super ("Super Dep.."), attached as Ex. 1, at 46:23.)  When asked if he had formal training in historical methods, he cited "quite a number of history courses in [his] undergraduate program" but acknowledged that taking undergraduate history classes does not an expert make. (*Id.* at 47:3-13.) Super agreed that he could "not hold [him]self as an ---out as an expert in historical methodologies." (*Id.* at 47:22-23.)

Rather, Super is a lawyer.  (*See* Decl. of David Super ("Super Decl."), attached as Ex. 2, at ¶¶ 1-2 & Ex. A; Ex. 1. at 6:8-9 (Q: And you're a lawyer. Right? A: I am.), 9:16-19 (Q: You have degrees after your undergraduate degree. Correct? A: I have one degree after my undergraduate degree. That's my law degree from Harvard University.); 10:12-16 ("I have an active license in the state of Pennsylvania and I'm admitted to the eastern district of Pennsylvania and the third and second circuit courts of appeal.").)[2]

Super did, in his deposition, claim to be an "expert in the United States presidential election of 1996" because he had "follow[ed] it very closely," had conversations "with both administration officials and congressional officials of both

---

[2]     Plaintiffs occasionally refer to Super as "Dr. Super" (*see, e.g.,* Ex. 1 at 101:20; 118:2, 118:5; 122:24; 133:17); while the City does not believe Plaintiffs are being intentionally misleading, the City does believe it is misleading to refer to a lawyer with no other advanced degrees as a "doctor."  "Doctor" would seem to imply, at the least, some more advanced and academically rigorous training than three years of law school.

parties," and knew "Senator Dole and [] people close to President Clinton." (*Id.* at 45:18-46:2.)  But Super acknowledged he has never published an academic study on the election, though he claimed to have a work in progress that makes "reference" to it. (*Id.* at 46:13-18.)  It's hard to believe that everyone who follows a presidential election closely, even those who have the occasional conversations with key figures in a campaign, is an expert in that campaign, without any further study.

Historians are a help to courts when they "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013). Super does not do this.  In response to a subpoena requesting the documents he relied on, Super produced some of his own writings, a handful of regulatory actions from the Clinton and later administrations, a prior expert report on an entirely unrelated issue, and two selections from legislative history materials from debates around the passage of PRWORA.  *See* Emails from Ellen Sue Katz in Resp. to Subpoena for Docs. of David Super, attached as Ex. 3.[3]  He did not identify, gauge the reliability of, or interpret evidence about the passage of PRWORA and the 1996 election.  Indeed, other than a handful of pages of legislative history, Super did not appear to consult anything except his memory. *(Cf.* Ex. 1 at 79:5-6 ("Everything in my declaration is based on my memory. Yes.").)

Super's declaration primarily covers his personal recollection of the passage of PRWORA, and the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208; Super had no formal role in these processes, though he testified that he was occasionally asked for analysis of the "implications" and "effects" of PRWORA by a variety of persons. (Ex. 1 at 20:22-21:14.)  Based solely on his memory, he claims that the "[Clinton] Administration was represented

---

[3]   Super did not provide a written response to the subpoena, or identify which documents responded to which document request.

3

primarily by [the Department of Health and Human Services (or "HHS")]." (Ex. 2 ¶ 10.)  Super testified he knew this in part by noting who else was attending a "number of hearings and committee business meetings" before acknowledging that these committees "did not play formal roles in most of the development of PRWORA." (Ex. 1 at 48:20-22, 49:19-20.)  Super acknowledged that PRWORA was negotiated in closed door meetings, that he did not attend, and he has no direct knowledge of who participated in the meetings or what was said.  (*Id.* at 51:7-52:9.)

   Super also acknowledged he was frequently speculating about the motives and emotional states of various unnamed politicians he talked with.  For example, in his declaration, Super claimed "Congressional Republicans . . . were anxious." (Ex. 2 at ¶ 15.)  When pressed, Super acknowledged that no Congressional Republican had told him this, but based on what he was told by unnamed persons, he "t[ook] [Congressional Republicans] to be anxious."  (Ex. 1 at 87:4-88:4.)  He speculated that Congressional Republicans were aggressive in negotiations over PRWORA because "President Clinton was widely regarded as being apprehensive about his re-election chances and unlikely to veto any bill Congress sent to him." (Ex. 2 at ¶ 14.) But Super has no knowledge of whether President Clinton was apprehensive (Ex. 1 at 77:12 ("I've never spoken with President Clinton.")) and Super was not present at the "closed door" negotiations where PRWORA was hammered out. (*Id*. at 51:2-52:5.) This sort of speculation as to the "motivations and intentions of certain parties" does not make for reliable expert testimony. *Marvel Characters*, 726 F.3d at 136.

   Even on subjects closer to Super's actual expertise—such as administrative law—he was confused and expressed patently inaccurate views.  In his deposition, Super conceded, for example, that nothing in PRWORA or IIRIRA directed HHS to offer an interpretative guidance on the meaning of a federal public benefit. (Ex. 1 at 107:4-22.)  But Super went on to claim that how "interpretation responsibilities are allocated within an administration is ultimately for the administration to decide" and

claimed there was "implicit authority for agencies to enter—issue regulations unless they have some prohibition," regardless of whether Congress authorizes it. (*Id.* at 107:23-108:7.) One hopes Super teaches his administrative law classes something else, because this is not the law: for an agency to have implicit authority, it must be "apparent from the agency's *generally conferred authority and other statutory circumstances* that Congress would expect the agency to be able to speak with the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (emphasis added). When Congress has not authorized a governmental agency to issue interpretive guidance (or has not expressly assigned rulemaking authority), an agency "has no authority to add to the requirements of the underlying statutes" regardless of whether Congress specifically forbids it. *Cf. City and Cty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1024 (N.D. Cal. 2019).

Super's attempt to provide an historical expert report on the passage of PRWORA and the 1996 Presidential election is well outside his wheelhouse or training as a lawyer. He is not a historian, is not an expert in historical methods, and has no "knowledge, skill, experience, training, or education" that would qualify him to offer expert testimony under Rule 702. As a result, Super's entire expert declaration should be excluded.

**III.   Super's opinions are not helpful, fact-based, or reliable.**

Even if Super was qualified to offer his "expert declaration" (and he is not), the Court should still exclude most, if not all, of his opinions because they will not "help the trier of fact," are not based on "sufficient facts" and are not "reliable." Fed. R. Evid. 702. Rather, Super offers a hodgepodge of improper legal opinions, numerous attempts to mischaracterize the historical record via unreliable evidence, and one-sided characterizations of facts that ignore or even consciously misrepresent the record.

5

### A. Super's Improper Legal Opinions

Experts may not offer legal opinions. Legal opinions are unhelpful to the trier of fact, not within an expert's purview, and impermissibly invade the province of the judge. *See* 29 Charles A. Wright et al., *Federal Practice and Procedure* ("Wright & Miller") § 6265.2 (2d ed., Apr. 2020 update) (stating that "courts often exclude expert opinions that involve legal conclusions"). "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir.1993) (citation omitted). "Accordingly, federal courts typically prohibit lawyers, professors, and other experts from interpreting the law for the court or from advising the court about how the law should apply to the facts of a particular case." *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005).

Super offered opinions that (at Ex. 2 ¶ 12) "Congress demonstrated the special trust it had in HHS" regarding the implications of PRWORA for immigrants ("Opinion 1")[4] and that (at Ex. 2 ¶ 23) Congress implicitly adopted what Super claims was "widely assumed": HHS would "issue authoritative interpretations of crucial terms such as 'federal public benefit'" via rules Super acknowledged would be written by the Department of Justice ("Opinion 2"). Based on Opinion 1 and Opinion 2, Super claimed (at Ex. 2 ¶ 26) that an August 4, 1998 notice with comment period guidance issued by HHS, *Notice: Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"* 63 Fed. Reg. 41,658 (Aug. 4, 1998) (the "HHS Notice"), attached as Ex. 6, was the "authoritative interpretation for the U.S. Government" of the meaning of federal public benefit ("Opinion 3").

---

[4]  Super does not label his opinions, and these labels are used for convenience only.

6

But the question of whether HHS *did* offer the authoritative interpretation of the United States Government is dependent on whether HHS *could* offer such an interpretation. To do so, Congress would need to have delegated authority to HHS to interpret the meaning of "federal public benefit" as that term is used in PRWORA. If Congress did make such a delegation (and the statutory definition of federal public benefit was ambiguous), the HHS guidance would need to qualify for *Chevron* deference for the Court to treat HHS's guidance as anything special. This is a quintessential question of law—as the Supreme Court has explained, "[a]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of such authority."[5] *Mead Corp.*, 533 U.S. at 218. The meaning of an act of Congress is, of course, a question of law. *See, e.g., United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998) (noting that a "district court's interpretation of statutes and applicable regulations is a question of law.")

Similarly, Super offered the opinion that during the drafting process, IIRIRA was changed "to eliminate the need for government agencies to perform immigration status checks on benefits distributed by non-profit organizations." (Ex. 2 ¶ 22.) ("Opinion 4.") Super is referring of course, to how to interpret 8 U.S.C. § 1642(d), regarding non-profit verification of immigration status. Again, Super is simply offering a legal opinion as to what he believes the law requires, which is not the proper subject of expert testimony.[6]

---

[5] The City does not address the substantive question of whether Congress delegated authority to HHS to offer an interpretation with the force of law here. For one, the Court has already addressed this question, and got the answer right. (Doc. 40 at 12-14.) For another, this is not a substantive brief on the merits of the issue.

[6] As explained below, Opinion 4 is based on Super's selective and cherry-picked reading of the legislative history of IIRIRA and is separately inadmissible for that reason.

7

This is not to say that expert analysis never has a place in statutory interpretation. There may be, for example, fact-based questions that are relevant to understand a statute's historical or linguistic context, or there may be fact questions that are necessarily intertwined with a statute's meaning. In such contexts, a qualified expert might be able to offer opinions on these issues. But that is not what Super purports to do; he instead purports to offer an opinion that in PRWORA, Congress selected HHS to offer an authoritative interpretation of the meaning of a "federal public benefit," despite never expressly saying so. This impermissibly invades the province of the Court.

Opinions 1, 2, 3, and 4 are Super's view of how to best interpret PRWORA's grant of authority (or lack thereof) to HHS and non-profit verification. This impermissibly intrudes on the province of the Court, and the Court should, at minimum, exclude Paragraphs 12 and 22-26 of Super's Declaration.

### B. Super's Improper Attempts to Characterize the Facts

Experts may not provide a one-sided characterization of facts, nor attempt to dress up an expert's personal observations in the cloak of an expert opinion. *See* Wright & Miller, *supra*, at § 6265.2 ("[E]xpert opinion does not help if it simply assumes crucial facts that are in dispute. Finally, expert opinion fails to help if it merely amounts to testimony about first-hand factual observations that are couched in the form of expert opinion.") Moreover, a one-sided characterization of facts strongly suggests that an expert failed to gather sufficient facts. *See id.*, at § 6268 ("If an expert 'cherry picks' favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data."). And a one-sided characterization of facts impugns an expert's reliability. *See id.*, at § 6268.2 (in assessing reliability, courts may consider whether the expert gave opinions about "facts not in evidence" or reached conclusions "not supported by logic or the data").

Further, as the Supreme Court has itself "repeatedly held, the authoritative statement is the statutory text, not the legislative history" in part because "legislative history is itself often murky, ambiguous, and contradictory." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see also Miller for and on Behalf of the N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 542 n.3 (9th Cir. 1993) (describing legislative history as a "notoriously unreliable indicator of legislative intent").

Super's expert report is wholly a mix of his personal recollections of facts he observed during PRWORA's passage, inadmissible hearsay conversations he generically summarizes, cherry-picked legislative history that Super places his own separate spin on, and Super's one-sided characterizations of the actions of HHS and the Department of Justice.  None of this is a proper subject of an expert report, and none of it is reliable for determining Congress's intent.

**Recollections of Hearsay**. In his report, Super offers several claimed authoritative statements about the role HHS had in the negotiation of the immigration title of PRWORA. One might think these statements were based on some sort of academic or comprehensive study of the negotiations and passage of the immigration title of PRWOA and of IIRIRA, as well as the 1996 United States Presidential election and its relationship to those negotiations.  Not so.  In his deposition, Super acknowledged he has never discussed these topics in his scholarship, except in passing.[7]  (Ex. 1 at 28:16-30:22 (discussing one article); 30:23-32:7 (discussing second article); 32:9-33:19 (discussing third article); 36:20-22 (confirming that any

---

[7] Super claimed he "believe[d]" that he discussed the effect of the 1996 United States Presidential election on the passage of PRWORA in one of his articles, but could not identify where, even when given the opportunity to review the article over a break.  (Ex. 1 at 31:14-17.)  The article in question is attached and does not discuss this topic. *See* David Super, *The Quiet "Welfare" Revolution: Resurrecting the Food Stamp Program in the Wake of the 1996 Welfare Law*, 79 NYU L. Rev. 1271 (2004) attached as Ex. 4.

9

detailed discussion of PRWROA and immigrants would have been in those three articles).)

Super further acknowledged that all of these statements were simply his recollection of various conversations he had with individuals in Washington D.C. in 1996, as set out in the following table.

| Declaration Statement | Basis According to Deposition |
|---|---|
| That "the [Clinton] Administration was represented primarily by HHS." (Ex. 2 ¶ 10.) | Based in part on "whenever I talked with people." (Ex. 1 at 48:20-49:1.) |
| That the "analysts [at the Office of Management and Budget and the Congressional Budget Office] relied heavily on the ASPE staff for information from which to estimate the fiscal implications of various pending proposals" regarding PRWORA (*Id.* ¶ 11.) | "Because I talked with both of them on a very frequent basis." (*Id.* at 72:5-14.) |
| That an HHS office was "privy to discussions" regarding how Congress would define "federal public benefit" in PRWORA. (*Id.* ¶ 13.) | Knows because he "spoke extensively with the [HHS office] staff" and "numerous other" people. (*Id.* at 73:23-74:13.) |
| President Clinton had reduced leverage during the passage of PRWORA in late July 1996 because he was "widely regarded as being apprehensive about his re-election chances." (*Id.* ¶ 14.) | Based on "what [Super] was hearing consistently from administration officials and from Democratic and Republican staff and members." (*Id.* at 77:3-9.) |
| But that by late September, two months later, President Clinton's leverage was increased because his "re-election was widely regarded as almost assured," (*Id.* ¶ 15.) | Comes "from talking to many people at the time." (*Id.* at 83:3-4.) |
| That Congressional Republicans were willing to negotiate with President Clinton at that time for fear of being blamed by voters for another shutdown. (*Id.*) | Based on what unnamed Congressional Republicans "told me." (*Id.* at 89:18-90:6.) |
| That Congress had a strong preference for private nonprofit charities to replace government bureaucracies, in part because of the influence of Charles Murray. (*Id.* ¶ 16.) | Based on "[m]any conversations." (*Id.* at 91:15-92:19.) |

| | |
|---|---|
| That Congress had a concern that "disaster relief to U.S. citizens might be delayed if they had to establish that status led Congress to exempt disaster assistance from otherwise applicable restrictions." (*Id.* ¶ 18.) | "This is based on my conversation with congressional staff of both parties." (*Id.* at 95:14-18.) |
| That President Clinton had conditioned his signature on IIRIRA with a demand that "no immigration check be required for benefits provided by nonprofit organizations." (*Id.* ¶ 21.) | Based on "[c]onversations with congressional staff and conversations with some advocacy organizations." (*Id.* at 96:13-97:3.) |
| That it was "widely assumed that HHS would issue authoritative interpretation of crucial terms such as 'federal public benefit.'" (*Id.* ¶ 23.) | "That [he] asked HHS about this . . . and they said that they were doing this . . . on a government-wide basis." (Super Depo. at 107:4-19.) |

When pressed, Super at one point refused to even identify who he was talking with or what they had in fact told him, because their words were things he "would prefer not to quote directly in a judicial proceeding" because it included "foul language." (Ex. 1 at 87:6-9.) In other words, rather than using any academic or professional methodology for explaining the circumstances of the passage of PRWORA (which Super would not be qualified to do, in any case; he's not a historian and acknowledged he's not an expert in historical methods), Super simply dressed up his personal recollection of hearsay from sources he would not identify, as an "expert opinion." This is not admissible. Testimony is inadmissible when it is "little more than a conduit or transmitter for testimonial hearsay." *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) (citation omitted); *see also Marvel Characters,* 726 F.3d at 135-36 (affirming exclusion of historical expert reports that were "by and large undergirded by hearsay statements, made by freelance artists in both formal and informal settings"). Plaintiffs are simply trying to repackage inadmissible hearsay testimony as an expert report. Super's entire declaration appears to be little more than a conduit for hearsay and should be excluded.

**Cherry-picked Legislative History.** The unreliability of legislative history as a source for statutory interpretation (and, for that matter, an expert report) is highlighted by Super's decision to cherry-pick from the legislative history to reach his desired conclusions to support Opinion 4 (Super's improper legal opinion on the meaning of 8 U.S.C. § 1642(d) of IIRIRA.) In his declaration, Super claimed the "[Clinton] Administration demanded that no immigration check be required for benefits provided by non-profit organizations." (Ex. 2 ¶ 21.) As support for this claim, Super cited legislative history which he described as consisting of "Senator [Edward] Kennedy confirm[ing] that this change was one of those made to gain . . . the President's signature." (*Id.*)

Like many other statements discussed below, this was in fact Super's one-sided characterization of Senator Kennedy's actual words, who in fact never stated that any change was made to the non-profit verification provisions in order to obtain President Clinton's signature. *See* 142 Cong. Rec. S11863, S11864 (daily ed. Sept. 30, 1996) (remarks of Senator Kennedy) (a copy of excerpts from the Congressional Report is attached as Ex. 5). When asked where Senator Kennedy said that a change was made to obtain the President's signature on IIRIRA, Super conceded that Senator Kennedy "does not say that explicitly because Senator Kennedy had no authority to speak for the president." (Ex. 1 at 99:9-11.)[8] Super then tried to defend his comment by claiming Senator Kennedy was describing the change as necessary to get bipartisan support, and that President Clinton was not a Republican. (*Id.* at 99:16-21.) When asked for where Senator Kennedy had said that, however, Super again could not find anything. (*See id.* at 100:14-19 (justifying his claim based on the "totality of the—of the statement" and Senator Kennedy referring to President Clinton's "strong leadership").)

---

[8] A strange statement, since Senator Kennedy could have stated what President Clinton had done or said without "speaking for" him.

  Moreover, other portions of the Congressional Record from the same day revealed that at least some Senators thought President Clinton's changes would in fact *force* nonprofits to verify immigration status. Speaking before Senator Kennedy, Senator Charles Grassley, from Iowa, offered an entirely different characterization of the changes sought by President Clinton and the Democratic Party. Senator Grassley complained that the prior versions of the legislation "provided protections from regulations" that would cause non-profits to perform verifications, while the new version had loopholes that would "unfortunately be left to regulations promulgated by the Attorney General." *See* 142 Cong. Rec. S11850, S11851 (daily ed. Sept. 30, 1996) (remarks of Senator Grassley) (attaching as Ex. 5). As Super conceded when confronted with Senator Grassley's remarks, the only way to tell the "implications of the inactive language" of PRWORA and IIRIRA is to "read the language." (Ex. 1 at 104:18-20.)

  Super's cherry-picked legislative history, by his own admission, does not tell whether the changes President Clinton reportedly sought "demanded that no immigration check be required for benefits provided by non-profit organizations" or that they "softened some of the restrictions on immigrants' access to public benefits," as Super claims in his declaration. (Ex. 2 ¶ 21.) Opinion 4, as well as Paragraphs 20-22 of the Declaration, should be excluded.

  **One-sided Characterizations**. Super's declaration is also rife with one-sided characterization of the facts, particularly with regard to Opinion 3, in which he claimed that HHS's guidance "reflected government-wide policy" regarding the meaning of the term "federal public benefit." (Ex. 2 ¶ 26.) In Paragraph 26 of his declaration alone, Super claimed:

- "[N]o other agency made any attempt to publish a comparable exegesis [as HHS] on the pertinent provisions of PRWORA[;]"

13

- "[S]ome [agencies] did publish lists of their own programs that did or did not meet the definitions as HHS had interpreted them."

These are, at best, Super's tilted gloss on events.

To claim that HHS was the only agency that published an "exegesis" on the meaning of "federal public benefit," Super discounts a Department of Justice proposed rule that provides a regulation defining "federal public benefit" and a lengthy justification of the offered definition. *See Verification for Eligibility for Public Benefits*, 63 Fed. Reg. 41662-01 (Aug. 4, 1998), attaching as Ex. 7. The Justice Department not only provided this definition but provided guidance to "benefit granting agenc[ies]" in general about how to "determine whether a program provides a Federal public benefit." *Id*. at 41664-03. This included instructing benefit granting agencies to determine if the program met the Justice Department's proposed definition, and noted that even if the program was covered by the definition, it would not be a "federal public benefit" if it fell within any of the identified regulatory exceptions. *Id.* In his deposition, Super admitted that he discounted the Justice Department's work because it did not diverge enough from the statute, stating "[t]hey added a little bit to it, but they largely—and they admitted in their preamble they largely replicated the statute." (Ex. 1 at 132:17-19.) Super also acknowledged that the Justice Department's proposed definition "does not" include HHS's separate definition. (*Id*. at 122:9-12.)

Super also believes that Congress showed a "special trust" in HHS to handle these issues because it directed Justice to "consult" with HHS in writing rules related to verification of citizenship or immigration status. (Ex. 2 ¶ 12.) He testified, consistent with that, that "[t]he final drafting would be done by the Department of Justice." (Ex. 1 at 66:3-4.) And Super conceded that Justice's final drafting of the regulatory definition of "federal public benefit" did not include HHS's proposed definition. (*Id.* at 122:9:12 ("Q: I'm not asking you whether they're consistent. I'm

asking you whether DOJ's proposed definition includes HHS's definition. Yes or no? A: It does not.").) Yet inconsistent with his own testimony, Super insists that Justice's work can be discarded.

Nor does Super acknowledge another distinction he was aware of: while the Justice Department purported to be acting on behalf of the entire government, and expressly offered guidance to **all** "benefit granting agencies" as to the definition of a "federal public benefit," HHS expressly disclaimed the opposite: it was speaking only on behalf of HHS programs. *See* Ex. 6, *supra*, at 41661-02 ("This Notice provides clarifying guidance as to which *HHS programs* are subject to the existing PRWORA requirements.") (emphasis added). Indeed, Super conceded that "HHS has no legal authority to affect" anything but HHS programs. (Ex. 1 at 137:25-138:3.)

As to Super's claim that other agencies "did publish lists of their own programs that did or did not meet the definitions as HHS had interpreted them," Super admitted during his testimony that while he was aware of agencies, such as the Federal Emergency Management Agency and the Housing and Urban Development Department that *did* publish lists of their own programs that were federal public benefits, he was "not aware of anything that was published after the HHS criteria came out" that used the HHS definition or discussed its criteria. (*Id*. at 128:22-129:1; *see also id.* at 127:10-12 ("I'm not aware of anything published that [said it was using that definition].")

In short, to reach Opinion 3, Super discounted the work that went into the Justice Department's proposed definition—which was expressly framed as guidance to other benefit granting agencies—because the Justice Department's definition was not a stark enough departure from the statute in favor of HHS's definition (which made clear it only applied to HHS programs). He also stated other agencies used the HHS definition, despite acknowledging in his deposition that he was not aware of any

15

agencies that did so. Opinion 3, as well as Paragraph 26 in its entirety, should be excluded.

**IV.    Conclusion.**

The declaration and testimony of David Super should be excluded in their entirety.

Dated this 19th day of October, 2020.

                      OSBORN MALEDON, P.A.

By    s/ Mary R. O'Grady
       Mary R. O'Grady
       Kristin L. Windtberg
       Emma J. Cone-Roddy
       2929 North Central
       21st Floor
       Phoenix, Arizona  85012-2793

CITY ATTORNEY'S OFFICE

       Cris Meyer
       Les S. Tuskai
       Phoenix City Hall
       200 West Washington Street
       13th Floor
       Phoenix, Arizona  85003

       Attorneys for Defendant