Cris Meyer, 012262
Les S. Tuskai, 012582
City Attorney
City of Phoenix
200 West Washington Street
13th Floor
Phoenix, Arizona  85003
(602) 262-6761
law.civil.minute.entries@phoenix.gov


Mary R. O'Grady, 011434
Kristin L. Windtberg, 024804
Emma J. Cone-Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
(602) 640-9000
mogrady@omlaw.com
kwindtberg@omlaw.com
econe-roddy@omlaw.com

Attorneys for City of Phoenix

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>The City of Phoenix, a municipal corporation,<br><br>Defendant. | No. CV-20-01429-DWL<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFFS' BRIEF FOR A FINAL DECISION IN THEIR FAVOR ON COUNT I** |

OSBORN
MALEDON
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Court should enter final judgment in favor of the City of Phoenix (the "City") on Count I, and confirm that the City is neither allowed nor required to offer federally funded housing and utility assistance payments to individuals who are not citizens or qualified aliens under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). The law here is clear: Congress has set a general policy that only citizens and qualified aliens can obtain federal public benefits, subject to a few narrow statutory exceptions. Regardless of what Plaintiffs might prefer as a policy matter, the City must comply with the applicable federal law.

**INTRODUCTION**

As the Court is aware, as a part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Congress authorized the Department of Treasury to distribute $150,000,000 to state and local governments to cover "necessary expenditures incurred due to the public health emergency" of the COVID-19 pandemic. 42 U.S.C. § 801(d). The only other direction given for this money was that state and local governments could only use allocated funding for expenses that "were not accounted for in [their] budget most recently approved as of March 27, 2020" and that were incurred between March 1 and December 30, 2020. *Id.* Using some of the money allocated to the City, the City created the COVID-19 Emergency Utility Rent and Mortgage Assistance Program (the "Program").

The Program authorizes the City "to assist Phoenix residents affected by the COVID-19 emergency . . . by providing aid to eligible Phoenix Residents for utility bills (water, electric, and/or gas), mortgage and rental obligations." (Doc. 24-1 at 2, Recitals: B.) Households can obtain up to $4200 each; to qualify, they must show either lost employment, a reduction in household income, or an increase in day care costs due to COVID-19 (a "COVID-19 Crisis"). (Doc. 28 ¶¶ 6-9.) The money is obtained by households applying with various agencies, including the City's Human Services Departments (the "Partner Agencies"), who make eligibility decisions. (*Id.* ¶¶ 13-15.) If a household is eligible, the Partner Agency will guarantee payment of

eligible, already incurred, housing and utility bills. (*Id.* ¶¶ 10, 15.)  The City contracts with the Arizona Community Action Association, doing business as Wildfire, to manage the Program, due to its experience administering similar programs.  (*Id.* ¶¶ 4, 11, 16.)

Plaintiffs' arguments that the Program is not subject to PRWORA's eligibility restriction fail, and therefore, Count 1 fails on the merits.  In addition to the deficiencies on the merits, further discovery has revealed that the organizational plaintiffs, Poder in Action ("Poder") and Arizona Dream Act Coalition ("ADAC") (collectively, "Organizational Plaintiffs") lack standing.  Finally, even if Plaintiffs were to prevail on the merits, declaratory, but not injunctive, relief is appropriate.

**ARGUMENT**

**A.    Organizational Plaintiffs Lack Standing.**

The standing doctrine functions to ensure that courts apply the judicial power only to "[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2, cl. 1.  Thus, a "lack of Article III standing requires dismissal for lack of subject matter jurisdiction[.]"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  In order to demonstrate standing to seek injunctive relief under Article III,

> a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  The "injury-in-fact" requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Plaintiffs must prove they have standing, in the same manner as they prove any other element of their claim.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Here, ADAC and Poder appear to claim an injury based on an organization standing injury and an associational standing injury.

2

Neither theory suffices.

To establish organizational standing, an organization must show "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). An organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). To have standing for injunctive relief, however, the organization—like any plaintiff—must also prove that there is a likelihood of repeated injury or future harm to the plaintiff. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1982) (describing the standing requirement for injunctive relief as requiring that the "threat to the plaintiffs" of future injury be "sufficiently real and immediate") (citation omitted.).

Poder claims it has been harmed because it "joined with other community groups and individuals to raise donations of the Arizona Undocumented Workers Relief Fund." This "diverted resources away from [Poder's] planned activities to obtain contributions to assist members harmed by the [Eligibility Requirement]." (Doc. 24 ¶ 12.) Similarly, ADAC claims that "[i]n response to the City limiting immigrant eligibility for the emergency CARES Act housing funds, ADAC had to divert its resources and work to establish the Arizona Undocumented Workers Relief Fund." (*Id.* ¶ 13.)

However, whatever harm Poder and ADAC suffered from needing to divert their resources is over as both organizations have moved on. Karina Ruiz De Diaz, ADAC's executive director, testified that ADAC is no longer raising money to aid with housing assistance because they are focused on their "community engagement and census work" instead. (Excerpts of Karina Ruiz De Diaz Dep., attached as Ex. 1,

3

at 16:15-19.)  She confirmed that ADAC "did not have the capacity" to engage in rental assistance work at this time, because of its other, higher priority work.  (*Id.* at 43:13-24.)  She further confirmed that ADAC specifically chose to stop supporting rental assistance for City of Phoenix residents, because it wanted the City to "provide to our people" and instead focused its final rental assistance work on other parts of Arizona.  (*Id.* at 42:22-25.)  Ms. Ruiz De Diaz confirmed that ADAC made the decision to move on even though it knew full well the City was not providing money to undocumented immigrants. (*Id.* at 45:2-5.)

Similarly, Viridiana Hernandez, Poder's executive director, testified that raising money to support rental assistance was no longer a "priority" because she had turned her focus to the "uprisings" and the "issue of policing" and families needed "emotional support" as a result of these matters.  (Excerpts of Viridiana Hernandez Dep., attached as Ex. 2, at 27:8-17.)  Hernandez further acknowledged that Poder's work raising money for the funds was limited to "sharing on social media the donation link."  (*Id.* at 27:24-25.)  Ms. Hernandez could not identify whether Poder had even done that work at any time since July 11, 2020.  (*Id.* at 28:10-15 (acknowledging it was "potentially" right that Poder's last public appeal was on July 11); 29:16-24 (agreeing to look for and send copies of any later solicitations).)  Ms. Hernandez further acknowledged that Poder was "finished distributing" money from the fund, though clarified that some checks to individual families still had to go out.  (*Id.* at 31:10-22.)

In other words, neither Poder nor ADAC are continuing to divert *any* resources to aid with the economic consequences of COVID for City-resident immigrants ineligible for the fund.  Other than this lawsuit, Poder and ADAC have simply moved on.  They thus have no ongoing injury and have not presented any evidence showing they are likely to have an injury in the future.  Poder and ADAC thus do not have standing.

Nor can Poder or ADAC establish that they have associational standing.

4

Associational standing is a narrow and limited exception to the general rule that litigants must assert their own rights in order to have standing. *Black Fac. Ass'n of Mesa Coll. v. San Diego Cmty. Coll. Dist.*, 664 F.2d 1153, 1156 (9th Cir. 1981). As stated by the Supreme Court:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Summers*, 555 U.S. at 499 ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm.").

Here, Organizational Plaintiffs made barebones allegations that "Poder members have been financially impacted as a result of the COVID-19 pandemic and would apply to the City's funds if they were eligible" and that "[m]any ADAC members have been financially impacted as a result of the COVID-19 pandemic and would have applied for the City's emergency funds if they were eligible." (Doc. 24 ¶¶ 12-13.) Despite several declarations from Hernandez and Ruiz De Diaz,[1] Plaintiffs

---

[1] Plaintiffs submitted initial declarations from Hernandez and Ruiz De Diaz with their motion for class certification. (Doc. 10 (Hernandez Dec.); Doc. 11 (Ruiz De Diaz Dec.).) The Court then ordered Plaintiffs to disclose all additional evidence by September 10, 2020. (Doc. 47.) Plaintiffs disclosed what they labeled as "first supplemental" declarations from Hernandez and Ruiz De Diaz on September 10, 2020. (Doc. 50.) The Court also allowed follow up discovery until September 30, 2020. (Doc. 47.) With their "opening brief" filed October 15, Plaintiffs now provide two additional declarations from Hernandez (Doc. 73) and Ruiz De Diaz (Doc. 71) which make additional, not previously disclosed, factual claims. These declarations, as well as Hernandez and Ruiz de Diaz's depositions, are riddled with inadmissible hearsay. For example, Ms. Hernandez's declaration refers to "persons who came to Poder for help" and told Poder that "they had been laid off or had their work hours reduced." (Doc. 72 ¶ 8.) This is an out-of-court state statement offered to prove the truth of the matter asserted. The City objects to Paragraphs 5, 6, 8, 9, 10, and 12 of Ms. Hernandez's First Supplemental Declaration (Doc. 72), Paragraph 5 of Ms. Diaz

have not substantially fleshed out these allegations.  In her most recent declarations, Ruiz De Diaz identifies individual plaintiff Galan Mejia as an ADAC member.  (Doc. 71 ¶ 9.)  But as this Court previously observed, there is no evidence that Galan Mejia has suffered any harm as of yet—her declaration suggested she is "still current on her mortgage payments and simply wishes to avoid falling behind in the future." (Doc. 40 at 23.)

Poder, however, according to its own data was able to provide nearly 100% of the funds requested from it through its work with the Arizona Undocumented Relief Fund.  (Ex. 2 at 57:2-58:10 (confirming that Poder's records showed it had given $162,000 in grants and had been requested to give $162,400).)[2]  Moreover, Hernandez has no knowledge about whether Poder members or applicants were even eligible to benefit from the City's Program, but for their immigration status.  To receive money from the City's Program, applicants need to provide acceptable documentation of both a COVID-19 crisis and Phoenix residency.  (*See* Doc. 24-1 at 27, 28 (setting out required eligibility documentation).)  Poder did not require any of the acceptable documentation when it made grants. (Ex. 2 at 36-40.)

Hernandez claims she spoke with Poder members who were evicted.  (Doc. 10. ¶¶ 13-14); (Doc. 72 ¶¶ 9-10.)  This is hearsay, and neither Hernandez nor Poder has produced any admissible evidence showing a single Poder member has been evicted. The only evidence shown that anyone has been threatened with eviction is apparently the declaration of L.V, a Poder member. (Doc. 68 ¶ 7.)  Hernandez now identifies a

---

de Ruiz's First Supplemental Declaration (Doc. 70), and Paragraph 8 of Ms. Diaz de Ruiz's Second Supplemental Declaration (Doc. 71) as inadmissible hearsay.

[2] Hernandez insisted on redirect examination that because of "many" "conversation[s]" with applicants, she knew that the amount requested "[d]efinitely [did] not" meet the needs of people who came to Poder for help, (Ex. 2 at 64:9-17), but Hernandez had earlier testified that she did not process applications herself and that this was done by other Poder employees and volunteers.  (*Id.* at 41:6-16.)  Despite her comments about unmet needs, the admissible evidence in the record is insufficient to satisfy Plaintiffs' obligation to establish standing.

1  document she disclosed as L.V.'s eviction threat, received by her from L.V . in April

2  of 2020.  (Doc. 73 ¶ 9.)  L.V. has not been evicted, and had she been eligible for the

3  Program, L.V. still would have received threatening letters and been charged late fees

4  because the Program did not exist in April of 2020.

5  ADAC likewise presents no evidence of members actually being harmed.  In

6  her deposition, Ruiz De Diaz confirmed that ADAC did not ask for, or receive, the

7  documents necessary to establish that their members could have obtained benefits.

8  (Ex. 1 at 30-36.).  Plaintiffs (at 17) claim that ADAC knew the amount they were

9  giving to members was not enough, but it was all ADAC could do.  Ruiz De Diaz

10  admitted in her deposition, however, that this was not true: ADAC admitted that it

11  chose to give people $500 because it was "an even round number."  (Ex. 1 at 21:18-

12  23).[3]

13  Organizational Plaintiffs contend that their failure to show that their members

14  could actually qualify for the Program is irrelevant because of the Supreme Court's

15  holding in *Ne. Fla. Chapter of Associated General Contractors of America v. City of*

16  *Jacksonville, Fla*., ("General Contractors") 508 U.S. 656 (1993).  Plaintiffs misread

17  *General Contractors*.  In that case, a challenge was brought to minority owned

18  business set aside under the Equal Protection Clause.  The Court examined its equal

19  protection precedents and held that an equal protection injury does not require proving

20  that a potential applicant *would* have received the benefit but for the discriminatory

21  practice. *Id.* at 666.  But an equal protection plaintiff needed to show they are "able

22  and ready to bid on [the] contract[]."  *Id*; *see also Barnes-Wallace v. City of San*

23  *Diego*, 704 F.3d 1067, 1085 (9th Cir. 2012) (refusing to extend *General Contractors*

24  when plaintiffs failed to establish they were able and ready to access Boy Scout

25  facilities because "the membership policies of the Boy Scouts make it repugnant for

26

27  [3] She also acknowledged the coalition of groups raising money for the fund set a $600

28  cap, again not because more was not possible, but because they were concerned about the tax implications of giving larger grants.  (Ex. 1 at 24:7-13.)

the Plaintiffs to apply for any facility operated by them").

Here, Organizational Plaintiffs are not asserting an equal protection injury. And even if they were, to demonstrate that their members were "ready and able" to apply for the Program; i.e., Organizational Plaintiffs simply had to show that *any* of their members had the documentation available to apply for the City Program. They did not do so. Because Organizational Plaintiffs cannot show any cognizable injury in fact, they should be dismissed from the case.

**B.    The City Must Comply with PRWORA's Eligibility Requirement.**

    **1.    The Program is a federal public benefit.**

As this Court explained in its decision denying a preliminary injunction, the Program is a federal public benefit under the best reading of PRWORA. (Doc. 40 at 11-14.) Plaintiffs again argue that the Court should give *Chevron* deference to 1998 Department of Health and Human Services ("HHS") guidance, *Personal Responsibility and Work Opportunity Reconciliation Act of 1996; Interpretation of "Federal Public Benefit",* ("HHS Guidance"), 63 Fed. Reg. 41658-01 (Aug. 4, 1998), to find that the City's Program is not a federal public benefit.[4] Their *Chevron* argument fails.

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) established a two-step process for determining whether to defer to an agency's statutory interpretation. The first step is to ask, "has [Congress] directly spoken to the precise question at issue." *Id*. at 842. If Congress's intent is clear, then that is the end of the inquiry. *Id*. at 842–43. But if "the statute is silent or ambiguous with respect to the specific issue," courts proceed to the second step, which asks if the agency's action is permissible. *Id*. at 843. If the agency's action is permissible, the court is

---

[4] They attempt to bolster their argument with a declaration from law professor David Super. Super's declaration is plainly inadmissible and is the subject of a separate *Daubert* motion to exclude (Doc. 76). The City renews its objection to the Plaintiffs' reliance on Super's declaration and asks the Court to exclude it and Super's deposition testimony.

1    required to defer, even if a better interpretation exists.  As many courts—including
2    this one—have observed, however, before the Court can begin the *Chevron* analysis it
3    must answer the so-called "Step Zero" question of "whether the *Chevron* framework
4    applies at all." *Valenzuela Gallardo v. Barr*, 968 F.3d 1053, 1059 (9th Cir. 2020)
5    (citation omitted.).

6                    **a.  The *Chevron* framework does not apply.**

7            The Supreme Court has held that "administrative implementation of a
8    particular statutory provision qualifies for *Chevron* deference when it appears that
9    Congress delegated authority to the agency generally to make *rules carrying the force*
10   *of law*, and that the agency interpretation claiming deference was promulgated in the
11   exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)
12   (emphasis added).  Thus if "(1) Congress did not intend to delegate interpretive
13   authority to the agency, or (2) . . . the agency did not take the challenged action in
14   exercise of that authority, [courts] defer to the agency only to the extent that the
15   agency's reasoning is persuasive." *Sierra Club v. Trump*, 929 F.3d 670, 692 (9th Cir.
16   2019). The importance of step zero comes from the fact that *Chevron* stands for the
17   proposition that "considerable weight should be accorded to an executive
18   department's construction of a statutory scheme *it is entrusted to administer*."
19   *Chevron*, 467 U.S. at 844; *see also Mead*, 533 U.S. at 228 (explaining that the "fair
20   measure of deference to an agency administering *its own statute* has been understand
21   to vary with circumstances" (emphasis added)).

22           Pointedly, this means that *Chevron* deference is generally not appropriate
23   whenever a statute is administered by *multiple* agencies.  *See Bowen v. Am. Hosp.*
24   *Ass'n*, 476 U.S. 610, 642 n.30 (1986) (distinguishing *Chevron* because 27 agencies
25   were involved in interpreting the statute); *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C.
26   Cir. 2000) ("When a statute is administered by more than one agency, a particular
27   agency's interpretation is not entitled to *Chevron* deference."); *Scales v. INS*, 232 F.3d
28   1159, 1165 (9th Cir. 2000) (approvingly citing *Proffitt*).  Denying *Chevron* deference

where multiple agencies administer the same statute is important, particularly when the claimed congressional delegation is implicit, because it prevents the potential for inconsistent interpretations. *Bonnichsen v. U.S. Dept. of Army*, 969 F. Supp. 628, 643 (D. Ore. 1997).

PRWORA does not indicate that Congress intended to delegate authority to HHS to offer an interpretation of PRWORA's definition of federal public benefits with the force of law.  To the contrary, the sole mention of HHS in PRWORA's immigration title contemplates a limited, consulting rule for HHS on regulations that the Department of Justice would issue with the force of law.  *See* 8 U.S.C. § 1642(a)(1) ("Not later than 18 months after August 22, 1996, the Attorney General of the United States, after consultation with the Secretary of Health and Human Services, shall promulgate regulations requiring verification that a person applying for a Federal public benefit (as defined in section 1611(c) of this title). . . .")  Congress did not intend HHS to have authority to speak with the force of law; Congress intended for HHS, and in some cases other agencies, merely to assist DOJ in doing so. *See* 8 U.S.C. § 1611(b)(1)(D) (requiring the Attorney General to consult "with appropriate Federal agencies and departments").

Nor are there any other circumstances suggesting Congress meant for HHS to determine the definition of federal public benefit.  Several federal agencies—and indeed, state and local governments and their agencies, as well as non-profit organizations—administer federal public benefits.  HHS may have expertise administering its *own* programs, but it has no expertise as to the administration of the various federal public benefits administered by the Department of Housing and Urban Development ("HUD"), the Department of Education, the Federal Emergency Management Agency ("FEMA"), or indeed, the City of Phoenix.

To support their *Chevron* argument, Plaintiffs rely primarily on David Super, who they claim (at 5) "followed closely the Congressional negotiations over PRWORA."  Plaintiffs also state (at 5) that Super "described the federal agency

1   coordination between DOJ and HHS" and that HHS took the lead on interpreting the

2   term "federal public benefit."  Finally, Plaintiffs rely on Super to claim (at 5) that

3   HHS was the "only federal agency to articulate principles for defining [federal public

4   benefit]."  Super argues that the requirement that DOJ "consult" with HHS shows the

5   "special trust" Congress had; however, he admits this "special trust" was to result in

6   "final drafting" by DOJ, not HHS.  (Excerpts of David Super Dep., attached as Ex. 3,

7   at 65:20-66:4; *see also id*. at 67:13-15 (Congress gave Justice, but not HHS,

8   rulemaking authority.)

9          Even if the Court accepts Super's testimony as true, it is simply irrelevant.  The

10  internal workings of the Clinton administration do not determine whether *Congress*

11  delegated authority to HHS.  *See Food and Drug Admin. v. Brown & Williamson*

12  *Tobacco Corp.*, 529 U.S. 120, 159 (2000) ("Deference under *Chevron* to an agency's

13  construction of a statute that it administers is premised on the theory that a statute's

14  ambiguity constitutes an implicit delegation *from Congress* to the agency to fill in the

15  statutory gaps.") (emphasis added.).  As this Court already rightly recognized (Doc.

16  40 at 13), "*Chevron* deference . . . is not accorded merely because the statute is

17  ambiguous and an administrative official is involved." *Gonzalez v. Oregon*, 546 U.S.

18  243, 258 (2006).  "An agency may not confer power upon itself." *Gorbach v. Reno*,

19  219 F.3d 1087, 1093 (9th Cir. 2000).  Plaintiffs' focus on what happened *after* the law

20  was passed entirely misses the point.  Only Congress could grant HHS power, and it

21  did not do so.

22         The administrative record also does not support Super's characterizations.

23  Plaintiffs assert (at 5) that HHS took the "lead on interpreting the term 'federal public

24  benefit.'"  Super took this further claiming the HHS Guidance was "government-wide

25  policy" and that when other agencies "publish[ed] lists of their own programs" based

26  on whether they "did or did not meet the definitions [of federal public benefit] as

27  HHS had interpreted them." (Doc. 67 ¶ 26.)  But Super admitted that while he knew

28  of agencies that published lists of which of their programs were or were not federal

11

public benefits, such as FEMA and HUD, he was "not aware of anything published that [said it was using HHS's definition]."  (Ex. 3  at 127:10-12, 128:22-129:1.)  The HHS Guidance itself made clear that it was only intending to "provide[] clarifying guidance as to which *HHS programs* are subject to the existing PRWORA requirements." HHS Guidance at 41661-02. (Emphasis added.)

Moreover, contrary to Super's claim that DOJ and HHS coordinated their publications so that DOJ could defer to HHS, DOJ's proposed rules make absolutely no reference to HHS's definition of public benefit, and do not direct benefit granting agencies to use HHS's definition.  *See Verification for Eligibility for Public Benefits* ("DOJ Proposed Rule"), 63 Fed. Reg. 41662-01 (Aug. 4, 1998).  DOJ directed "benefit granting agenc[ies]" to consult with both PRWORA and the DOJ proposed rules, not HHS's definition, when determining whether a program is a federal public benefit. *See id*. at 41664-03 (explaining that agencies "should first consider whether the program" falls within DOJ's affirmative regulatory definition and then ensure that it does not fall within one of DOJ's regulatory exceptions).

Plaintiffs want to dismiss the DOJ proposed regulation as a "parroting" regulation, but this is not the case.  Rather, as DOJ explained, its regulatory definition focused on the ambiguous part of the statute: the meaning of a "similar benefit" that falls within the PRWORA definition of a federal public benefit.  8 U.S.C. § 1611(c)(1)(B) (defining a federal public benefit as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States").  As DOJ explained, its proposed regulation sought to clarify what types of government programs were *not* similar to the listed benefits, and thus did not fall within the definition, flagging "police, fire, ambulance, transportation (including paratransit), sanitation, or other regular, widely available public services or accommodations."  DOJ Proposed Rule at

41664-03.  This not a parroting regulation, but one that fills in the ambiguous term "similar benefit."[5]

Finally, Plaintiffs argue (at 7-8) that the Court should defer to HHS because it offers a "long-standing interpretation" that has never been "challenged [] in court." Other than this Court's decision on the preliminary injunction, the HHS Guidance has been mentioned in one other court decision: *Oakley v. DeVos*, 2020 WL 3268661, at *14 (N.D. Cal. June 17, 2020).[6]  The HHS Guidance has been treated for what it is: HHS's list of its programs it believed to be federal public benefits in 1998.

### b.  The HHS Guidance does not address any silence or ambiguity in PRWORA.

If the HHS Guidance could pass "Step Zero," the Court would then need to consider whether the statutory language at issue is ambiguous.  *Cf. Nat. Res. Def. Council v. U.S. EPA*, 915 F.2d 1314, 1320 (9th Cir. 1990) (refusing to grant *Chevron* deference to a non-ambiguous statute).  Courts must "read in the context of the surrounding statutory language" to determine whether a particular term is ambiguous—an agency cannot simply take a phrase out of context and claim it is ambiguous.  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 660 (9th Cir. 2011). Nor can an agency create ambiguity by suggesting a change in wording. *Nat. Res. Def. Council*, 915 F.2d at 1322.

PRWORA defines a "federal public benefit" as "(A) any grant, contract, loan,

---

[5]  Plaintiffs also misstate the discussion of "parroting regulation" in *Gonzales v. Oregon*, 546 U.S. 243 (2006).  In *Gonzales*, the government sought deference under *Auer v. Robbins*, 519 U.S. 452 (1997) for its interpretation of its own regulation; the Court held that *Auer* deference was not appropriate because the regulation did not actually clarify key statutory terms.  *Gonzales*, 546 U.S. at 257 (noting the regulation repeated two ambiguous statutory phrases—"legitimate medical purpose" and "the course of professional practice"—without clarifying their meaning).

[6] As noted in the City's Response to Plaintiffs' Motion for Preliminary Injunction, there is a split in district courts in this circuit as to whether *Oakley* is correctly decided.  *Washington v. DeVos*, 2020 WL 4275041, at *6 (E.D. Wash. Jul. 24, 2020) (reaching opposite conclusion as *Oakley*).

13

professional license, or commercial license provided by an agency of the United
States or by the appropriated funds of the United States; and (B) any retirement,
welfare, health, disability, public or assisted housing, postsecondary education, food
assistance, unemployment benefit, or any similar benefit for which payments or
assistance are provided by an individual, household, or family eligibility unit by an
agency of the United States or by the appropriated funds of the United States."  8
U.S.C. § 1611(c).  HHS claimed that the phrase "an individual, household or family
eligibility unit" was ambiguous.  HHS Guidance at 41659-2 ("With respect to the
second condition, the phrase 'individual, household, or family eligibility unit' is
particularly ambiguous and requires clarification.")

It is not clear what in particular is ambiguous about the phrase "individual,
household, or family eligibility unit"; it appears simply to refer to any benefit for
which eligibility is based on a particular individual, household, or family, as is true of
the Program.   There is no ambiguity to resolve and, the Program fits squarely within
the statutory definition.

### c.  Plaintiffs' reading of the HHS Guidance is unreasonable.

Even if "individual, household, or family eligibility unit" were ambiguous, the
Court should not defer to Plaintiffs' interpretation of the HHS Guidance because it is
not reasonable.  An interpretation is "not reasonable" when it "leads to absurd results"
and "does not forward Congress' purposes."  *State of Hawaii ex. rel. Atty. Gen. v.
FEMA*, 294 F.3d 1152, 1159 (9th Cir. 2002) (refusing to defer to unreasonable FEMA
interpretation); *see also Port of Portland v. Dir., Off. of Workers Comp. Programs*,
192 F.3d 933, 939 (9th Cir. 1999) (refusing to defer to a regulation when it is
"inconsistent with the structure of the [statute]").  Here, at least as interpreted by
Plaintiffs, the HHS Guidance cannot be a reasonable interpretation of PRWORA
because it is inconsistent with PRWORA's structure.

PRWORA provides an "expansive" and "broad" definition of federal public
benefit.  *Washington v. DeVos*, 2020 WL 4275041, at *5 (E.D. Wash. Jul. 24, 2020);

14

1   Congress's stated purpose was "to further the national immigration policy that 'aliens

2   within the Nation's borders not depend on public resources to meet their needs, but

3   rather rely on their own capabilities and the resources of their families, their sponsors,

4   and private organizations, and ... [that] the availability of public benefits not constitute

5   an incentive for immigration to the United States.'" *Pimentel v. Dreyfus*, 670 F.3d

6   1096, 1099 (9th Cir. 2012). (citation omitted.)  In particular, Congress directed that

7   benefits that come from "appropriated funds" of the United States are "federal public

8   benefits," not just benefits that are directly created or administered by Congress.

9        On Plaintiffs' reading, the HHS Guidance applies PRWORA's restriction to

10   federally funded benefits only if the "authorizing statute . . . mandate[s] ineligibility."

11   This reading is unsupported by PRWORA's text and completely undermines the

12   general eligibility restriction that PRWORA established.  In addition, it creates a

13   strange loophole because PRWORA also prohibited state and local governments from

14   using their *own* funds to provide benefits to non-qualified aliens.  8 U.S.C. § 1621(a).[7]

15   Even if the Court adopted Plaintiffs' reading, the Program would be a state or local

16   public benefit because it is administered by the City, and is not excluded from the

17   definition as being a "federal public benefit" within the meaning of PRWORA.  8

18   U.S.C. § 1621(c) (defining state or local public benefit).  To reach Plaintiffs' desired

19   result, there would have to be an implicit and non-statutory exception that would

20   render City-designed but federally funded benefit programs uniquely beyond the

21   reach of PRWORA, which would mean the City was barred from using its *own*

22   money but not federal money in creating the Program, a strange and inexplicable

23   loophole.  This interpretation should be rejected.

24        The HHS Guidance attempted to provide "clarifying guidance as to which

25   *HHS programs* are subject to the existing PRWORA requirements regarding

26   immigrants' eligibility for 'Federal public benefits.'"  HHS Guidance at 41661-2.

27   _____

28   [7] States, but not local governments, can affirmatively decide to provide state and local
     benefits to people who are not qualified aliens.   8 U.S.C. § 1621(d).

1    (emphasis added.)  Because HHS programs are authorized by acts of Congress, HHS

2    analyzes those acts to determine whether its programs are federal public benefits.

3    This is plainly the focus of the HHS guidance.  *See id.* at 41659-3.  Since the City,

4    rather than Congress, created the Program, the analogous question here is whether the

5    City "mandated ineligibility" based on specified criteria.

6           The City unquestionably did. To be eligible an applicant must be a city

7    resident.  (Doc. 24-1 at 19, 21.)  Residency is one of the "specific criteria" that HHS

8    identified as something that could "mandate ineligibility."  This is hardly trivial—the

9    City provides many benefits—such as its parks or police services—that are available

10   to residents of Scottsdale, Tempe, Flagstaff, or New Mexico when they visit the City.

11   But such persons are ineligible for the Program because they are not Phoenix

12   residents.  This squarely fits within the HHS interpretation.

13          Thus, even considering the HHS guidance, the Program is a federal public

14   benefit under PRWORA.

15          **2.     The Program is not short term, non-cash, in-kind, emergency**
16                  **disaster relief.**

17          PRWORA provides a limited exception for federal public benefits that are

18   "[s]hort-term, non-cash, in-kind emergency disaster relief." 8 U.S.C. § 1611(b)(1)(B).

19   As the Court is aware, there is extremely limited authority interpreting the meaning

20   and extent of this exception.  Only one other court has provided any examination of

21   the question at all, and ultimately reached its decision on other grounds.  *Coal. of Fla.*

22   *Farmworker Orgs., Inc. v. FEMA*, 2006 WL 8433326, at *3 (S.D. Fla. Nov. 30, 2006)

23   (holding that court lacked jurisdiction to review FEMA's determination that

24   emergency housing benefits did not fall within the exception because FEMA had

25   discretion to deny benefits even if it did).

26          An analysis of FEMA's determination regarding the application of PRWORA

27   is instructive.  In 1998, FEMA released guidance identifying which FEMA programs

28   were federal public benefits and thus not available to non-qualified aliens.  The

guidance was discussed at Super's deposition. "(*See* Doc. 78-1 ("FEMA Guidance").)"  FEMA,[8] the federal agency charged with disaster response, interpreted the "short-term, non-cash, in-kind emergency disaster relief" exception to mean "programs that provide for: search and rescue; emergency medical care, emergency mass care, emergency shelter, clearance of roads and construction of temporary bridges necessary to the performance of emergency tasks and essential community services; warning of further risk or hazards; dissemination of public information and assistance regarding health and safety measures; provision of food, water, medicine, and other essential needs, including movements of supplies or persons; or reduction of immediate threats to life, property, and public health and safety."  Doc. 78-1 at 5. Applying this interpretation, FEMA determined that just four of its programs (all of which involve emergency disaster relief) met the definition of federal public benefit and were not subject to an exception.  *Id.*

One of these programs is the Temporary Housing Assistance program, originally adopted as Section 408 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 93-288, and currently codified at 42 U.S.C. § 5174. Under the Temporary Housing Assistance Program, the President, acting through FEMA, "may provide financial assistance to individuals or households to rent alternative housing accommodations, [or] existing rental units . . . . Such assistance may include the payment of the cost of utilities, excluding telephone service."  42 U.S.C. § 5174(c)(1)(A)(i).  Alternatively, the President, acting through FEMA, can "provide temporary housing units, acquired by purchase or lease, directly to individuals or households."  *Id.* § 5174(c)(1)(B)(i).  This program is deemed by FEMA to not be a "short term, non-cash, in-kind, emergency disaster relief" benefit.  *See Fla. Farmworkers*, 2006 WL 8433326, at *3 (describing Plaintiffs' argument that housing

---

[8] The City does not argue that FEMA's interpretation is entitled to *Chevron* deference. The Court should only defer to it to the extent it finds FEMA's interpretation persuasive.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

assistance should fall within the category).  This contrasts with the myriad of FEMA administered benefits that *do* fall within the exception, including: "Essential assistance", 42 U.S.C. § 5170b; "Legal services", 42 U.S.C. § 5182; and "Emergency public transportation," 42 U.S.C. § 5186.  FEMA's guidance remains the same through today.[9]

The Court thus can avoid surplusage between the exceptions in 8 U.S.C. § 1611(b)(1)(B) and (b)(1)(D) by adopting FEMA's reading.   The exceptions in section (b)(1)(D) refer to "community[-]level" benefits such as soup kitchens that do not take into account an individual's "income or resources."  FEMA's interpretation of section (b)(1)(B) allows needy individuals to take advantage of, for example, federally funded legal services, but prevents them from receiving individualized monetary housing assistance.

Plaintiffs' authorities are not to the contrary.  Plaintiffs focus on uses of the terms "cash" and "in-kind."  In many of their cases, the point is that "cash" and "in-kind" income must both be accounted for in determining the amount of income a person has.  For example, 20 C.F.R. § 416.1102 defines income as "anything you receive in cash or in kind" and "[i]n-kind income" as "not cash, but [] actually food or shelter, or something you can use to get one of those."  But the City is not providing Program beneficiaries food or shelter, nor is it providing beneficiaries with "something" they "can use to get" food and shelter.  The City is paying outstanding bills for shelter and utilities that beneficiaries have *already* acquired, using cash.  In some ways, the funds are for disaster prevention, not disaster relief.

Plaintiffs also cite several cases that hold that when a renter is provided housing either free or at a reduced rate, the difference with the fair market value of the rent is treated as in-kind income for calculating Supplemental Security Income

---

[9] FEMA, Citizenship and Immigration Status Requirements for FEMA Disaster assistance, available online at https://www.fema.gov/fact-sheet/4562/citizenship-and-immigration-status-requirements-fema-disaster-assistance.

("SSI") benefits.  None of these cases involve the payment of an already incurred bill, as the City's Program does, for which the beneficiary remains responsible.  *See Young v. Schweiker*, 680 F.2d 680, 682 (9th Cir. 1982); *Antonioli v. Harris*, 624 F.2d 78, 80-81 (9th Cir. 1980); *Hoff v. Colvin*, 2014 WL 2880427 (N.D. Cal. June 24, 2014).  Rather, they deal with the direct provision of housing to an individual without a market rate exchange of cash.  The point of these cases is that if SSI beneficiaries artificially deflate their expenses by obtaining below market rent, their imputed income will increase and their benefits reduce.  These cases do not, as a rule, state that when a public agency pays an individual's already incurred bill, the agency has provided an "in-kind" benefit.

Better for the Plaintiffs, as the Court already noted, is *City and County of San Francisco v. United States Citizenship and Immigration Services*, 944 F.3d 773 (9th Cir. 2019).  This case repeatedly refers to Section 8 housing assistance as "in-kind" payment.  *See, e.g, id.* at 783, 796, 799.  This nomenclature appears to be the Ninth Circuit's alone; the rule the Circuit evaluates refers to Section 8 housing assistance as "non-cash" but never calls it "in-kind."  *See* Inadmissibility on Public Charge Grounds ("Public Charge Rule")*,* 83 Fed. Reg. 51114-01, 51168 (describing the Section 8 rental assistance payments as "non-cash" but never "in-kind"); 51290 (identifying Section 8 rental assistance payments as "[n]on-cash benefits, monetized") (Oct. 10, 2018).

Moreover, while there are some similarities between Section 8 housing assistance payments and the City's Program, they are not identical.  Section 8 housing beneficiaries generally receive a voucher, which they use to obtain housing. 24 C.F.R. § 982.303.  When renting housing, the beneficiary only pays a fixed amount, based on their income, while a public agency pays the balance of the reasonable rent.  These create two distinctions with the Program, both of which make Section 8 closer to a traditional in-kind payment.  First, the voucher is a traditional form of in-kind payment—it is something beneficiaries can use to obtain shelter; this is unlike the

City's Program, which simply uses cash to pay already incurred bills. Second, unlike the Program, where the City makes a payment on an individual's existing obligation, Section 8 involves a public agency taking on a separate, ongoing obligation that the tenant has never been responsible for.

The Court should follow FEMA and determine that monetary benefits provided to individuals for their housing needs are not "short-term, non-cash, in-kind, emergency disaster relief."

### 3.   There is no non-profit exception relevant to the Program.

Plaintiffs once again argue the non-profit "exception" in 8 U.S.C. § 1642(d) which provides that "nonprofit charitable organizations, in providing any Federal public benefits . . . is not required under this chapter to determine, verify, or otherwise require proof of eligibility for any applicant of such benefits."  Plaintiffs have never explained how this provision injures them—it does not make non-qualified aliens *eligible* for any benefits, and neither Poder nor ADAC administer the Program.

Plaintiffs now rely on the Department of Justice's previously interim guidance. But that guidance suggests that there is no problem with non-profit charitable organizations verifying eligibility, stating only that "[a] non-profit charitable organization that chooses not to verify cannot be penalized." 62 Fed. Reg. 61345, 61346.  This guidance confirms that non-profits can choose to verify eligibility.

Plaintiffs also cite Super's declaration and language from Senators Kennedy and Grassley that they claim shows how important it was to various members of Congress and the Clinton Administration.[10]   As explained in the City's *Daubert* Motion, Super's declaration on this point is highly unreliable.  (Doc. 76 at 13).  And none of those statements can change the language Congress enacted.

Nothing in 8 U.S.C. § 1642(d) prevents non-profits from verifying eligibility or

---

[10] Plaintiffs' reliance on legislative history is "notoriously unreliable."  *Miller for and on Behalf of the N.L.R.B. v. Cal. Pac. Med. Ctr.,* 991 F.2d 536, 542 n.3 (9th Cir. 1993); *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history.").

relieves the City's obligation to ensure that federal public benefits go only to citizens and qualified aliens.

**C.      The Eligibility Requirement is Not Preempted.**

The Program's eligibility requirement is not preempted because it does exactly what federal law requires: deny federal public benefits to non-qualified aliens.

Congress's policy choice since PRWORA's enactment in 1996 has been to generally prohibit non-qualified aliens from receiving federal and state and local governments public benefits.  See 8 U.S.C. §§ 1611 (barring non-qualified aliens from most receiving federal public benefits); 1621 (barring non-qualified aliens from receiving most state and local benefits).  For state and local benefits, Congress allowed a State to bypass this general prohibition only through "the enactment of a State law after August 22, 1996."  8 U.S.C. § 1621(d).  The CARES Act simply directed the City to spend the federal funds it received however the City determined was "necessary" in light of the pandemic.  42 U.S.C. § 801(d).  Because these are federal public benefits under PRWORA, absent an express directive by Congress, PRWORA's restrictions apply.  If they are not federal public benefits because they are excluded under the HHS Guidance, they would be state or local public benefits subject to the same eligibility restrictions, absent an express directive by the State.

Indeed, the eligibility requirement is consistent with the goals the federal government set out in PRWORA, that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." 8 U.S.C. § 1601(2).  Congress's goal was to make it more difficult for non-qualified aliens to receive monetary benefits from local governments.  There is no preemption.

**D.      Plaintiffs Are Not Entitled to a Permanent Injunction.**

Since Plaintiffs are wrong on the merits, there is no need to consider their request for injunctive relief.  *Knox v. Brnovich*, 336 F. Supp. 3d 1063, 1068 (D. Ariz. 2018).  If this Court agrees with Plaintiffs on the merits, four factors are relevant to

whether injunctive relief is appropriate, including whether:  (1) Plaintiffs have suffered an irreparable injury, (2) remedies are available at law are inadequate to compensate for that injury, (3) the balance of hardships tip in their favor, and (4) the public interest favors an injunction.  *See City and Cty of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir, 2018) .

Moreover, even if Plaintiffs demonstrate that they could receive an injunction, the Court should not issue an injunction in this case because it will not meaningfully differ from declaratory relief.  *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("At the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect that interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."); *Grandco Corp. v. Rochford*, 536 F.2d 197, 208 (7th Cir. 1976) (reversing grant of permanent injunction  against unconstitutional city ordinance because declaration would suffice and comports with consideration of comity and federalism); *Emp'rs Mut. Cas. Co. v. Branch*, 381 F. Supp. 3d 1144, 1153 n.6 (D. Ariz. 2019) (refusing to enjoin tribal officials because declaration would suffice and injunction would be "contrary to the notions of comity").  If the Court determines that federal law requires the City to allow non-qualified aliens to receive benefits from the Program, there is no reason to think the City would refuse to do so.

Plaintiffs are also not entitled to an injunction based on the four factors.

**1.    Plaintiffs have not established an irreparable injury.**

As explained above in Section A, neither Poder nor ADAC has demonstrated a cognizable injury in fact, let alone an irreparable injury.  Plaintiffs' remaining evidence is equally unavailing.

**Individuals**.  Plaintiffs identify two individuals who they claim have suffered irreparable harm, Plaintiff Aurora Galan Mejia and anonymous declarant L.V..  Plaintiffs have not offered any new evidence regarding Ms. Galan Mejia, and the Court already recognized she had not shown the type of harm required for an

injunction based on denial of housing assistance.  (*See* Doc. 40 at 22-23); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("The district court . . . correctly determined that the individual Plaintiffs were likely to suffer irreparable harm . . . because they faced eviction from their rental units.").

L.V. has also not demonstrated irreparable harm due to her ineligibility for the City's program.  L.V. was threatened with eviction in April, 2020, and has demonstrated that she was behind on her rent at that time.  (Doc. 73 ¶ 9).  All L.V. states now is that she will "get another statement from her trailer park soon."  (Doc. 69 ¶ 5.)  In April, when L.V. received her eviction threat and accrued late fees, the Program did not exist and could not have helped her.  L.V. has not stated that she is currently behind on her rent or threatened with eviction.  She thus fails to demonstrate irreparable harm for the same reasons Ms. Galan Mejia fails to do so.

Additionally, L.V. lives with an adult, United States citizen son.  (Doc. 68 ¶ 1; Doc. 69 ¶ 7.)  She did not provide any evidence as to whether her son is either currently or able to work, or whether or not her son is on her lease (or if she has asked her landlord about adding him to her lease).  L.V.'s household would plainly qualify for the program if her son was either on the lease, or if she simply added him to the lease.  Any injury L.V. may suffer appears to be avoidable and thus self-inflicted and not irreparable. *See, e.g., Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

**Community Housing Group Director.**  Plaintiffs discuss the testimony and declaration of John ("Jay") Young at length.  Mr. Young's testimony and declaration are inadmissible and unreliable for the reasons explained in the City's motion to exclude his testimony.  (Doc. 75.)  The City does not restate its arguments here.  In any case, Mr. Young had no knowledge of any persons excluded from the City program due to their immigration status, or indeed, any City residents threatened with eviction or any related harms for any reason during the pandemic.  (*See, e.g.,* Excerpts of John H. Young Dep., attached as Ex. 4, at 14:16-15:2; 17:18-22, 19:19-

20:12, 21:12-22:3, 22:15-23:8, 35:13-38:5.)

**National and Local Studies and Reports**. Plaintiffs also offer several web links to blog posts, and newspaper articles which they claim demonstrate irreparable harm. All of these articles are out-of-courts statements offered to prove the truth of the matter asserted and thus inadmissible, regardless of whether they are published on a blog, in a newspaper, or elsewhere. *See, e.g., Meekins v. Chipotle Servs., LLC*, 2018 WL 6503498, at *3 (C.D. Cal. Dec. 11, 2018) (unauthenticated news articles rife with hearsay statements are not reliable enough to be considered even under a relaxed evidentiary standard). Some of these articles, such as a local newspaper story cited by Plaintiffs (at 22 n.16), address concerns about a now counterfactual world where Governor Ducey did not extend his eviction moratorium. Another of Plaintiffs' citations (at 22 n.18) suggests evictions are dramatically below their historical averages during the pandemic in Phoenix, suggesting the likelihood of being evicted is low. And none of these articles appear to address whether City-resident undocumented immigrants are, or are likely to be, evicted.

Plaintiffs also complain that the City has not rebutted Plaintiffs' evidence. The problem here, however, is that Plaintiffs have not presented sufficient evidence to prove the harm necessary to justify an injunction.

### 2. Plaintiffs have not established they lack an adequate remedy at law.

Plaintiffs make no argument that they lack an adequate remedy at law. The Court should weigh this factor against Plaintiffs.

### 3. The Balance of hardships and public interest tip against an injunction.

When the Government is a party, the analysis of the final two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, the balance of harms is at best, neutral. As the Court (Doc. 40 at 28), and Plaintiffs, (at 24) have recognized, the Program's interplay with this litigation is a zero-sum game. There is a limited amount of funds available, and every dollar will be allocated to

24

some household that has suffered economic consequences from the pandemic.  For any dollar that may go to whatever needy non-qualified immigrant, a dollar will not go to a needy qualified immigrant or citizen.  The hardship factor is neutral; it favors neither Plaintiffs or the City.

The public interest is also not served by an injunction. If this Court agrees with Plaintiffs on the merits, an injunction from this Court is not necessary to affect a change in the eligibility requirements. Declaratory relief would suffice.

**E.      Declaratory Judgment**

The City agrees that the Court can and should enter a declaratory judgment in favor of whichever party is correct on the merits.

**CONCLUSION**

For the reasons stated above, the Court should dismiss Poder and ADAC from this case for lack of standing and enter a declaratory judgment in favor of the City, confirming that PRWORA prevents non-qualified aliens from receiving Program benefits.

DATED this 26th day of October, 2020.

OSBORN MALEDON, P.A.


By      s/Emma J. Cone-Roddy
Mary R. O'Grady
Kristin L. Windtberg
Emma J. Cone-Roddy
2929 North Central Ave., 21st Floor
Phoenix, Arizona  85012-2793

CITY ATTORNEY'S OFFICE

Cris Meyer
Les S. Tuskai
Phoenix City Hall
200 West Washington Street, 13th Floor
Phoenix, Arizona  85003

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

I hereby certify that on October 27, 2020, I served the attached document by first-class mail on the Honorable Dominic W. Lanza, United States District Court, Sandra Day O'Connor U.S. Courthouse, Suite 621, 401 West Washington Street, SPC 46, Phoenix, Arizona 85003-2151.

s/Karen McClain

8721785