Index of Exhibits

**Exhibit 1:**   Excerpts of Karina Ruiz De Diaz Deposition

**Exhibit 2:**   Excerpts of Viridiana Hernandez Deposition

**Exhibit 3:**   Excerpts of David Super Deposition

**Exhibit 4:**   Excerpts of John H. Young Deposition

# Exhibit No. 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated, | ) ) ) ) ) ) ) | CV-20-01429-DWL |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| The City of Phoenix, a municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

ZOOM VIDEOCONFERENCE
DEPOSITION OF KARINA RUIZ DE DIAZ

September 24, 2020
9:08 a.m.
MEETING ID: 849-3254-7200

Prepared by:
KIM RUPIPER, CR, CRR
Certified Realtime Reporter
Certificate No. 50456

```
 1                              INDEX
      WITNESS                                              PAGE
 2
      KARINA RUIZ DE DIAZ
 3
            Examination by Ms. Cone-Roddy               4
 4          Examination by Ms. Katz                    45
            Further Examination by Ms. Cone-Roddy      47
 5

 6                            EXHIBITS

 7    NO.   DESCRIPTION                              IDENTIFIED

 8    DX1   2020-09-10 Poder Karina Ruiz De Diaz        12
            Supplemental Declaration
 9
      DX2   2020-07-24 DE 11 Ruiz De Diaz Declaration   15
10          Re Motion for Class Certification

11    DX3   Copy of AUWR Distribution Form ADAC         21
            Redacted
12
      DX4   ADAC Grant Agreements 9.22.2020             19
13
      DX6   Grant letters ADAC                          18
14
      DX7   VH Redacted Committee Notes 9.22.2020       36
15
      DX8   First Amended Complaint - Exhibit 1         28
16

17

18                       ATTORNEY REQUESTS

19    ATTORNEY                                  PAGE   LINE

20    Ms. Cone-Roddy                             20     25

21

22

23             INSTRUCTIONS TO WITNESS NOT TO ANSWER

      ATTORNEY                                  PAGE   LINE
24
      Ms. Katz                                   5      24
25
```

1              **ZOOM VIDEOCONFERENCE DEPOSITION OF**

2     **KARINA RUIZ DE DIAZ** commenced at 9:08 a.m. at ZOOM

3     MEETING ID: 849-3254-7200 on September 24, 2020, before

4     Kim Rupiper, a Certified Reporter for the State of

5     Arizona.

6

7     **APPEARANCES:**

8          For Plaintiffs:

9               (Via Zoom Videoconference)
                **INSTITUTE FOR JUSTICE**
10              **By:  Ms. Ellen Sue Katz, Esq.**
                     **Ms. Brenda Munoz Furnish, Esq.**
11                   **Mr. Sam Schnarch, Esq.**
                3707 North Seventh Street, Suite 300
12              Phoenix, Arizona  85014
                602-252-3432
13              eskatz@qwestoffice.net
                bmfurnish@qwestoffic.net
14
                **-and-**
15
                (Via Zoom Videoconference)
16              **ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**
                **By:  Mr. Daniel J. Adelman, Esq.**
17              514 West Roosevelt Street
                Phoenix, Arizona  85003
18              602-258-8850
                danny@aclpi.org
19

20         For Defendant:

21              (Via Zoom Videoconference)
                **OSBORN MALEDON, P.A.**
22              **By:  Ms. Emma J. Cone-Roddy, Esq.**
                     **Ms. Mary R. O'Grady, Esq.**
23              2929 North Central Avenue, 21st Floor
                Phoenix, Arizona  85012-2793
24              602-640-9000
                econe-roddy@omlaw.com
25              mogrady@omlaw.com

1        Q.    And do you recognize this document?

2        A.    Yes, it is my first declaration.

3        Q.    Did you prepare this declaration as well?

4        A.    Yes.

5        Q.    And these are your words?

6        A.    Yes.

7        Q.    One sec.  If we go to Paragraph 5, the second

8    sentence from the end, could you read that into the

9    record for me.

10        A.    Where it says, "ADAC concentrated..."?

11        Q.    The sentence after that, "ADAC had to

12    prioritize..."

13        A.    "ADAC had to prioritize rent assistance over

14    the scholarships because of the pandemic."

15        Q.    Is this still true?

16        A.    I want to say that we don't even have time

17    right now to fundraise scholarships for students because

18    of the programs that we have that involves community

19    engagement and census work.

20        Q.    So rent assistance is no longer a priority for

21    ADAC?

22        A.    No, there is a need.  We don't have the

23    capacity right now to meet that need.

24        Q.    Let's go back to your Exhibit 1.  In Paragraph

25    3, the paragraph where you read the entire one, there's

1    have the grant letters for any other money after the

2    deposition?

3         A.    The grant letters?

4         Q.    Yes -- or the grant agreements, sorry.

5         A.    Yes.

6         Q.    So you think there was more.  How much more do

7    you think there was?

8         A.    I believe from my recollection, 145,000.

9         Q.    And I think that goes with some of the other

10   questions I had, because if we look at Exhibit 3 -- tell

11   me what Exhibit 3 is.

12        A.    That is the Excel -- well, the sheet where we

13   kept track to provide a report to the Fund.

14        Q.    And it looks to me if we go over to Column AD,

15   the most you provided to anyone was $500; is that right?

16        A.    Yes.

17        Q.    Why 500?

18        A.    That was an amount we decided in order to give

19   an even number, so the money -- we didn't want to be

20   left any money, so that was like an even amount of money

21   that when we got the 20,000, it was an even number to

22   give all the funds out.  And when we got the 40, again,

23   an even round number.

24        Q.    If you look over at Column P, this column is

25   labeled "Amount Requested."  What is this column?

1        A.    b), okay.  "Cap the assistance to any

2   individual at $600 per month."

3        Q.    Were you involved with the decision to sort of

4   then -- the group that was raising this money group-wide

5   to cap the individual payments at 600?

6        A.    Yes.

7        Q.    And what was the purpose of this $600 cap?

8        A.    I believe at the time we did not want to give

9   more than that because of IRS.  When we created this, we

10  were trying to figure out if we were going to have to

11  give some sort of documentation to the IRS about the

12  people because of IRS compliance.  We were unsure at the

13  time, so we decided to give that amount.

14       Q.    So it was based on the cap liability issues?

15       A.    Yes.

16       Q.    And then ADAC decided to go lower; correct?

17       A.    We did because we didn't want to have any

18  amount left.  We wanted to be able to use an even number

19  to distribute the amount.

20       Q.    And that let you reach even more people;

21  right?

22       A.    We were able to help more people.

23       Q.    Do you know how much the City has given out?

24       A.    I believe it was 4,200.

25       Q.    If I asked you to assume that the City has a

1    way this would work is you would need to provide at

2    least one of the documents on this list to qualify for

3    the City program.  I'm just representing that to you,

4    whether that's true or not.  Do you understand?

5         A.   Yes.

6         Q.   When you interviewed people, did you ask them

7    to provide you a termination letter from their employer?

8         A.   No.

9         Q.   Did you ask them to provide you proof of an

10   unemployment application?

11        A.   No.

12        Q.   Did you ask them for proof that they had

13   applied for unemployment benefits?

14        A.   No.

15        Q.   Did you ask them in the event that their

16   employment was not tied to a formal employment

17   structure, that they provide you with a written

18   self-certification that they had lost their job?

19        A.   We filled out affidavits for them declaring

20   that they did lose their job or had reduction in hours.

21        Q.   But did they provide you any written

22   self-certification saying, my employment is not tied to

23   a formal employment structure and I have lost my job?

24        A.   Yes.

25        Q.   Yes?

1         A.    Can you repeat the question?  I --

2         Q.    Sure.  Did you ask people whose employment was

3    not tied to a formal employment structure, such as

4    people who might work as baby-sitters or mechanics or

5    housekeepers, to provide you with written

6    self-certification of that and confirm that their

7    employment was not tied to a formal structure and that

8    they had lost their employment?

9         A.    No, we didn't.

10        Q.    Did you ask them to provide a letter stating

11   that they had a reduction in hours from their employer?

12        A.    We didn't ask them to provide anything in

13   writing.  We just talked to them and made notes in our

14   Google sheet of the circumstances.

15        Q.    And that's fine.  I just do want to go through

16   each of these documents individually and get you on the

17   record about them.

18              So did you ask them for pay stubs from the

19   last three pay cycles showing a reduction in hours?

20        A.    No.

21        Q.    Did you ask them for an employer letter

22   regarding wage reduction or notice of furlough?

23        A.    No.

24        Q.    Did you ask them for a letter saying that

25   their current or future hours had been reduced?

1          A.    No.

2          Q.    Did you ask them for a letter saying that

3     their unemployment or SSI benefits had been

4     discontinued?

5          A.    No.

6          Q.    Did you ask them for documents related to

7     increased expenses in daycare tied to COVID-19 social

8     distancing requirements?

9          A.    No.

10         Q.    And, again, if their employment was not tied

11    to a formal employment structure, did you ask them for a

12    self-certification that they had a reduction in income,

13    a written self-certification?

14         A.    No.

15         Q.    So do you understand that if I am correct that

16    they would have needed to provide one of these documents

17    to get money from the City, you have no knowledge of

18    whether any of the people you interviewed would have

19    been able to provide these documents; correct?

20         A.    I would not know.  I don't know what other

21    people are able to produce or not, what documentation

22    they can produce or not.  What I do know is that we

23    didn't require these because of the state of emergency

24    and people needed the assistance right away, so we tried

25    to make the process as simple as possible for them, and

 1    they did fill out an affidavit stating that they lost

 2    their job or had reduction in hours, and that's as far

 3    as we went.

 4         Q.    Turn to the next page, Page 21.  It says,

 5    "Attachment 2" at the top, "City of Phoenix Residency

 6    Documentation."  Do you see that?

 7         A.    Yes.

 8         Q.    I'm again going to represent to you that in

 9    addition to providing a document listed in Attachment 1,

10    to qualify for the program, an applicant needed to

11    provide documents to verify their identity as listed in

12    Attachment 2.  You understand that I'm just representing

13    this, regardless of whether it's true or false.

14         A.    I'm sorry, could you repeat that?

15         Q.    Just like with the documents in the previous

16    attachment, I'm going to represent that to qualify for

17    the program, an applicant would have needed to provide

18    the City or one of its nonprofit partners residency

19    verification documents as listed in this attachment.  Do

20    you understand?

21         A.    Yes.

22         Q.    Did you ask applicants to provide a driver's

23    license?

24         A.    It wasn't a requirement.  We just asked people

25    to show some sort of ID to have the right name and

1    spelling in the check that we provided to them.

2        Q.   So you did ask them for some sort of

3    identification with their name on it?

4        A.   We didn't limit the identification that they

5    could have provided.  It could have been passport.  It

6    could have been a matricula.  It could be any document

7    for their -- it could have been a document from their

8    country of origin.

9        Q.   Okay.  And what was that second thing you said

10   between passport and document?

11       A.   Matricula.  Matricula.  It's like a -- a

12   matricula, it's type of ID.  I can spell it out.  It's

13   m-a-t-r-i-c-u-l-a.

14       Q.   But you didn't require documents that showed

15   that they had residence in the city of Phoenix?

16       A.   No, because this was a statewide effort, so

17   people could have lived in Tempe, Scottsdale, Flagstaff.

18   They could have lived outside of Phoenix to receive the

19   benefit.

20       Q.   So you wouldn't be able to say for certain

21   whether the people you interviewed established that they

22   were city residents eligible for the program?

23       A.   I'm confused.  Are you talking about our fund

24   or the City's fund?

25       Q.   Sorry.  The people you interviewed, you don't

1    know if they had documentation to show that they were

2    residents of the City of Phoenix that would have

3    entitled them to apply for the City?

4         A.    They had utility bills that we -- people

5    actually showed us their -- the utility bills.  We did

6    not require them or collect them, but they did show

7    their mortgage agreement, or they showed their utility

8    bills, and we just saw and verified that way they had

9    that need; they were going to use that money for that.

10   So in the bills I would have seen that it was to the

11   City of Phoenix or other cities.

12        Q.    But this wasn't a document you required, and

13   you weren't using these documents to verify their

14   residency, so you didn't keep track of that?

15        A.    Yes, we were just using it to -- to see that

16   they were going to use the money for that.

17        Q.    And you mentioned earlier that you took notes

18   during these interviews.  Do you still have those?

19        A.    No, because -- no, I don't.  What the notes

20   would have had, it's in the -- in the Google sheet.

21   That's the same information that we would have had with

22   the Google sheet.

23        Q.    And the Google sheet is sort of a summary of

24   the notes, and you no longer have the original notes?

25        A.    Correct.

1          Q.    And you no longer have the originals?

2          A.    Correct, I do not.

3          Q.    Do you know when you got rid of them?

4          A.    We usually got rid of them after we gave

5    people the assistance.  We no longer had a need or a use

6    since we recorded the information in the Google sheet;

7    we gave the assistance to the person, and because of

8    privacy and the nature of the individuals who are

9    undocumented, we did not want to keep extra information

10   than what we needed.

11         Q.    I would like to now look at Exhibit 7, DX7,

12   which I'm going to pull up on my screen.  Can you

13   identify this document for me?

14         A.    It's Selection Committee notes from

15   August 15th, 2020, and it seems like other dates also.

16         Q.    So if we go to Page 3, it says there was an

17   emergency meeting on August 17th, 2020.  Do you see

18   that?

19         A.    Yes.

20         Q.    I'm just going to ask you about each meeting.

21   The August 15th, 2020 Selection Committee round, did you

22   attend this meeting?

23         A.    My name is not there, and I don't have

24   recollection.

25         Q.    And the August 17th, 2020 meeting, which is on

1    sentence that says, "Notify..."  Can you read that for

2    me.

3         A.    "Notify the Distribution Committee not to

4    spend more money before approval.  Only organizations in

5    Non-Phoenix area."

6         Q.    What does that last sentence mean?

7         A.    That last sentence refers to this effort was

8    told to donors, but it was a statewide effort, and the

9    organizations have to make choices about distributing in

10   a more equitable manner with limited funds that we

11   received.  So we had to make the tough choice of doing

12   more outreach outside of Maricopa areas, such as

13   Cottonwood, Flagstaff, Sedona, Tucson, because most of

14   the money was being spent in the Phoenix area, and we

15   knew there was a need in people outside of the Maricopa

16   area, and that's what that refers to.  The little money

17   we had left we wanted to do outreach to outside of

18   Maricopa because this is a statewide effort.

19        Q.    So just to be clear, your organization made a

20   choice to cut off Phoenix residents from the remaining

21   amounts of the fund; correct?

22        A.    The organization knew that there's money that

23   the City holds, and they can provide to our people where

24   we help other people that could not apply for the City

25   of Phoenix fund outside of Maricopa.

1          Q.    You knew that, but you chose to cut off

2     residents of the City of Phoenix from ongoing aid from

3     your program; correct?

4                MS. KATZ:  I'm going to object to that

5     misleading question, and it doesn't accurately reflect

6     her testimony.

7                THE WITNESS:  We knew that there's a couple of

8     other organizations that could have had a little more

9     resources that could have given that money in this area,

10     and I believe when this note was taken it was because we

11     were to the last of our funds.  It wasn't at the

12     beginning when we had most of the funds.

13          Q.    BY MS. CONE-RODDY:  You were at the end of

14     your funds and you weren't going to do new fundraising

15     because you were prioritizing census work and civic

16     engagement; correct?

17          A.    I'm sorry, you were cutting off.  I heard the

18     last part but not the first part.

19          Q.    You were at the end of your funds and you

20     weren't going to be prioritizing raising new funds

21     because you were prioritizing census work and civic

22     engagement; correct?

23          A.    Well, we had conversations about doing it, but

24     we did not have the capacity.

25          Q.    Because you were prioritizing this other work;

1    $25 million to operate to continue this effort.

2        Q.    And when you made the decision to stop

3    continuing the effort, you knew that the City wasn't

4    giving money to undocumented immigrants?

5        A.    Yes, and that's why we're here.

6            MS. CONE-RODDY:  Ellen, I'd like to take just

7    one final break just to make sure I don't have any

8    follow-up questions I want to ask.

9            MS. KATZ:  Okay.  Well, do you want to break

10   for, what, five, ten minutes, and then we'll come back?

11           MS. CONE-RODDY:  Yeah, we'll break for five,

12   ten minutes.  If I don't have follow-up questions, you

13   can proceed to redirect.

14           MS. KATZ:  Okay.  That works.  Thank you.

15           (A recess was taken from 10:39 a.m. to

16   10:44 a.m.)

17       Q.    BY MS. CONE-RODDY:  The City has no more

18   questions for the witness.

19           MS. KATZ:  I just have a few (reverberating

20   audio) whoa, is that me?  Hang on for just a second.

21           (Discussion off the record.)

22           MS. KATZ:  Okay.  Is this better?  It's

23   probably enough to get us through the end of this

24   deposition.

25

1    Thank you for your time, Karina.

2              (10:49 a.m.)

3

4                                    _____

5                               KARINA RUIZ DE DIAZ

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT KNOWN that the foregoing proceeding
was taken before me; that the witness before testifying
2   was duly sworn by me to testify to the whole truth; that
the questions propounded to the witness and the answers
3   of the witness thereto were taken down by me in
shorthand and thereafter reduced to typewriting under my
4   direction; that the foregoing pages are a true and
correct transcript of all proceedings had upon the
5   taking of said proceeding, all done to the best of my
skill and ability.

6
           I CERTIFY that I am in no way related to any of
7   the parties hereto nor am I in any way interested in the
outcome hereof.

8
           [X]  Review and signature was requested.
9          [ ]  Review and signature was waived.
           [ ]  Review and signature was not requested.

10
           I CERTIFY that I have compiled with the ethical
11  obligations in ACJA 7-206(F)(3) and 7-206(J)(1)(g)(1)
and (2).

12

13  *Kim Rupiper*                            10/4/20
14  Kim Rupiper, CRR, CR
AZ CR No. 50456

15

16
           I CERTIFY that JD Reporting, Inc., has complied
17  with the ethical obligations in ACJA 7-206(J)(1)(g)(1)
through (6).

18

19

20  JD REPORTING, INC.
Registered Reporting Firm R1012

21

22

23

24

25

# Exhibit No. 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>The City of Phoenix, a municipal corporation,<br><br>        Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. CV-20-01429-DWL |

**VIDEOCONFERENCE DEPOSITION OF VIRIDIANA HERNANDEZ**

Zoom Meeting ID:  815 1526 6535
September 25, 2020
9:06 a.m.

                                    JD REPORTING, INC.
                                    CERTIFIED REPORTERS
Prepared by:                        1934 East Camelback Road
KELLY SUE OGLESBY, RPR              No. 428
Arizona CR No. 50178               Phoenix, Arizona  85016
Registered Reporting Firm R1012    jdri@jdreporting.co

VIRIDIANA HERNANDEZ, 9/25/2020

```
 1                         INDEX

 2   WITNESS:                                  PAGE

 3   VIRIDIANA HERNANDEZ

 4   EXAMINATION

 5   By Ms. Cone-Roddy                          5

 6   By Ms. Katz                                64

 7                       EXHIBITS

 8   EXHIBIT:            DESCRIPTION        MARKED/REF'ED

 9   DX9    First Supplemental Declaration of   33    33
            Viridiana Hernandez in Support of
10          Plaintiffs' Request for Final Relief,
            Including a Permanent Injunction
11
     DX10   Copy of AUWR Distribution from Poder  54    55
12          Redacted

13   DX11   Printout of text messages             46    46

14   DX12   Document entitled Seven day Letter,   44    44
            Non-Payment of Rent, Termination of
15          Tenancy

16   DX13   Document entitled Eviction and how it 45    45
            affects You
17
     DX14   Printout from Poder in Action Twitter 28    28
18          account

19               PREVIOUSLY REFERENCED EXHIBITS

20   EXHIBIT            PAGE
     DX7...................18
21   DX8...................35

22               REQUESTS TO PRODUCE DOCUMENTS

23                      Page      Line
                         29        22
24                       52        20

25
```

VIRIDIANA HERNANDEZ, 9/25/2020

1                QUESTIONS INSTRUCTED NOT TO ANSWER

2                      Page          Line
                        6             24
3
                       RECESSES TAKEN
4                                               PAGE
   Recess taken from 9:46 a.m. to 10:02 a.m.      31
5  Recess taken from 10:50 a.m. to 11:03 a.m.     61
   Recess taken from 11:04 a.m. to 11:11 a.m.     62
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              VIDEOCONFERENCE DEPOSITION OF VIRIDIANA

 2   HERNANDEZ, commenced at 9:06 a.m. on September 25, 2020,

 3   with all parties appearing remotely via Zoom, before KELLY

 4   SUE OGLESBY, a Certified Reporter, CR No. 50178, in and

 5   for the County of Maricopa, State of Arizona, pursuant to

 6   the Rules of Civil Procedure, appearing remotely via Zoom.

 7                         APPEARANCES

 8   FOR PLAINTIFFS:

 9          INSTITUTE FOR JUSTICE
            BY:  MS. ELLEN SUE KATZ
10               MS. BRENDA MUNOZ FURNISH
                 3707 North Seventh Street
11               Suite 300
                 Phoenix, Arizona  85014
12               eskatz@qwestoffice.net
                 bmfurnish@qwestoffice.net
13
            ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
14          BY:  MR. DANIEL J. ADELMAN
                 514 West Roosevelt Street
15               Phoenix, Arizona  85003
                 danny@aclpi.org
16
17   FOR DEFENDANT:

18          OSBORN MALEDON, P.A.
            BY:  MS. MARY R. O'GRADY
19               MS. EMMA J. CONE-RODDY
                 2929 North Central Avenue
20               Suite 2100
                 Phoenix, Arizona  85012-2793
21               mogrady@omlaw.com
                 econe-roddy@omlaw.com

22

23

24

25
```

1        A.    We work with families that are directly impacted

2  by police brutality and police violence.  So during this

3  time there was a lot happening, and my focus area of work

4  became supporting those mothers and sisters whose children

5  were killed by police.

6        Q.    You said "a lot happening."  What do you mean by

7  that?

8        A.    Nationally the uprisings.  The issue of

9  policing.  The continued cases of violence.  So that

10  triggers a lot of the traumatic experience of families, so

11  there were a lot of feelings were very present and they

12  needed a lot of emotional support.

13        Q.    So for you, this became a priority over the

14  raising money for the Undocumented Relief Fund?

15        A.    Yes.  And the fund also does not have staff.  So

16  the people who can help fundraise, we all also had like

17  another full-time-plus job.

18        Q.    Was Poder generally, besides you, still raising

19  money for the fund?

20        A.    I'm sorry.  I couldn't hear you.

21        Q.    Was Poder generally, besides you as an

22  individual, at this point raising any more money for the

23  fund?

24        A.    We were sharing on social media the donation

25  link, but that was about the extent.

VIRIDIANA HERNANDEZ, 9/25/2020

1        Q.   Let me ask you, actually, about that.

2             Is your -- is Poder's Twitter account Poder in

3    Action?

4        A.   Our Facebook account?

5        Q.   Twitter account.

6        A.   Twitter account, yes, Poder in Action.

7        Q.   Do you happen to know the last time Poder in

8    Action placed a public appeal on Twitter to fundraise for

9    the fund?

10       A.   I do not know.  Our Twitter game is very weak.

11       Q.   If I told you that I had searched on your

12   Twitter account and the last thing I found was on

13   July 11th, would that sound right to you?

14       A.   Potentially.  I don't -- I'm not the person who

15   handles social media.

16            (Deposition Exhibit No. DX14 was marked for

17   identification.)

18       Q.   (BY MS. CONE-RODDY)  Can we just look at DX14

19   briefly, which I will put on the screen.

20       A.   DX14?

21       Q.   Yes.  The last exhibit.  We are a little out of

22   order.  I'm sorry.

23       A.   Got it.

24       Q.   Is this the sort of appeal you would put on

25   social media?

1        A.    Yes.

2        Q.    Do you see the date on this is July 11th?

3        A.    Yes.

4        Q.    Are you aware of any Facebook posts that have

5    been posted after July 11th?

6        A.    I am not sure.

7        Q.    Do you happen to know when this lawsuit was

8    filed?

9        A.    It was in July.

10       Q.    If I told you that it was filed on July 20th,

11   would that sound right to you?

12       A.    Yes.

13       Q.    So are you aware of any solicitations, after

14   this July 11th solicitation, to raise money for the fund?

15       A.    Can you repeat that?

16       Q.    Were you aware of any social media

17   solicitations, following this one we have here on

18   July 11th, to raise money for the fund?

19       A.    I think there were more.  We are more active in

20   Instagram and Facebook, but I wouldn't be able to confirm

21   that.

22       Q.    Would you be able to look after this deposition

23   and send, through your lawyers, some copies of those?

24       A.    Yes, I could look.

25       Q.    All right.  So we talked about --

VIRIDIANA HERNANDEZ, 9/25/2020

1    then.  Thank you.

2              (A recess was taken from 9:46 a.m. to

3    10:02 a.m.)

4        Q.   (BY MS. CONE-RODDY)  I just had a few follow-up

5    questions about what we were talking about before the

6    break.

7              Is Poder, to your knowledge, still fundraising

8    money for the fund?

9        A.   They are posts scheduled to go out in a video.

10       Q.   Is Poder still making grants to individuals from

11   the fund?

12       A.   Yes.  We finished -- well, can you just clarify?

13   So we finished distributing.  We still have to get out the

14   checks.

15       Q.   When did you finish distributing?

16       A.   We haven't distributed the checks.

17       Q.   But you said that you had finished distributing.

18   What did you mean by that?

19       A.   That we have allocated the funds to individuals.

20       Q.   When did you finish allocating the funds to

21   individuals?

22       A.   That was at the end of last week.

23       Q.   And these video posts you mentioned that are

24   scheduled to go out, when were those scheduled?

25       A.   I haven't checked in with our comms team.

VIRIDIANA HERNANDEZ, 9/25/2020

1  which I'm going to pull up now.  I'm just going to go to

2  the first page of this.

3         Do you recognize this document?

4    A.   Just a second.

5         No.

6    Q.   I'm going to represent to you that this document

7  was attached to a complaint your organization filed, their

8  amended complaint, but also their original complaint.

9         Did you review that complaint before it was

10 filed?

11   A.   Yes.

12   Q.   Did you review its exhibits?

13   A.   Yes.  Okay.  Yes, I have seen this.

14   Q.   Okay.  I want to go down to page 20.  I'm going

15 to ask you to take my word for it, so you can make this as

16 an assumption that what's on page 20 is a list of

17 documents that someone who was applying to the City's

18 program would have to provide to the City in order to be

19 eligible to get funds from the city.

20        Do you understand what I'm claiming this

21 document is?

22   A.   Yes.

23   Q.   When Poder was giving these grants to these

24 approximately 334 people, did they ask people to provide

25 them a termination letter from their employer?

VIRIDIANA HERNANDEZ, 9/25/2020

1        A.    No.

2        Q.    Did they ask those people to provide them an

3   unemployment application?

4        A.    No.

5        Q.    Did they ask them to provide them a proof that

6   they had applied for unemployment benefits?

7        A.    No.   That was -- I guess it's not applicable.

8   We -- we were not supporting people who had -- who

9   could -- who had unemployment benefits.

10       Q.    Did you ask them, if your employment is not tied

11  to a formal employment structure, such as that you are

12  maybe a housekeeper or a babysitter or a mechanic who

13  doesn't have a formal employer, to sign a written

14  declaration saying that they had lost their informal

15  employment?

16       A.    Did we require that?  Is that -- what was the

17  question?

18       Q.    Did you ask people whose employment was not tied

19  to formal employment structures, such as mechanics,

20  babysitters or housekeepers, to provide a written

21  self-certification that their employment had been

22  terminated?

23       A.    That was not a requirement.

24       Q.    Did you ask them to provide you with a letter

25  from their employer stating that they had a change in

1    hours?

2         A.    That was not a requirement.

3         Q.    Did you ask them to provide paystubs from the

4    last three pay cycles showing a reduction in their hours?

5         A.    That was not a requirement.

6         Q.    Did you ask them to provide a letter from their

7    employer stating that they had had their wages reduced or

8    that they received a notice of furlough?

9         A.    That was not a requirement.

10        Q.    Did you ask for a letter from their employer

11   stating that their current or future hours had been

12   reduced?

13        A.    That was not a requirement.

14        Q.    Did you ask them to provide an unemployment

15   letter, a letter saying that their unemployment or SSI

16   benefits were discontinued?

17        A.    That was not a requirement.

18        Q.    Did you ask them for documentation showing

19   increased daycare expenses tied to Covid-19 social

20   distancing requirements?

21        A.    That was not a requirement.

22        Q.    And, again, if we are talking about people who

23   were employed informally, such as mechanics or babysitters

24   or housekeepers, did you ask them to provide a written

25   self-certification that they had had a reduction in

VIRIDIANA HERNANDEZ, 9/25/2020

1   income?

2       A.   That was not a requirement.

3       Q.   If I am correct that to receive benefits from

4   the City's program, an applicant would have had to provide

5   at least one of these documents to the City, is it true

6   that you don't know whether anyone you gave money to would

7   have been eligible for City funding, regardless of their

8   immigration status?

9       A.   No, that's not correct.

10      Q.   What makes that not correct?

11      A.   There were people who brought this or who

12  offered it or who did bring some of these proofs.  They

13  were not requirements.

14      Q.   Do you have records of how many people brought

15  this or offered it?

16      A.   Again, no.  Those are not requirements for us.

17      Q.   So you can't prove that anyone offered this to

18  you?

19      A.   Some people did submit these documents.

20      Q.   Okay.  I'm going to go to the next page, which

21  is page 21.  Again, I'm going to represent to you that

22  like the previous page, all applicants would have had to

23  provide some documentation from this list as well to

24  verify their city of residency.

25           Do you understand that?

VIRIDIANA HERNANDEZ, 9/25/2020

1          A.    Yes.

2          Q.    Did you ask applicants to provide a driver's

3    license?

4          A.    That was not a requirement.

5          Q.    Did you ask applicants to provide a work or

6    school ID?

7          A.    That was not a requirement.

8          Q.    Did you ask them to provide a public benefit or

9    work letter, such as a Supplemental Nutrition Assistance

10   Program award letter or a Temporary Assistance for Needy

11   Families award letter?

12         A.    That was not a requirement.

13         Q.    Did you ask them to provide a utility bill?

14         A.    That was not a requirement.

15         Q.    Sorry?

16         A.    That was not a requirement.

17         Q.    Did you ask them to provide a mortgage bill or

18   lease agreement?

19         A.    That was not a requirement.

20         Q.    Did you ask them to provide other documents

21   verifying their residency?

22         A.    That was not a requirement.

23         Q.    We are going to look back to your declaration

24   now, and I'd like you to look at paragraph 6.

25               Could you read that to me?

1      A.    "I would estimate that approximately 90% of the

2   relief funds Poder distributed was for rent and

3   mortgages."

4      Q.    How do you know this?

5      A.    Through the application process.

6      Q.    Did you process applications yourself?

7      A.    No.

8      Q.    Where did this number come from?

9      A.    Approximately 90 percent?  From the data of the

10   applicants that we -- of grants that we gave.

11      Q.    What data are you talking about?

12      A.    It was in the distribution, the fund

13   distribution list.

14      Q.    You had access to this sort of summary of what

15   other Poder employees had and volunteers had collected?

16      A.    Yes.

17      Q.    And the 90 percent comes from your review of

18   that document?

19      A.    Yes.

20      Q.    Did you talk to anyone at your office before you

21   hit to 90 percent?

22      A.    No.

23      Q.    I want you to go down to paragraph 8.  Could you

24   read paragraph 8 for me?

25      A.    "The persons who came to Poder for help, told us

1    A.   Yes.

2    Q.   So it looks like to me that you gave out around

3  340 grants.

4         Does that sound right to you?

5    A.   Around, yes.

6    Q.   And the total amount was around $162,000.

7         Does that sound right to you?

8    A.   It sound sounds about right.

9    Q.   I'm sorry?

10    A.   It sounds about right.

11    Q.   And an average grant of $476 and roughly 50

12  cents.

13         Does that sound right?

14    A.   That's what I'm seeing here, but I didn't take

15  them, so that's what I think.

16    Q.   Let's look over at column P, which I am

17  highlighting again.

18         Do you see column P?

19    A.   Yes.

20    Q.   What do you understand column P is?

21    A.   It seems like there was a question about

22  requests of funds, and potentially that's the data.

23    Q.   And then when we look down at the bottom, we see

24  the same count, average and sum for this column.

25         Do you see that?

1          A.    Yes.

2          Q.    And the count here is, again, around 340?

3          A.    Yes.

4          Q.    And then the sum here it says is 162,400.

5                Does that sound right to you?

6          A.    That's what it says, yes.

7          Q.    So if I'm understanding this correctly, maybe

8    I'm not, it seems like you were asked to provide $162,400

9    and you did provide $162,000.  Is that right?

10         A.    That's what it looks like.

11         Q.    At least of the needs that you know you were

12   asked for, you met basically 100 percent of those needs,

13   right?

14         A.    I don't know.  One of the things with data is

15   that it seems like for a while, the amount requested, the

16   person inputting the data was just putting in the same

17   amount as the amount received, at least for Poder.

18               So that was one of the -- throughout the

19   process, that was one of the data issues we recently saw,

20   was that we weren't -- a lot of people, organizations were

21   not putting the actual amount requested.  We were just

22   putting the amount given.  Other organizations did put the

23   amount requested, so --

24         Q.    So -- I'm sorry.  Didn't mean to interrupt you.

25               (Interruption by the court reporter.)

1   it said amount requested, and I, in my notes -- was that

2   P?  Nope.

3            Oh, okay.  It is P.  Thank you.

4

5                          EXAMINATION

6

7       Q.   (BY MS. KATZ)  Ms. Hernandez, I just wanted to

8   go back.  There was some discussion about column P.

9            And is it your understanding that the

10  individuals who were coming to Poder, that the amount of

11  money that would meet their needs was limited to $600?

12      A.   Definitely not.

13      Q.   And how do you know that?

14      A.   In the conversation, many, you know, I think as

15  we have seen in one of the last columns, talked about

16  being behind rent or bills several months, which was

17  definitely more than 600.

18           MS. KATZ:  Let me just ask my co-counsel a

19  question.  Thank you.

20      Q.   (BY MS. KATZ)  The only other question I had was

21  when -- when the Poder staff were interviewing persons,

22  were they explained that the amount of money that Poder

23  had to give to each family or individual was limited?

24      A.   Yes, we told them it was extremely limited; that

25  if they can think of their most priority bill, that that's

1    what we could consider.

2         Q.   But did you ever tell -- did you tell people

3    that you were able to give them an unlimited amount of

4    money?

5         A.   No.  We told them many times it was -- it was

6    very limited, and, you know, we apologized for that as

7    well, actually.

8              MS. KATZ:  Okay.  I have no further questions.

9              MS. CONE-RODDY:  I don't have any other

10   questions, except for the unanswered question already on

11   the record.

12             MS. KATZ:  Are you ordering this transcript or

13   you don't know?

14             MS. CONE-RODDY:  We will be ordering the

15   transcript.

16             MS. KATZ:  And so we would like to read and

17   sign.

18             (Deposition recessed at 10:47 a.m.)

19

20                    _____

21                         VIRIDIANA HERNANDEZ

22

23

24

25

VIRIDIANA HERNANDEZ, 9/25/2020

```
 1          BE IT KNOWN that the foregoing proceeding was
    taken before me; that the witness before testifying was
 2  duly sworn by me to testify to the whole truth; that the
    questions propounded to the witness and the answers of the
 3  witness thereto were taken down by me in shorthand and
    thereafter reduced to typewriting under my direction; that
 4  the foregoing is a true and correct transcript of all
    proceedings had upon the taking of said deposition, all
 5  done to the best of my skill and ability.

 6          I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
 7  outcome hereof.

 8
            [X]  Review and signature was requested.
 9          [ ]  Review and signature was waived.
            [ ]  Review and signature was not requested.
10

11          I CERTIFY that I have complied with the ethical
    obligations in ACJA Sections 7-206(F)(3) and
12  7-206-(J)(1)(g)(1) and (2).

13
    Kelly Sue Oglesby                           9/29/2020
14  _____    _____
    Kelly Sue Oglesby                               Date
15  Arizona Certified Reporter No. 50178

16
            I CERTIFY that JD Reporting, Inc. has complied
17  with the ethical obligations in ACJA Sections
    7-206(J)(1)(g)(1) and (6).
18

19
    Jane M. Doyle                               9/29/2020
20  _____    _____
    JD REPORTING, INC.                              Date
21  Arizona Registered Reporting Firm R1012

22

23

24

25
```

3 REPORTING, INC. | 602.254.1345 | jdri@jdreporting.co

# Exhibit No. 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated,<br><br>                   Plaintiffs,<br>v.<br><br>The City of Phoenix, a municipal corporation,<br><br>                   Defendant. | No. CV-20-01429-DWL |

VIDEOCONFERENCE DEPOSITION OF DAVID A. SUPER

Zoom Meeting ID: 893 2909 2384
September 30, 2020
9:06 a.m.

Prepared By:

Annette Satterlee, RPR-CRC
Certified Reporter
Arizona Certificate #50179
Registered Reporting Firm R1012

*JD REPORTING, INC.*
Certified Reporters
1934 East Camelback Road
No. 428
Phoenix, Arizona  85016
jdri@jdreporting.co

1                    I N D E X

2  WITNESS:                                    PAGE

3  DAVID A. SUPER

4       Examination by Ms. Cone-Roddy        5, 137
        Examination by Ms. Katz                133
5

6                      * * *

7
                     EXHIBITS
8
   EXHIBIT:              DESCRIPTION         MARKED/REF'D
9
   DX16    *The Future of U.S. Immigration*     5      28
10         *Law,* David A. Super

11 DX17    *The Quiet "Welfare" Revolution:*    5      28
           *Resurrecting the Food Stamp Program*
12         *in the Wake of the 1996 Welfare Law,*
           David A. Super
13
   DX18    *Acute Poverty:  The Fatal Flaw in*  5      32
14         *U.S. Anti-Poverty Law,* David A. Super

15 DX19    Chapter XI, from Public Welfare Law, 5      33
           David A. Super
16
   DX20    Declaration of David A. Super        5      10
17
   DX21    ASPE Organization Chart              5      --
18
   DX22    NY Times article, Sept. 12, 1996     5      --
19
   DX23    Public Law 104-193, August 22, 1996  5      --
20
   DX24    Gallup Poll:  Presidential Election  5      --
21         Trial-Heat Trends, 1936-2008

22 DX25    Excerpt of Report 104-249 by         5      93
           Senator Hatch
23
   DX26    Excerpt of CREC, September 30, 1996  5      98
24
   DX27    HHS definition of Federal Public     5     109
25         Benefit

```
 1                            EXHIBITS

 2   EXHIBIT:            DESCRIPTION           MARKED/REF'D

 3   DX28     DOJ NPRM on Citizenship and          5      114
             Immigration Status
 4
     DX29     FEMA bulletin re federal public      5      123
 5           benefits, March 1998

 6   DX30     Stafford Act, May 2019               5      --

 7

 8                 PREVIOUSLY MARKED EXHIBITS

 9                        (None.)

10
                 REQUESTS TO PRODUCE DOCUMENTS
11
                          (None.)
12

13              INSTRUCTIONS NOT TO ANSWER

14                        (None.)

15

16                       RECESSES

                                              PAGE
17
     Recess taken from 9:58 to 10:12 a.m.            40
18
     Recess taken from 11:07 to 11:20 a.m.           76
19
     Recess taken from 12:35 to 1:04 p.m.           123
20

21

22

23

24

25
```

1          VIDEOCONFERENCE DEPOSITION OF DAVID A. SUPER

2    commenced at 9:06 a.m. on Wednesday, September 30, 2020,

3    with all parties appearing remotely via Zoom before

4    Annette Satterlee, RPR, CRC, Arizona Certified Reporter,

5    Certificate #50179, pursuant to the Rules of Civil

6    Procedure, appearing remotely via Zoom.

7                          APPEARANCES

8    FOR PLAINTIFFS:

9
             INSTITUTE FOR JUSTICE
10           BY:   ELLEN SUE KATZ, ESQ.
                   BRENDA MUNOZ FURNISH, ESQ.
11                 3707 North Seventh Street
                   Suite 300
12                 Phoenix, Arizona  85014
                   eskatz@qwestoffice.net
13                 bmfurnish@qwestoffice.net

14
             ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
15           BY:   DANIEL J. ADELMAN, ESQ.
                   514 West Roosevelt Street
16                 Phoenix, Arizona  85003
                   danny@aclpi.org

17

18   FOR DEFENDANT:

19
             OSBORN MALEDON, P.A.
             BY:   EMMA J. CONE-RODDY, ESQ.
20                 KRISTIN WINDTBERG, ESQ.
                   2929 North Central Avenue
21                 Suite 2100
                   Phoenix, Arizona  85012
22                 econe-roddy@omlaw.com

23

24

25

1 version of Title IV of PRWORA.

2          I don't know that ASPE's senior political

3 leadership -- which is quite distinct from the career

4 staff -- took a positive or negative position on that

5 title, specifically.  It's very possible they were

6 reacting to the overall legislation rather than any

7 particular title.

8     Q.   And HHS as a whole, through the secretary you

9 said, was opposed to the legislation as well.  Right?

10     A.   When the legislation was finalized in Congress

11 by the House and the Senate, the secretary of HHS

12 advised the president to veto.  I don't know what she

13 would have thought about earlier versions.  I'm not

14 aware that she declared herself on earlier versions.

15 But on the final version, she recommended a veto.

16     Q.   Do you know if HHS ever expressed that opinion

17 to Congress?

18     A.   It would not be appropriate for them to do it,

19 and to the best of my knowledge they didn't do it.

20     Q.   Now, you say that Congress demonstrated a

21 special trust here.  Right?

22     A.   I did.  Yes.

23     Q.   But the authority it gave here was to the

24 Department of Justice.  Right?

25     A.   They gave authority to the Department of

1  Justice to write rules relating -- to provide guidance

2  in this area or make determinations in this area in

3  consultation with HHS.  So, yes.  The final drafting

4  would be done by the Department of Justice, which at

5  that time included the Immigration and Naturalization

6  Service, the predecessor to several immigration agencies

7  we have now.

8      Q.   Congress didn't give HHS any authority here.

9  Correct?

10     A.   Congress gave HSS consultative authority,

11 which is not given out routinely.  And within

12 administrations, you don't ordinarily have a voting

13 process because they all work for the president.

14     Q.   Congress could have given HHS the

15 responsibility to write the legislation.  Right?

16     A.   They could have given it to HHS, or USDA, or

17 any number of people.  Certainly.

18     Q.   But they chose Justice to write these rules.

19 Right?

20     A.   They did.

21     Q.   So Congress expressed its trust in the Justice

22 Department.  Correct?

23     A.   They did.

24     Q.   Do you know if any high-ranking officials in

25 the Justice department resigned over PRWORA?

1      A.    I don't -- I'm not aware of any that did.  No.

2      Q.    And you said earlier that you teach

3 legislation and administrative law.  Correct?

4      A.    That's correct.

5      Q.    In your teaching of your legislation and

6 administrative law classes have you come across any

7 other statutes where Congress demonstrated a special

8 trust in one agency by giving an entirely different

9 agency rulemaking authority?

10     A.    I, I don't accept your characterization of

11 what happened here since you described that as other.

12 So I, I don't know how to answer your question.

13     Q.    Would you agree here that Congress gave

14 Justice, but not HHS, rulemaking authority?

15     A.    That I would agree.

16     Q.    And you would agree that what you said here is

17 that this demonstrates a special trust in HHS.

18     A.    I believe that I said that the requirement to

19 consult with HHS shows a special trust in HHS.

20     Q.    Can you identify any other statutes where

21 Congress has given one agency rulemaking authority and,

22 in your opinion, by doing so they have shown special

23 trust in a different agency?

24     A.    Again, I don't think I said that they showed

25 trust in HHS by giving authority to Justice.  I think I

1 completely, copied from the statute.

2     Q.   And that definition does not include the HHS

3 definition.  Yes or no?

4     A.   That definition is consistent with the

5 statute.  HHS believes that their interpretation is

6 consistent with the statute, so the two are consistent.

7 If HHS is contrary to this, then they're also contrary

8 to the statute.

9     Q.   I'm not asking you whether they're consistent.

10 I'm asking you whether DOJ's proposed definition

11 includes HHS's definition.  Yes or no?

12     A.   It does not.

13     Q.   All right.

14          I'd like to jump to Exhibit 29.  Could you

15 identify Exhibit 29 for me.

16          MS. KATZ:   Emma, were we going to take

17 the break?  Maybe we could just break now and then come

18 back at 1:00 o'clock?  Is that okay?

19               MS. CONE-RODDY:   Sure.  That works.

20          MS. KATZ:   So that would be, you know,

21 almost a half an hour.  Is that okay?  Then we can eat

22 and whatever.

23               MS. CONE-RODDY:   Sure.

24          MS. KATZ:   Is that okay, Dr. Super?

25               THE WITNESS:   Fine.

1             MS. CONE-RODDY:   But just before you go,

2  just for clarity, could Professor Super just identify

3  the document for me, then.

4             THE WITNESS:   Yes.  This appears to be

5  the guidance that was issued by FEMA, the Federal

6  Emergency Management Agency, in 1998 concerning the

7  verification process for receipt of disaster assistance.

8             MS. CONE-RODDY:   Now we can break until

9  1:00 o'clock.

10            THE WITNESS:   Thank you.

11            *(Recess taken from 12:35 to 1:04 p.m.)*

12  BY MS. CONE-RODDY:

13      Q.   Professor, I think before the break we were

14  looking at document 29, which you had identified as a

15  guidance document coming from FEMA?

16      A.   I was -- I did.  Yes.

17      Q.   All right.  Did you rely on this document in

18  creating your declaration?

19      A.   I looked at it, yes.

20      Q.   How did you rely on it?

21      A.   I -- my belief was that the HHS guidance was

22  the only effort to unpack the meaning of federal public

23  benefit with reference to legislative materials and

24  purpose.  I knew other agencies had put out guidance,

25  and to -- before I was going to say under oath that HHS

1 else was doing any sort of independent analysis.  It was

2 being centralized.

3      Q.   But the question I want to know the answer to

4 is do you know of any other federal agencies who issued

5 a policy document that referred to the HHS definition?

6 The Clinton administration.

7      A.   I'm not aware of any that did because the HSS

8 document was authoritative.  They don't need people

9 saying "Me, too."

10      Q.   So you would agree with me that no other

11 agency ever said it was using that definition.  Correct?

12      A.   I'm not aware of anything published that did

13 that.  They had put out things advising their

14 constituencies that -- advising them of section 401 of

15 PRWORA and related provisions, but had consistently just

16 parroted the statute until the administration's position

17 was -- interpretation was completed.  And that was being

18 conducted by HSS.

19      Q.   But you are not aware of any guidance from any

20 federal agency of the Clinton administration besides HSS

21 that ever used HSS's policy definition -- definition of

22 federal public benefit.  Correct?

23      A.   There was no need --

24           MS. KATZ:   Objection.

25           THE WITNESS:   -- for publishing after

 1  that --

 2              MS. KATZ:   Asked and answered.

 3              THE WITNESS:   There was no need for

 4  publishing anything after that.  And OMB would not have

 5  cleared anything that disagreed with it.  It was -- it

 6  was the authoritative guidance.  And as both DOJ and HSS

 7  noted, it was the result of extensive interagency

 8  coordination and discussion.  So the other agencies had

 9  their input into what HSS published.

10  BY MS. CONE-RODDY:

11      Q.   So you're not aware of any agencies that

12  discussed a specific eligibility criteria from the

13  authorizing statute in determining what was or was not a

14  federal public benefit.  Correct?

15      A.   This was the authoritative guidance.  I'm

16  aware of no other.

17      Q.   But other agencies would have had to identify

18  which of their problems were federal public benefits.

19  Correct?

20      A.   Yes.  As you see, FEMA does a bit of that

21  here.  And some other agencies do, too.

22      Q.   And to your knowledge, none of them have said

23  they were using the HSS definition or discussed its

24  criteria.  Correct?

25      A.   I'm not aware of anything that was published

1  after the HSS criteria came out, no.

2      Q.   Okay.  I'm going to go back to your

3  declaration, which was Exhibit 20.  And I'd like to go

4  to paragraph 26.  And that's the final paragraph, and I

5  can put it on the screen if you want.  But if you don't

6  need it --

7      A.   I don't need it.  I've got your binder in

8  front of me.

9      Q.   All right.

10     A.   It's been repaired.

11     Q.   That's good to hear.

12          There is a section that starts at the end of

13 page 12 and goes on to the start of page 13.  Line 27 of

14 12.  Can you read that sentence for me.

15     A.   Yes.

16          "Other agencies administering public benefit

17 programs, such as the Food and Nutrition Service of the

18 U.S. Department of Agriculture, understood from OMB and

19 inter-agency meetings that HSS's guidance reflected

20 government-wide policy."

21     Q.   You weren't involved in those interagency

22 meetings.  Correct?

23     A.   I was not personally involved, but my

24 responsibilities with the Center on Budget to stay

25 apprized of and potentially intervene in these policy

1   programs.  Correct?

2        A.    HSS has no legal authority to affect any

3   others.

4              MS. CONE-RODDY:   I don't have any other

5   questions.

6              MS. KATZ:   We have no further questions.

7              (Videoconference deposition concluded at

8               1:26 p.m., September 30, 2020.)

9

10                   _____

11                        DAVID A. SUPER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFIED REPORTER'S CERTIFICATE

 2        BE IT KNOWN that the foregoing proceeding was taken
      before me; that the witness before testifying was duly
 3    sworn by me to testify to the whole truth; that the
      questions propounded to the witness and the answers of
 4    the witness thereto were taken down by me in shorthand
      and thereafter reduced to typewriting under my
 5    direction; that the foregoing pages is a true and
      correct transcript of all videoconference proceedings
 6    had upon the taking of said proceeding, all done to the
      best of my skill and ability.

 7
          I CERTIFY that I am not related to, nor employed
 8    by, any of the parties hereto, nor am I in any way
      interested in the outcome thereof.

 9
                 [XX] Review and signature was requested.
10               [  ] Review and signature was waived.
                 [  ] Review and signature was not requested.

11
          I CERTIFY that I have complied with the
12    ethical obligations in ACJA Sections 7-206(F)(3) and
      7-206(J)(1)(g)(1) and (2).

13

14    _____      _____
      Annette Satterlee, RPR, CRR             Date
15    AZ CR No. 50179

16

17        I CERTIFY that JD Reporting, Inc., has complied
      with the ethical obligations in ACJA 7-260(J)(1)(g)(1)
18    through (6).

19    _____      _____
      JD Reporting, Inc.                      Date
20    Registered Reporting Firm R1012

21

22

23

24

25
```

# Exhibit No. 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Poder in Action, an Arizona nonprofit corporation; Arizona Dream Act Coalition, an Arizona nonprofit corporation; and Aurora Galan Mejia, individually and on behalf of others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | NO. CV-20-01429-DWL |
| The City of Phoenix, a municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**VIDEOCONFERENCE DEPOSITION OF JOHN HARLAN YOUNG**

Zoom Meeting ID:  825 2967 9541
September 29, 2020
9:57 a.m.

Prepared by:
KELLY SUE OGLESBY, RPR
Arizona CR No. 50178
Registered Reporting Firm R1012

JD REPORTING, INC.
CERTIFIED REPORTERS
1934 East Camelback Road
No. 428
Phoenix, Arizona  85016
jdri@jdreporting.co

JOHN HARLAN YOUNG, 9/20/2020

```
 1                          INDEX

 2   WITNESS:                                   PAGE

 3   JOHN HARLAN YOUNG

 4   EXAMINATION

 5   By Ms. Cone-Roddy                          4, 35

 6   By Mr. Adelman                             30, 38

 7                       *   *   *

 8                       EXHIBITS

 9   EXHIBIT:              DESCRIPTION        MARKED/REF'ED

10   DX15   Declaration of Jay Young in Support   10   10
            of Plaintiffs' Request for Final
11          Relief, Including a Permanent
            Injunction
12

13               PREVIOUSLY REFERENCED EXHIBITS

14   EXHIBIT              PAGE
     DX13.................32
15

16               REQUESTS TO PRODUCE DOCUMENTS

17                    Page        Line
                       6           15
18

19         QUESTIONS INSTRUCTED NOT TO ANSWER

20                    Page        Line
                         (None.)
21

22                   RECESSES TAKEN
                                         PAGE
23   Recess taken from 10:33 a.m. to 10:44 a.m.   28

24

25
```

```
 1              VIDEOCONFERENCE DEPOSITION OF JOHN HARLAN YOUNG,
 2   commenced at 9:57 a.m. on September 29, 2020, with all
 3   parties appearing remotely via Zoom, before KELLY SUE
 4   OGLESBY, a Certified Reporter, CR No. 50178, in and for
 5   the County of Maricopa, State of Arizona, pursuant to the
 6   Rules of Civil Procedure, appearing remotely via Zoom.
 7                          APPEARANCES
 8   FOR PLAINTIFFS:
 9          INSTITUTE FOR JUSTICE
            BY:  MS. ELLEN SUE KATZ
10               MS. BRENDA MUNOZ FURNISH
                 3707 North Seventh Street
11               Suite 300
                 Phoenix, Arizona  85014
12               eskatz@qwestoffice.net
                 bmfurnish@qwestoffice.net
13
            ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
14          BY:  MR. DANIEL J. ADELMAN
                 MR. SAMUEL D. SCHNARCH
15               514 West Roosevelt Street
                 Phoenix, Arizona  85003
16               danny@aclpi.org
                 sschnarch@aclpi.org
17
     FOR DEFENDANT:
18
            OSBORN MALEDON, P.A.
19          BY:  MS. EMMA J. CONE-RODDY
                 2929 North Central Avenue
20               Suite 2100
                 Phoenix, Arizona  85012-2793
21               econe-roddy@omlaw.com
22
23
24
25
```

 1  no spike?

 2          MR. ADELMAN:  Asked and answered.

 3          THE WITNESS:  Again, I would have to look

 4  specifically at the records.  I don't keep track of them

 5  off the top of my head.

 6      Q.  (BY MS. CONE-RODDY)  Let's go down to

 7  paragraph 4.  Can you read paragraph 4 for me?

 8      A.  Sure.  Governor Ducey has signed two executive

 9  orders regarding evictions.  The executive orders only

10  stop the constable from removing a tenant from their home.

11  The orders still let a landlord get a money judgment

12  against the tenant, so tenants still have the problems I

13  discuss above.  These money judgments can be for rent,

14  late fees, costs, and attorneys' fees.  These other fees

15  and charges can often double the rent owed.

16      Q.  Are you personally aware of any money judgments

17  that a tenant has received against them since Governor

18  Ducey issued his executive orders?

19      A.  No.

20      Q.  So you don't know whether anyone is having the

21  problems you discussed in paragraph 3 as a result of money

22  judgments issued against them after that, any tenants are

23  having the problems you discussed in paragraph 3?

24      A.  I do know that, but I don't know of specific

25  people, though, you know, the article that I referenced

1   does specifically talk about a family that this -- that

2   this has happened to.

3        Q.   Okay.  So the article you referenced, that you

4   don't remember the name of, mentioned one family?

5        A.   Yeah.

6        Q.   You don't know of any other families?

7             MR. ADELMAN:  Form.

8             THE WITNESS:  Again, I am regularly involved

9   with task forces and groups that are dealing with

10  evictions, and, you know, through folks who are on the

11  front lines, I do hear regularly of stories of this

12  happening, and am aware based on those meetings and the

13  folks that are involved in these meetings, that the things

14  that I state are happening, are happening.

15       Q.   (BY MS. CONE-RODDY)  So other people have told

16  you that they have been told these things are happening?

17       A.   That's correct.

18       Q.   Okay.  I'd like to look at paragraph 5.  Can you

19  read the last sentence of paragraph 5 to me?

20       A.   Sure.  I believe that would be, "An eviction

21  judgment may mean that a family is not eligible for

22  subsidized housing until they pay off the rental

23  judgment."

24       Q.   What do you mean when you say "may mean"?

25       A.   Again, from my experience in this field, and

1    SWFHC are that when tenants are evicted, they may be

2    forced to relocate considerable distances, mainly because

3    of their limited housing options."

4         Q.   Are you aware of anyone being forced to relocate

5    a considerable distance due to a pandemic-related

6    eviction?

7         A.   Again, you know, my experience and where I'm

8    coming from with my knowledge is, you know, based on years

9    of experience in the housing space, and, you know, based

10   on the extensive conversations that I have had with my

11   staff and with other folks working in housing, you know,

12   this is one of the many things that we see that folks that

13   get evicted experience.  Because, again, you know, because

14   the eviction is on their record, that really limits where

15   they can live, so, you know, it makes it difficult for

16   them to move next door.  It often forces folks to

17   relocate.

18        Q.   But are you aware of anyone who has been evicted

19   during the pandemic who has been forced to relocate a

20   considerable distance?

21        A.   Again, I'm not -- I can't think of or don't know

22   of specific people.

23        Q.   This is just a general statement about what you

24   think happens when someone gets evicted?

25        A.   Well, you know, this is based on not just what I

JOHN HARLAN YOUNG, 9/20/2020

1  eviction that is related to the pandemic, so, you know,

2  there are specific stories out there in the public realm,

3  as well as the experience that I have as the director of

4  Southwest Fair Housing Council.

5        Q.    I would like to move on to paragraph 7.

6        A.    Okay.

7        Q.    Can you read paragraph 7 to me?

8        A.    Sure.  "In some cases, the Governor's orders

9  still allow the landlord to ask the court to let the

10  constable come out.  If the tenants cannot move out by the

11  time the constable comes, the tenant may have their

12  property stored by the landlord, and the tenant cannot get

13  their property back until they can pay the storage fees.

14  In reality, this means that tenants sometimes never get

15  their belongings back.  So not only are tenants faced with

16  no place to stay, but they also lose their possessions,

17  making it even harder to maintain employment and keep

18  children in school."

19        Q.    Are you aware of any instances where there has

20  been a pandemic-related eviction and the court -- and the

21  landlord has asked the court to have the constable come

22  out?

23        A.    Again, you know, the specifics of, you know,

24  particular people or names, I don't, but I do participate

25  in an eviction prevention group that meets every Monday,

 1  and frequently on that call, a constable is on the call

 2  and has told us about particular instances where this is

 3  the case.

 4      Q.   Just to be clear, this is based off something a

 5  constable has told you that he knows about?

 6      A.   That she knows about, correct.

 7      Q.   That she knows about.  Okay.

 8           And are you aware of any instances where a

 9  tenant, who has been evicted due to the pandemic, has had

10  their property placed in a storage and they cannot get it

11  back?

12      A.   Again, specifically no.  However, the -- again,

13  just to illustrate the point, the article in the Tucson

14  paper talks about someone who was not able to retrieve

15  their belongings because of an eviction.

16      Q.   Can you read paragraph 8 to me?

17      A.   Sure.  "We also hear of tenants who become

18  homeless after their eviction due to many of the reasons

19  noted above."

20      Q.   This is just a general statement that people

21  sometimes become homeless after they are evicted, right?

22      A.    It is a general statement, but the statement is

23  based on, again, years of experience and numerous clients

24  who have become -- have been evicted and become homeless

25  while we have worked with them.  And it also refers to

1    folks who have contacted us, you know, after they have

2    experienced eviction and are homeless or had been homeless

3    and have described how the eviction, you know, basically

4    led to their homelessness.

5              So, again, I don't have specific names in mind,

6    but I am aware of specific cases over the years where this

7    has happened.

8         Q.   But this isn't specific to the Covid 19

9    pandemic, correct?

10        A.   Well, evictions happening before or after Covid,

11   you know, the results are basically the same, so...

12        Q.   Are you aware of anyone who has been evicted

13   during the Covid pandemic who has then become homeless?

14        A.   Not specifically that has come through our

15   agency, but that doesn't mean that it hasn't happened.

16   I'm just not aware.  And, again, referring back to the

17   article in the Tucson paper this weekend, that's exactly

18   what happened.

19        Q.   Are you personally aware of anyone who has

20   become evicted in Phoenix, not Tucson, who is now

21   homeless, who is ineligible for the City's program because

22   of their immigration status?

23        A.   I'm not aware of any specific people, no.

24        Q.   So you don't know if anyone in Phoenix has

25   suffered this harm, correct?

1        A.   Yes.

2             (Interruption by the court reporter.)

3             THE WITNESS:   I said "that's correct."

4        Q.   (BY MS. CONE-RODDY)   I would like to move on to

5   paragraph 9.   Could you read the sentence that starts on

6   line 20, or "Evictions will likely."

7        A.   Sure.   "Evictions will likely spike dramatically

8   after the order expires because tenants will still owe

9   back rent and late fees.   The order also fails to address

10  the dire straits of landlords, particularly small

11  landlords, that cannot pay their mortgages or maintain

12  properties because tenants cannot pay rent nor be evicted.

13  Tenants are likely to be displaced from properties that go

14  into foreclosure, as well."

15       Q.   Are you personally aware of any landlords who

16  have charged late fees and other penalties to Phoenix

17  residents ineligible for the City's program because of

18  their immigration status?

19       A.   I am not aware of anybody specifically, but,

20  again, my experience working on the statewide level has

21  shown that, you know, this is what happens during

22  evictions.   And I do also know that these types of fees

23  are allowed to be charged to folks even under the CDC

24  order.   So I do know that that is happening, though do I

25  know of a specific person?   Not off the top of my head,

1  but I do know through experience and what I know about the

2  CDC order that, again, back rent and late fees are able to

3  be charged and that, you know, ultimately that this will

4  likely lead to evictions and foreclosures.

5       Q.   Just to be clear, you are aware that they could

6  be charged, but you are not actually aware that they have

7  been charged, right?

8       A.   That's correct.

9       Q.   You said that evictions will likely spike

10  dramatically after the order expires.

11           How much do you think evictions will increase?

12       A.   You know, again, I'm not an expert, but in my

13  participation in an eviction prevention task force, a

14  professor from the U of A has estimated that the number of

15  homeless, on a very, very conservative level, could

16  double, and, you know, could be much worse than that.  As

17  many, you know, as five or six times the number of

18  homeless people that we currently have in Arizona.  So

19  orders of magnitude greater than what we currently know to

20  be true today, or pre-pandemic I should say.

21       Q.   Orders of magnitude based off of a University of

22  Arizona professor that you have talked to, right?

23       A.   That's correct.

24       Q.   Which professor?

25       A.   Professor Bentele, I believe is his last name.

 1  that is definitely a commonality with almost all of the

 2  evictions.  It's rare that a landlord is just wanting the

 3  person gone and is willing to forgive late fees and all of

 4  those types of charges that they pile up on tenants.

 5      Q.   Okay.  Hang on just one second.  Okay?  I think

 6  I may be done.

 7      A.   Okay.

 8           MR. ADELMAN:  Okay.  I don't have any other

 9  questions.  Thank you.

10

11                      RE-EXAMINATION

12

13      Q.   (BY MS. CONE-RODDY)  Mr. Young, I just have some

14  follow up, after Danny's questions.

15           With Mr. Adelman you talked a lot about specific

16  instances that you were aware of.

17           Are you generally aware, in the month of July of

18  this year, of any immigrants living in the City of Phoenix

19  who don't have lawful immigration status and have suffered

20  any of the harms listed on Exhibit 13?

21      A.   You know, I don't know of specific people, but,

22  you know, I do know that the extent of the pandemic and

23  the number of people that have experienced economic harm

24  and have faced eviction and have needed assistance is

25  great.  So though I don't know of any specific people,

JOHN HARLAN YOUNG, 9/20/2020

1  again, I do imagine that, you know, immigrants of all

2  kinds have been affected by this and have needed rental

3  assistance.  So that would be my thoughts on the matter.

4      Q.   You imagine this is true, but you aren't

5  specifically or generally aware of any immigrants without

6  lawful status, living in the City of Phoenix in July of

7  this year, who have suffered any of these harms?

8            MR. ADELMAN:  Form.

9            THE WITNESS:  Again, generally, I would say

10 that, yes, do I believe that folks that are in the country

11 unlawfully or without legal status have been harmed by

12 this and have needed rental assistance, but, you know, do

13 I know of a specific person or specific people?  No, I do

14 not.

15     Q.   (BY MS. CONE-RODDY)  In August of this year, are

16 you aware of any immigrants living in the City of Phoenix,

17 without lawful immigration status, who have suffered any

18 of the harms listed on Exhibit 13, generally?

19     A.   Again, I would just have the same answer as for

20 July.  Generally speaking, again, I know that economic

21 harm has been great.  I know that the need for rental and

22 other assistance to remain in housing is great, and I do

23 generally believe that folks that don't have lawful status

24 have been harmed by not having access to the assistance

25 through the City of Phoenix.

1      Q.   You believe, but you do not know for sure?

2      A.   I don't know of any specific instances.  I don't

3  know of specific people.

4      Q.   In the month of September, are you aware of any

5  immigrants living in the City of Phoenix, without lawful

6  immigration status, who suffered any of the harms listed

7  on Defendant's Exhibit 13?

8      A.   Generally speaking, again, the same for July and

9  August, because of the great harm suffered by folks

10  economically that is making it hard for them to stay in

11  their homes, including folks that are not in the country

12  or don't have legal status or are undocumented, I do

13  believe, generally speaking, that they have suffered harm

14  by not being able to access funds available through the

15  City of Phoenix, though, again, I do not know of any

16  specific names.

17      Q.   Again, this is something you believe is

18  happening, but not something that you know for a fact is

19  happening, correct?

20          MR. ADELMAN:  Form.

21          THE WITNESS:  Through my experience as director

22  of Southwest Fair Housing Council and dealing with folks

23  who need assistance, both documented and undocumented, I

24  do believe that this is occurring.

25      Q.   (BY MS. CONE-RODDY)  I'm not asking you whether

1  you believe it's occurring.  I'm asking whether you know

2  for a fact that it's occurring.

3       A.   No, I do not know for a fact.

4            MS. CONE-RODDY:  All right.  I don't have any

5  other questions.

6

7                      RE-EXAMINATION

8

9       Q.   (BY MR. ADELMAN)  Jay, I'm just going to follow

10 up on that last question.

11           Even though you don't know it for a fact, based

12 on your experience, do you believe, to a high level of

13 confidence, more probably than not, immigrants without

14 lawful status are among the people who are suffering harm

15 and could be helped if they could participate in the

16 program from the City of Phoenix?

17      A.   Yes, I am confident that that's true, based on

18 my experience.

19           MR. ADELMAN:  Okay.  That's all.

20           MS. CONE-RODDY:  Danny, I did ask the court

21 reporter if I could get a rough draft of Mr. Young's

22 transcript.  I just wanted you to know we were asking for

23 that.

24           MR. ADELMAN:  Okay.  Thank you.

25           And, Kelly, will you -- do you have Ellen's and

JOHN HARLAN YOUNG, 9/20/2020

1   my email?

2            (An off-the-record discussion.)

3            MR. ADELMAN:   I would like to put on the record

4   that we would like to read an sign, if you can just send

5   us an email.

6            (11:01 a.m.)

7

8                          _____

9                          JOHN HARLAN YOUNG

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN HARLAN YOUNG, 9/20/2020

```
 1          BE IT KNOWN that the foregoing proceeding was
     taken before me; that the witness before testifying was
 2   duly sworn by me to testify to the whole truth; that the
     questions propounded to the witness and the answers of the
 3   witness thereto were taken down by me in shorthand and
     thereafter reduced to typewriting under my direction; that
 4   the foregoing is a true and correct transcript of all
     proceedings had upon the taking of said deposition, all
 5   done to the best of my skill and ability.

 6          I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
 7   outcome hereof.

 8
            [X]  Review and signature was requested.
 9          [ ]  Review and signature was waived.
            [ ]  Review and signature was not requested.
10

11          I CERTIFY that I have complied with the ethical
     obligations in ACJA Sections 7-206(F)(3) and
12   7-206-(J)(1)(g)(1) and (2).

13
     Kelly Sue Oglesby
14   _____     10/2/2020
     Kelly Sue Oglesby                    Date
15   Arizona Certified Reporter No. 50178

16
            I CERTIFY that JD Reporting, Inc. has complied
17   with the ethical obligations in ACJA Sections
     7-206(J)(1)(g)(1) and (6).
18

19   Jane M. Doyle                        10/2/2020
     _____     Date
20   JD REPORTING, INC.
     Arizona Registered Reporting Firm R1012
21

22

23

24

25
```

JD REPORTING, INC. | 602.254.1345 | jdri@jdreporting.co