**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Poder in Action, et al., | No. CV-20-01429-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, | |
| Defendant. | |

**INTRODUCTION**

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") came into effect. Among other things, the CARES Act allocated $150 billion to state, local, and tribal governments to assist those entities in covering "necessary expenditures incurred due to the public health emergency" arising from the COVID-19 pandemic. *See* 42 U.S.C. § 801(d). This $150 billion allocation is known as the Coronavirus Relief Fund ("CRF").

The City of Phoenix, which received an allocation of CRF funds, chose to use $25.7 million of that money to create the COVID-19 Emergency Utility Rent and Mortgage Assistance Program ("the Program"). The purpose of the Program is "to assist Phoenix residents affected by the COVID-19 emergency . . . by providing aid to eligible Phoenix residents for utility bills (water, electric and/or gas), mortgage and rental obligations." (Doc. 24-1 at 2.)

When formulating the Program's eligibility criteria, the City consulted the Personal

Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), a federal statute enacted in 1996. *See* 8 U.S.C. § 1611. Under PRWORA, "an alien who is not a qualified alien" is ineligible to receive any "federal public benefit" unless certain exceptions apply. The City concluded that the distribution of CRF funds via the Program constitutes a "federal public benefit" and further concluded that none of PRWORA's exceptions were applicable. Thus, the City concluded that it was required, as a matter of federal law, to require applicants to the Program to "provide proof of qualified legal status in the U.S." (Doc. 24-1 at 19.) As a practical matter, this excluded many Phoenix residents.

In this action, Plaintiffs Poder in Action ("Poder"), the Arizona Dream Act Coalition ("ADAC"), and Aurora Galan Mejia ("Ms. Galan Mejia") (collectively, "Plaintiffs") challenge the City's exclusion of unqualified aliens from the Program. They argue that the City isn't required by PRWORA, or any other federal law, to impose immigration-related eligibility restrictions under the Program and that the City's decision to impose such restrictions is therefore preempted by federal law.

Earlier this year, the Court denied Plaintiffs' motion for a preliminary injunction. (Doc. 40.) Among other things, the Court concluded that Plaintiffs hadn't demonstrated a likelihood of irreparable harm in the absence of preliminary relief because Arizona's governor had issued a pair of executive orders delaying evictions during the pandemic. The Court emphasized, however, that "[t]his outcome should not . . . be interpreted as a sign that Plaintiffs' challenge to the Program will ultimately fail" and recognized that Plaintiffs had established "serious questions going to the merits" of their challenge. To that end, the Court set an accelerated schedule for a merits resolution of Plaintiffs' challenge.

On October 15, 2020, Plaintiffs filed their opening brief, seeking a permanent injunction and a declaratory judgment. (Doc. 64.) In support of their position, Plaintiffs proffered an array of evidence, including declarations from Jay Young, the executive director of the Southwest Fair Housing Council (Doc. 66), and David Super, a law professor at Georgetown University (Doc. 67). Afterward, the City filed a response brief

(Doc. 77) and motions to exclude the opinions of Mr. Young and Professor Super (Docs. 75, 76); Plaintiffs filed a reply brief (Doc. 87) and responses to the exclusion motions (Docs. 85, 86); and the City filed replies in support of its exclusion motions (Docs. 90, 91).

For the following reasons, the Court concludes that Defendants' standing challenge is unavailing, that the City is not required by PRWORA to exclude unqualified aliens from participating in the Program (because the Program falls within PRWORA's exception for "short-term, non-cash, in-kind emergency disaster relief"), and that the City's choice to exclude unqualified aliens from the Program is therefore preempted by federal law. Given these conclusions, it is unnecessary to resolve Plaintiffs' other theories as to why PRWORA should be deemed inapplicable here. As for relief, Plaintiffs' request for a declaratory judgment will be granted but the presence of that judgment, coupled with the City's avowal that it will comply with the judgment, makes it unnecessary to issue a permanent injunction. Finally, the City's motions to exclude the opinions of Mr. Young and Professor Super will be denied as moot.

**DISCUSSION**

I. <u>Standing</u>

As a preliminary matter, the City argues that two of the three Plaintiffs in this action, Poder and ADAC (the "Organizational Plaintiffs"), lack standing. (Doc. 77 at 2-8.) Specifically, the City argues that (1) the Organizational Plaintiffs lack organizational standing because they are not experiencing any current injury and will not experience a future injury, as "both organizations have moved on" and are no longer "divert[ing] any resources to aid with the economic consequences of COVID for City-resident immigrants ineligible for the fund"; and (2) the Organizational Plaintiffs lack associational standing because they have not proffered any admissible evidence of members suffering harm from the Program restrictions. (*Id.*, emphasis omitted.) Plaintiffs respond that the City focuses on the wrong timeframe, because standing is determined at the time the complaint is filed, and that the Organizational Plaintiffs have organizational and associational standing regardless of which timeframe is used. (Doc. 87 at 2-6.)

The City's standing challenge is unavailing. The Ninth Circuit has repeatedly stated that it is unnecessary to address the standing of each plaintiff in a multi-plaintiff case, at least where all plaintiffs seek the same form of relief, so long as one of the plaintiffs has standing. *See, e.g., Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008) ("Because we conclude that Preminger has direct standing to bring an as-applied challenge, we need not and do not consider whether the Santa Clara County Democratic Central Committee has standing and whether either Plaintiff has associational or third-party standing."); *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff [with standing], we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."). Here, the City doesn't appear to argue that Ms. Galan Mejia, the individual Plaintiff, lacks standing. (Doc. 77 at 2 [first section of the City's brief, with the heading "Organizational Plaintiffs Lack Standing"].)[1]

The Court has, at any rate, evaluated whether Ms. Galan Mejia possesses standing and concludes that she does. Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. *See* U.S. Const., art. III, § 2, cl. 1. "[O]ne of the controlling elements in the definition of a case or controversy under Article III is standing. The requisite elements of Article III standing are well established: A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (citations and internal quotation marks omitted). Put another way, "[t]he plaintiff must show that he has sustained or is immediately in

---

[1] The Court uses the word "appears" because, although the headings in the City's brief (as well as the sentence appearing at page 22, lines 22-23) suggest the City is only challenging the standing of the Organizational Plaintiffs, the City proceeds to argue that ADAC lacks associational standing because the sole "ADAC member" identified in Plaintiffs' submissions, Ms. Galan Mejia, has not "suffered any harm as of yet." (Doc. 77 at 5-6.) It is unclear why the City views this argument as sufficient to defeat ADAC's associational standing but insufficient to raise questions about Ms. Galan Mejia's individual standing.

danger of sustaining some direct injury as a result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations and internal quotation marks omitted). Because this case is no longer at the pleading stage, Plaintiffs "cannot rest on mere allegations, but must set forth [standing] by affidavit or other evidence specific facts." *Sierra Club v. Trump*, 977 F.3d 853, 865 (9th Cir. 2020) (internal quotation marks omitted). Nevertheless, although "the proof required to establish standing increases as the suit proceeds . . . the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020) (alteration in original) (internal quotation marks omitted).

These standards are satisfied here. Ms. Galan Mejia contends that she was wrongfully denied the opportunity to apply to, and potentially receive benefits under, the Program. *Bradley v. T-Mobile US, Inc.*, 2020 WL 1233924, *8 (N.D. Cal. 2020) ("It is well-established that the denial of an opportunity to obtain a benefit is itself an injury in fact."). The City states that applicants must meet the following requirements: they must provide "acceptable documentation of both a COVID-19 crisis and Phoenix residency." (Doc. 77 at 6.) Ms. Galan Mejia stated in her declaration that she lives in Phoenix and that she has been financially harmed by the pandemic. (Doc. 12.) She therefore has "plausibly allege[d] that she is able and ready to apply for the benefit." *Compare Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, *5 (N.D. Cal. 2020) (granting motion to dismiss for lack of standing where the plaintiff did not allege that she was "was qualified for and interested in actually applying for the product offered"). Additionally, although Ms. Galan Mejia has not yet missed a mortgage payment or been evicted from her home, this is not fatal to standing. *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("Th[e] direct injury requirement is tempered . . . in that [o]ne does not have to await the consummation of threatened injury to obtain preventive relief.") (third alteration in original) (internal quotation marks omitted). Although the Court previously

identified these considerations as reasons why Ms. Galan Mejia had not shown a likelihood of irreparable harm for purposes of seeking a preliminary injunction (Doc. 40 at 23-24), they easily suffice for purposes of establishing Ms. Galan Mejia's standing to file suit and seek other forms of relief. *See, e.g., Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it."); *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1025 n.8 (E.D. Cal. 2013) ("Establishing injury-in-fact for purposes of standing is less demanding than demonstrating irreparable harm to obtain injunctive relief.").

Given these conclusions, there is no need to address the City's other standing-related arguments.[2]

II. <u>Merits</u>

    A. **Whether The Program's Exclusion Of Unqualified Aliens Is Mandated By Federal Law**

In a previous order, the Court held that the CARES Act does not "provide a clear expression of congressional intent concerning whether certain aliens should be excluded from CRF funds." (Doc. 40 at 11.) Neither party challenges that conclusion in their most recent round of briefing.

---

[2] It should be noted that Ms. Galan Mejia's individual standing likely also means that ADAC has associational standing. Under the associational standing doctrine, an organization "has standing to bring suit on behalf of its members" if (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the City's only challenge to ADAC's associational standing is that ADAC has failed to identify a member who would have individual standing to bring suit. (Doc. 77 at 5-6.) But as discussed above, Ms. Galan Mejia qualifies as such a member. *See also Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 2011 WL 2173713, *5 (D. Colo. 2011) ("*Hunt* requires an organization to identify members who would be able to assert standing on their own behalf, but the *Hunt* Court never stated that these members could not also be individual named plaintiffs in the suit."); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1169 (M.D. Ala. 2016) ("ADAP has plainly satisfied the first *Hunt* prong with respect to the Eighth Amendment and due-process claims the individual named plaintiffs have standing—as recognized in the court's separate summary-judgment opinion—to bring, because the individual named plaintiffs are constituents of ADAP on whose behalf it has brought precisely the same claims they have brought on their own behalves.").

Instead, the parties focus on whether PRWORA prohibits the City from providing Program funds to unqualified aliens. Plaintiffs argue that PRWORA does not apply because (1) Program funds are not a "federal public benefit" under PRWORA or, alternatively, because (2) the Program falls under PRWORA's exception for "short-term, non-cash, in-kind emergency disaster relief" and/or (3) the Program triggers PRWORA's provision exempting non-profit organizations from verifying the immigration status of applicants. (Doc. 64 at 2-14.) The City argues the reverse: Program funds are a federal public benefit (or a state or local benefit) and are not subject to any PRWORA exceptions. (Doc. 77 at 8-21.) As discussed below, the Court agrees with Plaintiffs that the Program falls within PRWORA's exception for "short-term, non-cash, in-kind emergency disaster relief" and that the City was therefore not required by federal law to exclude unqualified aliens from participating in the Program. This conclusion makes it unnecessary to resolve the parties' other PRWORA-related arguments.

PRWORA provides that, with certain enumerated exceptions, "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). The statute defines "federal public benefit" as:

> (A) any grant, contract, loan, professional license, or commercial license provided by any agency of the United States or by appropriated funds of the United States; and
>
> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c)(1). "[A] federally funded benefit is still considered a 'federal public benefit' even if administered by a state or local agency." *Pimental v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012).

Notwithstanding PRWORA's general prohibition against providing federal public benefits to unqualified aliens, the statute exempts several categories of benefits, including

"Short-term, non-cash, in-kind emergency disaster relief." 8 U.S.C. § 1611(b)(1)(B). As noted, Plaintiffs argue that the Program falls within this exception (Doc. 64 at 9-11) while the City argues it does not (Doc. 77 at 16-20). There is no dispute that the Program delivers benefits that are "short-term" in duration. Nor is there any dispute that the Program qualifies as "emergency disaster relief." The dispute centers on the remaining two elements: whether the benefits available under the Program are "non-cash" and/or "in-kind."

These issues were addressed at length in the order denying Plaintiffs' motion for preliminary injunction. (Doc. 40 at 15-18.) There, the Court began by observing that "it seems clear that the benefits provided under the Program are 'non-cash' benefits" because "[m]oney isn't disbursed directly to applicants but instead is sent to landlords, mortgage companies, and utility companies." (*Id.* at 16.) As for whether the Program qualifies as an "in-kind" benefit, the Court acknowledged that some of the City's arguments had "undeniable force" but identified three reasons why Plaintiffs' arguments might still prevail: (1) the City's proffered interpretation of Section 1611(b)(1)(B) would limit the reach of that exception to programs such as "temporary housing, emergency medical treatment, and the like," but a different PRWORA exception, codified at Section 1611(b)(1)(D), already covers such programs and "it is logical to infer that Congress intended Section 1611(b)(1)(B) to encompass something different"; (2) the City's proffered interpretation might lead to absurd results, because "[u]nder the City's interpretation . . . it would be permissible for the City to wait until Phoenix residents were evicted from a building, then use CRF funds to purchase that building, and then use that building as an emergency shelter for the now-homeless residents, but it would be impermissible to use the same CRF funds to prevent the evictions from occurring in the first place"; and (3) some federal agencies treat housing subsidies as "in-kind" benefits and the Ninth Circuit has characterized the Section 8 rental-assistance program—which "is very similar to the Program"—as an "in-kind" benefit. (*Id.* at 16-18, citing *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773 (9th Cir. 2019).)

This analysis provides the backdrop for the arguments raised in the parties' latest round of briefing. Plaintiffs argue the Program should be considered a "non-cash" benefit because "[n]o money is paid to the applicant" and "[u]nlike cash, the assistance is not fungible, but goes directly to the housing or utility provider." (Doc. 64 at 10.) As for whether the Program should be considered an "in-kind" benefit, Plaintiffs repeat many of the regulatory and case citations that were set forth in the earlier order, which show that housing subsidies are often considered "in-kind" benefits, and proffer one new agency document in support of their position—a 2001 publication by the Department of Justice ("DOJ") that, in Plaintiffs' view, shows "that DOJ interprets the terms [non-cash and in-kind] as interchangeable." (*Id.* at 10-11.) Meanwhile, the City begins by acknowledging that "there is extremely limited authority interpreting the meaning and extent of this [Section 1611(b)(1)(B)] exception." (Doc. 77 at 16.) The City also acknowledges that the Ninth Circuit's 2019 decision in *City & County of San Francisco*, which was discussed in the earlier order, is "[b]etter for the Plaintiffs" but then offers various reasons why *City & County of San Francisco* is distinguishable. (*Id.* at 19-20.) The City also identifies various reasons why the other agency regulations and interpretations cited in Plaintiffs' brief (and in the earlier order) are distinguishable. (*Id.* at 18-19.) Finally, the City places heavy emphasis on a guidance document issued by the Federal Emergency Management Administration ("FEMA") in 1998, which it views as proof that temporary housing assistance programs don't fall within Section 1611(b)(1)(B). (*Id.* at 16-18.) The City also argues that adopting FEMA's interpretation would resolve the surplusage issue raised in the earlier order. (*Id.*)

At the preliminary-injunction stage of this case, the Court did not resolve whether the Program actually falls within Section 1611(b)(1)(B)'s exception for short-term, non-cash, in-kind emergency disaster relief—instead, the Court simply characterized this issue as a "close call" and a "serious question[]." (Doc. 40 at 16.) Because this case has now reached its final stage, a definitive conclusion is required. Having considered the parties' latest round of arguments, the Court concludes that the Program does, in fact, fall within

1  Section 1611(b)(1)(B).

As an initial matter, the Court has little trouble concluding (as it did before) that the housing and utility assistance available under Program qualifies as a "non-cash" benefit. The City offers no additional argument with respect to this issue, instead choosing to focus on whether the Program qualifies as an "in-kind" benefit. As for that issue, it is notable that housing voucher and assistance programs have long been characterized, by courts and agencies alike, as "in-kind" benefits. *See, e.g., City & County of San Francisco*, 944 F.3d at 783, 799, 800; *Young v. Schweiker*, 680 F.2d 680, 682 (9th Cir. 1982); 20 C.F.R. § 416.1102. *See also City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, __ F.3d __, 2020 WL 7052286, *5, 8-9 (9th Cir. 2020) (again referring to the Section 8 voucher program as an "in-kind" and "non-cash" benefit). This is at least some evidence that Congress intended for the term "in-kind," as it appears in Section 1611(b)(1)(B), to potentially encompass housing assistance programs. *Cf. Neder v. United States*, 527 U.S. 1, 21 (1999) ("It is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (cleaned up).

The City's arguments to the contrary are unpersuasive. The City argues that the 2019 decision in *City & County of San Francisco*, in which the Ninth Circuit repeatedly characterized the Section 8 voucher program as an "in-kind" benefit, is distinguishable because "[t]his nomenclature appears to be the Ninth Circuit's alone; the rule the Circuit evaluates refers to Section 8 housing assistance as 'non-cash' but never calls it 'in-kind.'" (Doc. 77 at 19.) But even if so, this Court is bound to follow Ninth Circuit law.[3]

---

[3] The Court acknowledges that the issue before the Ninth Circuit in *City & County of San Francisco* wasn't whether housing benefits should be considered "in-kind" benefits for purposes of PRWORA. Accordingly, the court's statements on that issue are not dispositive of the issue presented here—they are simply one piece of the puzzle. *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1231 (10th Cir. 2004) ("[C]ases are not authority for propositions not considered.") (internal quotation marks omitted). With that said, district courts in the Ninth Circuit should not be too quick to disregard the Ninth Circuit's statements on a particular issue as

The City also contends that the Section 8 program discussed in *City & County of San Francisco*, as well as the other housing assistance programs cited in Plaintiffs' brief (and in the earlier order), are distinguishable because those programs provided "something beneficiaries can use to obtain shelter," whereas the Program "simply uses cash to pay already incurred bills." (*Id.* at 18-20.) This argument is unavailing. As an initial matter, it is untrue (or, at least, the City has not established) that the Program only covers already incurred bills. The City's proffered support for this point is the declaration of Spencer Self, the director of the City's Neighborhood Services Department. (*Id.*) Mr. Self's declaration states that the Program operates by making "guarantees and payments to utility companies, mortgage/bank lenders, and/or landlord/property management companies on behalf of the beneficiaries." (Doc. 28 ¶ 15.) This statement suggests that, although some payments may cover already incurred bills, the Program also makes *guarantees* for the bills, *i.e.,* the Program promises to pay future bills on behalf of beneficiaries. *Guarantee*, Black's Law Dictionary (11th ed. 2019) (defining "guarantee" as the "assurance that a contract or legal act *will be* duly carried out" and "[s]omething given or existing as security, such as to fulfill a *future engagement* or a condition subsequent") (emphases added). The City has not pointed to any language in the contract that expressly requires an already incurred bill. More important, even if the Program were limited to paying for already incurred bills, the City has not explained why this distinction would be meaningful. Section 8 vouchers, the other housing assistance programs, and the Program all exist for the same reason—to prevent those in financial need from losing their housing. It would be anomalous to conclude that some housing assistance programs qualify as providing "in-kind" benefits, but others do not, based solely on whether the underlying obligation is past due or prospective.

Nor does the FEMA guidance document support the City's position. That

---

dicta. *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense. . . . In other words, well-reasoned dicta is the law of the circuit . . . .") (citations, brackets, and internal quotation marks omitted).

- 11 -

document, issued in 1998, defined "short-term, non-cash, in-kind emergency disaster relief" as

> programs that provide for: search and rescue; emergency medical care; emergency mass care; emergency shelter; clearance of roads and construction of temporary bridges necessary to the performance of emergency tasks and essential community services; warning of further risk or hazards; dissemination of public information and assistance regarding health and safety measures; provision of food, water, medicine, and other essential needs, including movement of supplies or persons; or reduction of immediate threats to life, property, and public health and safety.

(Doc. 78-1 at 5.) Based on this definition, FEMA concluded that four programs that were part of the Robert T. Stafford Disaster Relief and Emergency Assistance Act—specifically, (1) Temporary Housing Assistance; (2) Unemployment Assistance; (3) Individual and Family Grant Programs; and (4) Food Coupons and Distribution—were federal public benefits under PRWORA and did not fall within a PRWORA exception. (Doc. 78-1 at 5.)

The City focuses on FEMA's assessment of the Temporary Housing Assistance ("THA") program, suggesting that, because FEMA concluded *this* temporary housing program didn't fall within Section 1611(b)(1)(B)'s exception for short-term, non-cash, in-kind emergency disaster relief, it follows that the Program (which is also a type of temporary housing program) also must fall outside Section 1611(b)(1)(B). (Doc. 77 at 17-18.) This argument lacks merit. The version of THA in effect at the time of the FEMA memo (*i.e.*, the version that FEMA was interpreting) was passed in 1988. Pub. L. No. 100-707, 102 Stat. 4689, 4702 § 408 (Nov. 23, 1988). That version of the statute, which authorized the President to "provide assistance on a temporary basis in the form of mortgage or rental payments to or on behalf of individuals and families who, as a result of financial hardship caused by a major disaster, have received written notice of dispossession or eviction from a residence," stated that such assistance was limited to the "duration of the period of financial hardship *but not to exceed 18 months*." *Id.* § 408(b) (emphasis added).

Notably, FEMA didn't set out its reasons for concluding that THA was a federal

public benefit not falling within a PRWORA exception. The memo doesn't, for example, provide any analysis as to whether THA benefits should be considered "in-kind" benefits—it simply offers the conclusion that PRWORA applies. This ambiguity, standing alone, renders the memo unhelpful in addressing the question of statutory interpretation presented here. Moreover, it seems entirely plausible that FEMA deemed PRWORA applicable because it determined that THA's authorization of housing assistance for up to 18 months meant the program didn't satisfy a different element of the Section 1611(b)(1)(B) exception—the requirement that the benefit have a "short-term" duration. For these reasons, the FEMA memo is a particularly thin reed on which to premise the argument that Congress's intent, when enacting PRWORA in 1996, must have been for the term "in-kind" to have a narrow construction that would exclude housing assistance benefits.[4]

Given these conclusions, it is unnecessary to address how much weight (if any) the DOJ guidance document adds to Plaintiffs' position. That document, promulgated in 2001, refers to "in-kind" benefits as "non-cash." *Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*, 66 Fed. Reg. 3613, 3616 (Jan. 16, 2001) ("The government-funded programs, services, or assistance specified in this Order are those that: deliver in-kind (non-cash) services at the community level . . . ."). Although Plaintiffs view the DOJ's fungible treatment of these two terms as good for their position, because it shows that a non-cash housing benefit is necessarily an

---

[4] The current version of THA provides that the President may "provide financial assistance to individuals or households to rent alternate housing accommodations, existing rental units, manufactured housing, recreational vehicles, or other readily fabricated dwellings. Such assistance may include the payment of the cost of utilities, excluding telephone service." 42 U.S.C. § 5174(c)(1)(A)(i). Such assistance is offered "to individuals and households . . . who are displaced from their predisaster primary residences or whose predisaster primary residences are rendered uninhabitable." *Id.* § 5174(b)(1). This statutory language is notable because it seems to contemplate direct cash payments to beneficiaries who no longer have housing. *See* FEMA, Individuals and Households Program Fact Sheet, *available at* https://www.fema.gov/sites/default/files/2020-07/fema_individuals-households-program_fact-sheet.pdf (July 2019) (noting that housing assistance programs under § 408 "provide[] funds paid *directly to eligible individuals and households*") (emphasis added). In contrast, and as noted above, the earlier version of the statute authorized "mortgage or rental payments to *or on behalf of* individuals and families who, as a result of financial hardship caused by a major disaster, have received written notice of dispossession or eviction from a residence." Thus, to the extent FEMA still considers THA to fall outside Section 1611(b)(1)(B), this may be because the program now fails to satisfy the "non-cash" element.

- 13 -

in-kind benefit, the Court is wary of endorsing an approach that would treat parts of a statute as surplusage. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Nevertheless, even if the DOJ document is disregarded, the other considerations discussed above (coupled with the earlier observation that adopting the City's interpretation might lead to absurd results) weigh in favor of concluding that the Program is a form of short-term, non-cash, in-kind emergency disaster relief that is therefore exempt from PRWORA's eligibility restrictions.

B. **Whether The Program's Inclusion Of Immigration-Based Eligibility Restrictions Renders The Program Invalid**

It isn't enough for Plaintiffs to show that the City's decision to include immigration-based eligibility restrictions in the Program was a permissive act not required by federal law. To prevail on their challenge, Plaintiffs must go further and identify a legal theory as to why the City's inclusion of such restrictions was impermissible. In Count One of the amended complaint, which is the sole claim that Plaintiffs have chosen to pursue, Plaintiffs raise a preemption challenge—they argue that "[t]he Supremacy Clause . . . provides that federal law preempts state and local law or policy in any area in which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government." (Doc. 24 ¶ 61.)

During the preliminary injunction hearing, the City seemed to concede that if the Program were deemed to fall within Section 1611(b)(1)(B)'s exception, the Program would be preempted by federal law and invalid. (Doc. 53 at 46-47 ["[I]f the Court concludes that it falls within the exemption, then I would agree at that point that there is, in terms of a likelihood of success scenario, . . . [a] likely conflict with Congress's directive . . . . [I]f the exception applies, I would agree that they're likely to succeed on a conflict preemption claim."].) Similarly, in its most recent brief, the City's sole argument related to preemption is that "[t]he Program's eligibility requirement is not preempted because it does exactly what federal law requires." (Doc. 77 at 21.) The City doesn't, in other words, attempt to argue that the Program could survive a preemption challenge even if its eligibility restrictions weren't mandated by PRWORA. Accordingly, the Court concludes that

Plaintiffs have prevailed on their preemption challenge in Count One of the amended complaint.[5]

III. Remedy

One of the forms of relief sought by Plaintiffs is a declaratory judgment (Doc. 24 at 19 ¶ B; Doc. 64 at 24-25), and the City acknowledges that Plaintiffs would be entitled to declaratory relief if they prevailed on the merits on Count One (Doc. 77 at 25). Plaintiffs' request for a declaratory judgment will therefore be granted.

Plaintiffs also request a permanent injunction. (Doc. 24 at 19 ¶ C; Doc. 64 at 15-24.) The City responds that (1) injunctive relief is unnecessary in light of the grant of declaratory relief, because "[i]f the Court determines that federal law requires the City to allow non-qualified aliens to receive benefits from the Program, there is no reason to think the City would refuse to do so"; and (2) alternatively, Plaintiffs have not suffered

---

[5] Plaintiffs submitted a declaration from Professor Super in support of their opening brief. (Doc. 67-1.) The opinions in Professor Super's declaration pertain to an issue not resolved in this order—whether the Program qualifies, in the first instance, as a "federal public benefit" under PRWORA. (As discussed, the Court concludes that, even assuming the Program qualifies as a "federal public benefit" under Section 1611(a), PRWORA's usual eligibility restrictions are inapplicable because the Program falls within the Section 1611(b)(1)(B) exception.) Given this outcome, there is no need to resolve the City's motion to exclude Professor Super's opinions (Doc. 76), which will be denied as moot. With that said, the Court notes that the City's exclusion arguments appear to be well-taken. The bulk of Professor Super's declaration concerns the legislative history of PRWORA. Among other things, Professor Super summarizes certain "major turns in the legislative deliberations" (Doc. 67-1 ¶ 13), discusses President Clinton's concerns about his re-election chances and opines about how those concerns affected "the Administration's leverage in negotiations with Congress" (*id.* ¶ 14), opines about certain "theme[s] that pervaded congressional deliberations about public benefit programs during this period" (*id.* ¶ 16), opines about how certain proposals "struck many Members of Congress" (*id.* ¶ 19), and opines about "the conditions the President set on his willingness to sign the legislation" (*id.* ¶ 21). This is interesting reading, and the Court has no concern about Professor Super's superb qualifications, but these opinions would not be helpful in resolving the question of statutory interpretation (*i.e.,* the meaning of the term "federal public benefit") the parties sought to present to the Court. The Supreme Court has stated that legislative history is not a helpful tool, *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[L]egislative history is not the law. It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute [w]e do not inquire what the legislature meant; we ask only what the statute means.") (internal quotation marks omitted), and legal opinions about the hidden meaning of a statute's legislative history would seem to have even less utility. It is unfortunate that the parties spent so much time and effort on this topic—the briefing schedule had to be extended so Professor Super could be deposed, and the City's submission of a *Daubert* motion resulted in further delay so the briefing process on that motion could be completed—in light of the Court's expressed desire, after the preliminary injunction proceedings, to reach a speedy final resolution.

irreparable harm or demonstrated the absence of an adequate remedy at law and the balance of hardships and public interest weigh against an injunction. (Doc. 77 at 22-25.) Plaintiffs reply that, because "timing is critical and funds are limited, injunctive as well as declaratory relief is appropriate." (Doc. 87 at 15.)

An injunction is an equitable remedy that should "issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (internal quotation marks omitted). "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 313. Instead, the "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *Pure Wafer Inc. v. City of Prescott*, 275 F. Supp. 3d 1173, 1175 (D. Ariz. 2017) (internal quotation marks omitted).

The Court, in its discretion, will decline to issue a permanent injunction. The City has consistently asserted that its decision to exclude unqualified aliens from the Program was based solely on its interpretation of PRWORA, as opposed to a policy decision, and the City has indicated that it will begin allowing unqualified aliens to participate in the Program upon the issuance of the declaratory judgment. Injunctions are extraordinary remedies and the Court concludes that such an extraordinary remedy is unnecessary under these circumstances. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("At the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect that interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."); *Grandco Corp. v. Rochford*, 536 F.2d 197, 208 (7th Cir. 1976) ("Because we believe that the grant of a permanent injunction may involve considerations of comity and federalism not raised by the grant of declaratory relief and because we are persuaded that the declaratory remedy is sufficient in itself in the context of this case, we conclude that the permanent injunction entered by the district court should be vacated."); *Emps. Mut. Cas. Co. v. Branch*, 381 F. Supp. 3d 1144, 1153 n.6 (D. Ariz. 2019). It is therefore unnecessary to address the other

injunction factors.[6]

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for a permanent injunction and a declaratory judgment (Doc. 64) is **granted in part and denied in part**, as follows: The Court declares that PRWORA does not prohibit unqualified aliens from receiving benefits via the Program and that the City's choice to exclude unqualified aliens from the Program is preempted by federal law and invalid.

**IT IS FURTHER ORDERED** that the City's motions to exclude the opinions of Mr. Young and Professor Super (Docs. 75, 76) are **denied as moot**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for class certification (Doc. 7) is **denied as moot**.

**IT IS FURTHER ORDERED** that Count Two of the amended complaint is **dismissed without prejudice**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and terminate this action.

Dated this 9th day of December, 2020.

Dominic W. Lanza
United States District Judge

---

[6] Plaintiffs submitted testimony from Mr. Young to support their claim of irreparable harm. (Doc. 64 at 20-21; Docs. 65-4, 66.) The City moved to exclude Mr. Young's testimony under Federal Rules of Evidence 701 and 702. (Doc. 75.) Because the Court does not address the parties' arguments concerning irreparable harm, the City's motion to exclude Young's testimony will be denied as moot.

- 17 -